# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LOOP INDUSTRIES, INC. SECURITIES LITIGATION | Case No. 7:20-cv-8538-NSR |
| | Consolidated with: Case No. 7:20-cv-9031-NSR |
| | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | <u>**JURY TRIAL DEMANDED**</u> |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND OVERVIEW ............................................................ 1

II.     JURISDICTION AND VENUE .................................................................................... 4

III.    PARTIES ....................................................................................................................... 5

IV.     SUBSTANTIVE ALLEGATIONS ............................................................................... 7

        A.      Loop's Business .................................................................................................. 7

        B.      Chemical Or "Advanced" Recycling As A Solution To The Plastics Crisis ......... 8

        C.      Loop's Technology Is Undifferentiated And Unproven As A Viable Economic Or
                Environmental Solution To The Plastics Crisis .................................................. 10

                1.      Loop's Technology Is Undifferentiated From The Decades-Old Process It
                        Is Based On .......................................................................................... 11

                2.      Loop's Technology Has Not Proven To Be Financially And/Or
                        Environmentally Viable At Any Sort Of Commercial Scale ................... 12

                3.      Loop's Process And Results Were Not Properly Vetted Throughout The
                        Company, By Peers, Or By Potential Partners ......................................... 14

        D.      Despite Loop's Summary Denial Of The Hindenburg Report's Allegations, The
                SEC And AMF Initiated Investigations Into The Allegations, Additional
                Publications Questioned Loop's Claims At Any Large Scale, And Coca-Cola
                Terminated Its Supply Agreement ..................................................................... 16

        E.      Loop's Post-Class Period, Independent Verification Report Provides Little
                Assurance ......................................................................................................... 18

V.      DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS
        ISSUED DURING THE CLASS PERIOD .................................................................. 20

        A.      Defendants' Materially False And/Or Misleading Statements Issued During The
                Second Half Of 2018 ......................................................................................... 20

        B.      Defendants' Materially False And/Or Misleading Statements Issued During The
                First Half Of 2019 ............................................................................................. 26

        C.      Defendants' Materially False And/Or Misleading Statements Issued During The
                Second Half Of 2019 ......................................................................................... 32

        D.      Defendants' Materially False And/Or Misleading Statements Issued During The
                First Half Of 2020 ............................................................................................. 34

E.  Defendants' Materially False And/Or Misleading Statements Issued During The Second Half Of 2020 .......................................................................................... 36

F.  Defendants' Materially False And/Or Misleading Statements About The Energy Inputs In Loop's Technology ............................................................................... 39

VI.  LOSS CAUSATION ............................................................................................. 44

VII.  ADDITIONAL SCIENTER ALLEGATIONS ....................................................... 45

A.  Defendants Continually Refined Their Descriptions Of Loop's Technology And Sustainability Of Its Product ................................................................................ 46

B.  Solomita Controlled Loop And Was Its Largest Shareholder ............................. 47

C.  Loop's Claims Concerning Results From Its Gen I Technology Were "Impossible" And Failing According To Former Employees And A Polymer Expert .................................................................................................................... 48

VIII.  CORPORATE SCIENTER ALLEGATIONS ....................................................... 49

IX.  CLASS ACTION ALLEGATIONS ...................................................................... 49

X.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ......................................................................................................... 51

XI.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ......................................................................................... 53

XII.  CLAIMS FOR RELIEF ........................................................................................ 54

Co-Lead Plaintiffs Sakari Johansson and John Jay Cappa ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Consolidated Amended Class Action Complaint ("Complaint") against defendants Loop Industries, Inc. ("Loop" or the "Company"), Daniel Solomita ("Solomita"), and Nelson Gentiletti ("Gentiletti") (together, "Defendants").  The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Co-Lead Counsel, which includes a review of, without limitation: U.S. Securities and Exchange Commission ("SEC") filings by Loop; securities analysts' reports and advisories about the Company; press releases and other public statements issued by and disseminated by the Company; media reports about the Company; information readily obtainable on the Internet; and interviews of former employees of Loop and other persons with knowledge of the matters alleged herein.  Co-Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

I.    **NATURE OF THE ACTION AND OVERVIEW**

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired Loop securities between September 24, 2018 and October 12, 2020, inclusive (the "Class Period").  Plaintiffs pursue claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Loop is a Canadian-based technology company focusing on recycling waste

polyethylene terephthalate ("PET") plastics and polyester fiber, such as plastic bottles and take-out clamshell containers. Loop states that its mission is to accelerate the world's shift to sustainable PET plastic and fiber and away from dependence on fossil fuels, through its self-described "revolutionary technology poised to transform the plastics industry."

3.      Specifically, Loop's "revolutionary" technology involves a form of chemical recycling, a process in which plastics are depolymerized into monomers, the basic components of plastic. Loop specifically depolymerizes waste PET plastic and polyester into dimethyl terephthalate ("DMT") and monoethylene glycol ("MEG"), two different monomers, and then filters, purifies, and repolymerizes these monomers into PET plastic resin and polyester fiber, which the Company claims can then be used to manufacture food-grade packaging.

4.      Loop is a development-stage company and has yet to earn revenues. Despite this, Defendants led investors to believe that Loop's technology would be commercially scalable in short order. Almost three years before the start of the Class Period, in January 2016, Loop announced the completion of its pilot plant. Defendants explained that this pilot plant was to "showcase" Loop's "proprietary process at commercial scale to potential partners" while continuing to optimize the process. Two-and-a-half years later, in June 2018, Loop announced that it had successfully activated its second generation ("Gen II") depolymerization technology—a self-described "major step forward in sustainable plastic[.]"

5.      With Loop's pilot plant built and its Gen II depolymerization technology activated, the Company turned to its "short-term priority" of actually commercializing its Gen II technology. During the Class Period, Defendants released multiple announcements hyping its collaborations with multinational manufacturers and supply chain management companies to manufacture Loop's PET resin, and its contracts with global consumer goods companies to

purchase Loop's PET resin.

6.       However, on October 13, 2020, short-selling analyst firm Hindenburg Research published an exposé (the "Hindenburg Report," attached as Exhibit 1) concluding that "Loop is smoke and mirrors with no viable technology."   Hindenburg Research based its conclusion on interviews with former Loop employees, competitors, partners, and industry experts, as well as a careful review of Loop's patents.   Specifically, the Hindenburg Report revealed to the market that Loop's claims about its "revolutionary" and "sustainable" technology were hollow, and that although Loop's technology might technically work, it was not economical at a commercial scale.

7.       The Hindenburg Report explained that chemical recycling and depolymerization has existed for decades.   When asked what made Loop's process different, the industry experts and competitor interviewed by Hindenburg Research expressed that it wasn't, commenting that Loop's technology was just "basic stuff."

8.       The key to revolutionizing chemical recycling through depolymerization is not found by any specific process or technology on its own.   Rather, the true way to revolutionize this industry is by finding a way to viably scale—economically and sustainably—the process in order to mass-recycle waste PET plastic.   The Hindenburg Report detailed that Loop's efforts to scale its process has proven to be economically unviable.   Two executives at thyssenkrupp Industrial Solutions ("thyssenkrupp"), a global polyester technology provider, explained that in their efforts to combine thyssenkrupp's and Loop's technologies to provide a licensable waste to resin solution, it became clear that Loop had underestimated the costs to scale its technology.

9.       The Hindenburg Report also revealed the misleading nature of Loop's claims (a) that its product was "100% sustainable" and (b) that its technology required "zero energy

input."   In reality, a close examination of Loop's patents reveals that the process needs, in multiple places, inputs of both heat and pressure that must be obtained from external sources—which would be quite energy intensive at larger scales.  A close examination of these patents also reveals Loop's monomer yields were quite low, meaning that not all waste PET plastic recycled was being reused.

10.   Upon the publication of the Hindenburg Report, the price of Loop's stock fell approximately 32.5%, or $3.78 per share, on October 13, 2020.  The SEC has since launched an investigation into Loop's "testing, testing results, and details of results from[Loop's] … technologies and certain of [Loop's] partnerships and agreements."  Danone and the Autorité des marchés financiers ("AMF"), the financial regulator in Québec, also stated that they intended to investigate the Hindenburg Report's findings, and Coca-Cola has terminated its supply agreement with Loop.

11.   As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.  Accordingly, Plaintiffs seek to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.   JURISDICTION AND VENUE

12.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Loop's common stock trades on Nasdaq Stock Market ("NASDAQ"), located within this Judicial District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

16.     Co-Lead Plaintiff Sakari Johansson, as set forth in the certification previously filed with the Court, incorporated by reference herein (Dkt. No. 12-2), purchased Loop securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Co-Lead Plaintiff John Jay Cappa, as set forth in the certification previously filed with the Court, incorporated by reference herein (Dkt. No. 9-3), purchased Loop securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Defendant Loop Industries, Inc. ("Loop" or the "Company") is incorporated in Nevada with its principal executive offices located at 480 Fernand Poitras, Terrebonne, Quebec, Canada, J6Y 1Y4.  Loop's common stock trades on the NASDAQ exchange under the symbol "LOOP."

19.     Defendant Daniel Solomita ("Solomita") has served as President and Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Loop since 2015, and is Loop's Founder.  Solomita also served as the President, Secretary, Treasurer and sole Director of

Loop Holdings, Inc., a wholly-owned subsidiary, from 2014 to March 2017, when Loop Holdings, Inc. merged with and into Loop.  Prior to founding Loop, Solomita served as board member and as President of Dragon Polymers from 2010 until 2014.

20.     Solomita possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Solomita signed and certified the accuracy of Loop's yearly reports on SEC Forms 10-K and 10-K/A for the fiscal years ended February 28, 2019 and February 29, 2020, and quarterly reports on SEC Form 10-Q for each quarterly period ended August 31, 2018 through August 31, 2020.

21.     Defendant Nelson Gentiletti ("Gentiletti") has served as the Company's Chief Financial Officer ("CFO") and Chief Operative Officer ("COO") since January 1, 2019. Gentiletti previously worked for Transcontinental Inc. from November 2011 until December 2018, serving most recently as the Chief Financial and Development Officer, leading the company's transformation into flexible packaging.  He is a certified public accountant ("CPA").

22.     Gentiletti possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Gentiletti signed and certified the accuracy of Loop's yearly reports on SEC Forms 10-K and 10-K/A for the fiscal years ended February 28, 2019 and February 29, 2020, and quarterly reports on SEC Form 10-Q for each quarterly period ended November 30, 2018 through August 31, 2020.

23.     Defendants Solomita and Gentiletti (collectively the "Individual Defendants"), because of their high-ranking positions with the Company and direct involvement in the everyday business of the Company, possessed the power and authority to control the contents of Loop's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were

provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Loop's Business

24.   Loop is a Canadian-based technology company that focuses on recycling waste PET plastics and polyester fiber, such as plastic bottles and packaging and carpet and polyester textile.

25.   Loop states that its mission is to accelerate the world's shift to sustainable PET plastic and fiber, and away from dependence on fossil fuels, through its self-described "revolutionary technology poised to transform the plastics industry."

26.   According to Loop, its "ground-breaking," patented and proprietary technology depolymerizes no- and low-value waste PET plastic and polyester fiber to its basic components (*i.e.*, monomers), which are then filtered, purified and repolymerized to create virgin-quality Loop branded PET plastic resin and polyester fiber suitable for use in food-grade packaging.

27.   Solomita founded Loop in October 2014, under the name Loop Holdings to purchase and develop what Loop referred to as its first generation, or "Gen I," depolymerization technology.  In 2015, after the completion of a reverse merger, whereby Loop Holdings was acquired by First American Group Inc. and depolymerization became its sole business, the

Company changed its name to Loop Industries, Inc.

28.     In January 2016, Loop announced the completion of its pilot plant in Terrebonne, Quebec, which was built to "showcase the Company's ability to scale production of sustainably produced [monomers] to commercial levels."  Loop then turned to refining its process to "ensure an easy transition from pilot scale to full scale commercial manufacturing facility."

29.     In June 2018, Loop announced that it had successfully activated its second generation ("Gen II") depolymerization technology, which Solomita characterized as a "major step forward in sustainable plastic[.]"  Loop explained that the Gen II technology was "significantly more streamlined and efficient than the Generation I process, including a considerable reduction in energy use and the complete elimination of water indicating that it may be the most resource efficient process for upcycling PET and polyester fiber in the world."[1]

**B.      Chemical Or "Advanced" Recycling As A Solution To The Plastics Crisis**

30.     Consumer companies such as Coca-Cola and Unilever have made ambitious commitments to incorporate recycled material in their packaging as a response to the ever-increasing plastic consumption and plastic waste filling landfills and oceans.  For decades, these companies have touted "advanced" or "chemical" recycling processes as the solution to the plastics crisis, which supposedly address a number of shortcomings of traditional, mechanical recycling methods.

31.     Traditional recycling methods, or "mechanical" recycling processes, are both economically and environmentally costly.  For example, to mechanically recycle waste PET into new bottles, pristine transparent raw materials are needed, and PET degrades every time it is

---

[1] Loop thereafter stated that it did not intend to commercialize its Gen I technology and impaired the remaining intangible asset balance for the Gen I technology on Loop's balance sheet for the fiscal year ended February 28, 2019.

reprocessed.  Thus, mechanically recycled materials are more expensive than "virgin" (*i.e.*, new) materials, and even after washing and melting, mechanically recycled plastics are downcycled.[2]

32.     "Advanced" recycling methods, however, promise to recover recycled plastics' original raw materials to be remade into high-quality resins or to be reused in other ways.  According to the Plastics Industry Association, "[a]dvanced recycling refers to processes like chemical recycling, pyrolysis and gasification, which are used to turn plastic polymers back into individual monomers—allowing materials to be reused in a variety of ways.  In these processes, the chemical building blocks that make up the recycled plastic are recovered.  The fundamental building blocks can in some cases be re-polymerized endlessly, giving them the qualities of brand-new, or virgin, resin.  The transformation can occur through a variety of processes, all of which avoid combustion, or burning, of plastics."  These techniques aim to minimize the use of heat and pressure.

33.     Chemical recycling is any process that involves breaking plastic down into its component parts (monomers) so that it can eventually be processed, *i.e.*, repolymerized, and remade into new plastic materials, and eventually, new plastic products.  These processes tend to use a combination of heat, pressure, and/or other chemicals in a reaction vessel to breakdown the waste plastic.

34.     Loop's Gen II technology is a chemical recycling process in which waste PET is depolymerized using methanolysis[3] to isolate dimethyl terephthalate ("DMT") and monoethylene

---

[2] For example, a plastic drink bottle does not become a drink bottle again, but is instead made into a carpet or fleece, which has less exacting specifications than what the virgin materials were designed for.

[3] Methanolysis is a process where "methanol reacts with PET at high temperatures (180–280°C) and pressures (20–40 atm) in the presence of a catalyst, most commonly zinc acetate.  This reaction leads to the formation of DMT and EG, which can then be used to resynthesize PET."

glycol ("MEG").   The DMT and MEG monomers are then purified to remover coloring, additives, and impurities, and lastly repolymerized into PET resin.  The following diagram from Loop's October 2020 investor presentation illustrates this process:



35.     Defendants have frequently likened this process to disassembling a chocolate cake into its ingredients to make a brand new cake.

### C.     Loop's Technology Is Undifferentiated And Unproven As A Viable Economic Or Environmental Solution To The Plastics Crisis

36.     Loop, as a development-stage company, has yet to generate revenues.  Instead, it has sold investors, future customers, and the public a story of a revolutionary, sustainable solution to tackle the world's plastics crisis: a simple process that breaks down all forms of waste PET plastic into clean, high-quality material with zero, or minimal, energy input.

37.     Defendants sold this story with overblown press releases, investor presentations, and media interviews highlighting the "revolutionary" and "ground-breaking" nature of its process and hyping its commercialization plans: collaborating with multinational manufacturers and supply chain management companies to manufacture Loop's PET resin and negotiating contracts with global consumer goods companies to purchase Loop's PET resin.  This story fueled multiple stock offerings during the Class Period and support from the largest names in

Timmy Thiounn & Rhett C. Smith, *Advances and Approaches For Chemical Recycling of Plastic Waste*, J. OF POLYMER SCI., Apr. 20, 2020 at 1350.

consumer goods, including evian (owned by Danone), PepsiCo, Coca-Cola, and L'Oréal Group.

38.     As was revealed at the end of the Class Period, Defendants' claims that Loop's Gen II technology is a "revolutionary technology poised to transform the plastics industry" are unsubstantiated.  Rather, as the Hindenburg Report summarized, "Loop's supposed proprietary process is a black box that has not shown itself to be more efficient or cost effective than comparable solutions, contrary to the company's claims[.]"

1.     **Loop's Technology Is Undifferentiated From The Decades-Old Process It Is Based On**

39.     Chemical recycling and depolymerization has been around since the 1950s, and is a process well-known in the plastics industry.  After speaking with multiple experts about Loop's technology, the Hindenburg Report concluded that these experts "raised serious questions about the company's ability to make its 'unparalleled purity' end product, as claimed, at large scales with any cost efficiency.  They said Loop is focused on a decades-old problem and there is nothing new or revolutionary about the idea of breaking down PET in the fashion Loop is claiming."

40.     Hindenburg Research consulted with a polymers/plastic expert with over three decades of experience, who stated that "the chemistry is there and has been there.  Implying that it is 'new' and implying that it is 'simple/easy,' and profitable as a standalone process, just isn't true."  Another expert with 45 years of experience likewise explained that "[b]ig companies like Coca Cola and so forth have been [depolymerizing] for a number of years."

41.     These experts, as well as another executive in the chemical recycling industry, told Hindenburg Research that they could not figure out what made Loop's process revolutionary.  The chemical recycling executive noted: "We started to pay attention (and) the first point to us was that the patent itself was not very detailed in the way things were done.  We

could not see any big difference away from what was already well known in the field of chemical decomposition of PET."  One of the experts further explained that "[t]he detailed information for either process is readily available to anyone.  No 'secret catalyst' or 'patented formulation' additive is required.  I do not know if any of the specific chemical pathways fall under someone's current patent though.  Wouldn't think so.  It's basic stuff."

> ### 2.    Loop's Technology Has Not Proven To Be Financially And/Or Environmentally Viable At Any Sort Of Commercial Scale

42.    GAIA, a worldwide alliance of hundreds of organizations and individuals working to advance solutions to waste, recently published a study on chemical recycling and found that of the 37 chemical recycling projects announced in the United States since 2000, none are successfully recovering plastic to produce new plastic.[4]  The same is true for Loop: the Company is years from proving itself to scale, and has already faced financial constraints in their efforts to do so.

43.    In December 2018, Loop announced a global alliance with thyssenkrupp to integrate the companies' respective technologies to provide a "rapidly scalable" waste-to-resin turnkey solution to manufacturing companies.   Hindenburg Research interviewed two thyssenkrupp executives as part of its report, and found out that this project has yet to get off the ground floor because Loop's efforts to scale its process has shown to be economically unviable. The first, a senior executive at thyssenkrupp's industrial division, stated that "by working on the development of a potential first integrated plant" thyssenkrupp got to understand Loop's technology, its potential, and what further developments were needed.  This executive continued: "We've also seen the weaknesses.  I believe it's more a matter of how economical such a

---

[4] Patel, D., Moon, D., Tangri, N., Wilson, M., *All Talk and No Recycling: An Investigation of the U.S. "Chemical Recycling" Industry*, Global Alliance for Incinerator Alternatives (2020), *available at* www.no-burn.org/chemical-recycling-us.

technology at the end of day is. I would say you will always find a technical solution potentially. But what is the OPEX and CAPEX price for it? That's the crucial point…"

44.    A second thyssenkrupp executive further commented: "The technology is available but they underestimated the cost I would say. So when they say it's a profitable process, then going into the detailed figures it turns out it might be profitable but there's a long way to go."

45.    Moreover, certain parts of Loop's process, which may be relatively inexpensive in an R&D lab or in a pilot plant, get exponentially more expensive at larger scales. Take for example Loop's claims that it technology is "revolutionary" in part because it has "zero"—or, as later amended, "low"—energy inputs. After taking a deep dive into Loop's Gen II patents, Hindenburg Research found that Loop's process was replete with the use of heat and pressure, inputs obtained from external sources—both of which require energy. Energy usage, particularly at mass scale, not only impedes profitability, but also reduces any potential net-positive environmental benefits of Loop's process.

46.    Indeed, a recent report published by The Pew Charitable Trusts and SYSTEMIQ noted that plastic-to-plastic chemical conversion is controversial in large part due to its high energy requirements, which leads to greenhouse gas (GHG) emissions that are ***110% higher*** than mechanical recycling and 9% higher than landfilling, and cautioned that chemically recycled plastic could have a higher level of embedded carbon (carbon footprint) than virgin plastic.[5]

47.    The Hindenburg Report further revealed that Loop's yields were far worse than Loop's previous claims. Loop's GEN II patents report MEG yields of 70%-83% after just one

---

[5] *Breaking the Plastic Wave: A Comprehensive Assessment Of Pathways Towards Stopping Ocean Plastic Pollution*, The Pew Charitable Trusts and SystemIQ, at 79 (July 2020), *available at* https://www.systemiq.earth/wp-content/uploads/2020/07/BreakingThePlasticWave_MainReport.pdf.

distillation, and that although Loop reported DMT yields of 99%, this was prior to distillation. Hindenburg Research's expert explained that multiple distillations are likely needed, and thus, it is uncertain what the ultimate yield of Loop's Gen II technology will be.

48.     Unsurprisingly, Loop has yet to actually supply any recycled PET to the big names they have contracted with.   Loop's former Chief Growth Officer, Nelson Switzer, explained to Hindenburg Research that the large consumer packaged goods regularly sign onto vague sustainability and environmental partnerships, but that before any partnerships are put into action, years of due diligence are required.

49.     For example, Loop's partnership with evian has gone nowhere despite evian making strides in producing recycled bottles independent of Loop.  In July 2020, Danone, owner of evian water, announced its new plastic bottle made from 100% recycled plastic.  When asked if the recycled plastic in evian's bottles came from Loop, evian's PR company replied to Hindenburg Research that evian will purchase Loop PET "[w]hen Loop's production site is operational"—indicating that the answer was no.   Likewise, Coca-Cola's response to Hindenburg Research's inquiry was similarly vague while generally indicating that it has not used an Loop PET to date: "Loop is one of many technology providers working on developing efficient processes and alongside our bottling partners across the globe, the Company continues to evaluate several solutions to accelerate commercialization, in support of a circular economy for our packaging and our World Without Waste goals."

### 3. Loop's Process And Results Were Not Properly Vetted Throughout The Company, By Peers, Or By Potential Partners

50.     The Hindenburg Report also revealed that Loop's "miraculous" results and successes came from a separate R&D lab for the Essaddam family, the father and sons credited for inventing Loop's Gen I and Gen II processes, respectively.  One former Loop chemist told

Hindenburg Research that all the other Loop chemists were not allowed in the Essaddam lab, and thus could not see what they were doing.  Another explained that the Essaddams, "when it was time to talk about results, they were hiding things and bypassing us (other Loop chemists) to go present results to the boss.  So, they would present their results and not ours."  This employee further explained that "There was always a group saying 'they did this again…' 'They brought samples and wouldn't tell them what it was' and 'when we gave results, they weren't happy about it…'"

51.     According to the Hindenburg Report, these former employees further explained that part of the problem was that the R&D lab did not share its process with the other, analytical lab, and that these processes weren't even documented, making any tweaking to a good batch impossible.

52.     Second, although Loop allowed its partners to do due diligence on site, these partners never saw the process from start to finish or were able to determine whether that process would be the same on a larger scale.  For example, a former Loop employee told Hindenburg Research: "Danone spent an entire week with us.  They wanted to see the process from the beginning to end…  It was taking almost 2 weeks to finish a batch.  So, they couldn't see the entire process.  They had to believe in the results we were giving them."

53.     Third, another former Loop employee told Hindenburg Research that they "never saw any test report from an outside lab or manufacturer[.]"  The Hindenburg Report also pointed out that it is typical for plastic companies, and startup companies in a multitude of scientific disciplines to publish peer reviewed studies or white papers with their advancements in the field. Loop does not seem to have any such publications.

54.     Fourth, according to the Hindenburg Report, one expert noted that it was suspect

that Loop stopped reporting the analytics of its process, explaining: "It should be very straight forward.  The analytical is the 'proof' of a process. Anything short of complete analytical support of a process should be suspect.  The 'secret sauce' has no effect on the resultant analytical results of the products.  Why won't they share the process vs. analytical? I think I know why."

   **D.   Despite Loop's Summary Denial Of The Hindenburg Report's Allegations, The SEC And AMF Initiated Investigations Into The Allegations, Additional Publications Questioned Loop's Claims At Any Large Scale, And Coca-Cola Terminated Its Supply Agreement**

   55.    Hours after the Hindenburg Report was released, Loop issued a press release responding to the "[i]naccurate" report.  Within the release, Loop commented that the Hindenburg Report contained "factual inaccuracies" and that it believes Hindenburg Research has not done the required due diligence for the report.  Loop continued: "[t]he claims it makes are either unfounded, incorrect, or based on the first iteration of Loop's technology, known as Gen 1, which was in use between 2014 and 2017."

   56.    Just three days later, on October 16, 2020 after the market close, Loop announced that the SEC had initiated an investigation into the Company and had requested information regarding "testing, testing results and details of results from our Gen I and Gen II technologies and certain of our partnerships and agreements."  On this news, the price of Loop's stock fell approximately 11.8%, to close at $6.92/share on October 19, 2020, the first trading date after the announcement of the SEC investigation.

   57.    That same day, an article entitled "*An Internal Investigation by Danone on Loop Industries*" was published on the news website CANADA LIVE.  The article published responses to inquiries it had sent to Danone and the AMF, the financial regulator in Québec.  Danone stated to CANADA LIVE that it intends to launch an internal investigation into Loop, with the AMF

likewise stating that it "intends to examine the information which has circulated in recent hours with regard to Loop Industries."

58.     Shortly thereafter, two different media outlets expressed their doubts as to Loop's process and viability.   On October 20, 2020, Clare Goldsberry,[6] a contributing editor for PLASTICSTODAY, published an article entitled "*Loop Industries: Pay No Attention to the Man Behind the Curtain*."  Goldsberry further called into question Loop's hype story commenting that "Loop Industries' claim that its rPET is infinitely recyclable without losing any of its properties sounded too good to be true.  And you know what they say about that!"  The article pointed out that Loop's commercial viability claims seem to come from computer modeling of successful pilot plant results, and similarly questioned Loop's story:

> Amazing!  … I'll bet Dow, DuPont, Eastman, and other big chemicals and resin companies wished they had known all these years just how easy this really was.  Imagine all the money these global companies have spent on polymer engineers and chemists, huge R&D laboratories, only to find out it just takes a "bundle of chemicals and beakers."

59.     Goldsberry concludes by noting that "Over the years that I've written about plastic recycling, there seems to be a common thread: Press releases tout 'revolutionary' technologies with great fanfare that promise to turn filthy PET waste … into pure, 100% virgin-like, food-grade PET.  More press releases follow about investors climbing on board, big money pouring into these advanced recycling startups, JVs with big multi-national companies and big promises to help them solve their sustainability challenges and meet their goals.  And then, crickets."

60.     On October 31, 2020, HUFFPOST published an article entitled "*Why 'The World's*

---

[6] Clare Goldsberry has been reporting on the plastics industry for more than 30 years.  She has authored thousands of articles and multiple books on plastics.  Ms. Goldsberry is a member of various trade organizations, including the Plastics Pioneers Association.

*Largest Recycling Plant' Won't Solve The Plastics Crisis*" which similarly called into question Loop's claims, noting that "[c]hemical recycling has been hailed as a holy grail solution to plastic waste for decades — but it has yet to live up to the hype."  The HUFFPOST article discussed GAIA's study, including the large amount of carbon content in the waste plastics that is lost as greenhouse gases, the energy intensive nature of chemical recycling, and GAIA's finding that no chemical recycling facilities in the United States has ever successfully produced recycled plastic on a commercial scale.

61.     When asked about the Hindenburg Report, Danone, which owns evian, stated to HUFFPOST that it would "conduct internal research and due diligence."  Coca-Cola likewise told HUFFPOST that it considers "a myriad of technology providers, suppliers and developers to accelerate the commercialization and scaling of technologies" to help it achieve its sustainability targets.

62.     Then, on November 4, 2020, Loop announced that it had received notice from Coca-Cola on October 29, 2020 that it intended to terminate its supply agreement with Loop effective December 14, 2020.  On this news, the price of Loop's stock fell approximately 9%, to close at $6.08/share on November 4, 2020.

**E.     Loop's Post-Class Period, Independent Verification Report Provides Little Assurance**

63.     On December 14, 2020, Loop issued a press release announcing the release of a "report of an independent verification of Loop's patented Gen II depolymerization technology" conducted by Kemitek, a not-for-profit College Centre for Technology Transfer specializing in the fields of green chemistry and chemical process scale-up (the "Kemitek Report").

64.     Loop commissioned Kemitek to conduct an independent verification of Loop's Gen II PET depolymerization technology and to produce a report stating Kemitek's opinion on

its ability to process waste PET plastic into DMG and MEG monomers, including the quality of the end products.  Although the Kemitek Report concluded that "Loop demonstrated a working process that produced significant quantities of MEG and DMT from post-consumer waste PET[,]" critically, the verification ***did not*** examine the more important issues of scalability and commercial viability of Loop's process, and specifically stated that the report "was not intended to ***certify the yields or economic viability of the process***."

65.     Moreover, Kemitek only verified four batches: two at the mini-pilot scale, and two at the pilot scale.  The Kemitek Report further noted that while the process ran smoothly at the mini-pilot scale, operations at the pilot scale did require some interventions, such as steps taking longer than planned and clogging of transfer lines, that Kemitek concluded "would have to be addressed at commercial scale."

66.     On December 15, 2020 Hindenburg Research published a follow-up to its October report in which it addressed the Kemitek Report's findings.  Hindenburg Research pointed out inconsistencies and problems with the Kemitek Report, with input from a former Loop employee and the polymers expert it previously consulted with.

67.     Hindenburg Research concluded that the Kemitek verification and analysis was largely meaningless due to its failure to certify the yields or economic viability of Loop's technology and process.  To drive this point home, Hindenburg Research gave the following hypothetical: "what if a company pays $1 trillion to process a warehouse full of PET plastic to achieve an end product that's "pure" but also the size of a dime?  Information on purity without cost and yield is incomplete to the point of being irrelevant."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

19

## V.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.   Defendants' Materially False And/Or Misleading Statements Issued During The Second Half Of 2018

68.   The Class Period begins on September 24, 2018.  On that day, Loop announced its first strategic step in its global commercialization plan with its joint venture with Indorama Ventures Public Company Limited ("Indorama") in a press release, also filed with the SEC as Exhibit 99.1 to Form 8-K on that same day.  The press release, which contained statements it attributed to Defendant Solomita, continually highlighted the sustainable nature of Loop's PET plastic resin and polyester and Loop's supposed "revolutionary" technology, stating:

a.   "This partnership brings together Indorama Venture's world-class manufacturing footprint and Loop's proprietary science and technology to become a reliable world leader in the 'circular' economy for *100% sustainable* and recycled *PET resin and polyester fiber*[;]"

b.   "The 50/50 joint venture will have an exclusive world-wide license to use Loop's technology to *produce 100% sustainably produced PET resin and polyester fiber* with plans to begin commercial production in Q1 2020[;]" and

c.   "Loop has created a *revolutionary technology poised to transform the plastics industry*.  This *ground-breaking technology* decouples plastic from fossil fuels by depolymerizing waste polyester plastic to its base building blocks (monomers)."

69.   On October 10, 2018, Loop announced that it had entered into a multi-year supply agreement with PepsiCo in a press release that was also filed with the SEC as Exhibit 99.1 to Form 8-K on that day.  The press release was titled: "PEPSICO AND LOOP INDUSTRIES SIGN MULTI-YEAR SUPPLY AGREEMENT FOR *LOOP BRANDED 100% SUSTAINABLE PLASTIC*[.]"

70. The press release, which contained statements it attributed to Defendant Solomita, further highlighted Loop's supposed "revolutionary" technology, stating:

a. "Loop Industries has emerged with ***truly transformational technology*** that allows no and low value plastics to be diverted, recovered and recycled endlessly into new, virgin-quality Loop™ PET plastic[;]" and

b. "Loop has created a ***revolutionary technology poised to transform the plastics industry***. This ***ground-breaking technology*** decouples plastic from fossil fuels by depolymerizing waste polyester plastic to its base building blocks (monomers)."

71. On October 10, 2018, Loop issued its report of financial results for its second quarter of fiscal 2019, ended August 31, 2018,[7] on SEC Form 10-Q (the "2Q19 10-Q"), which was signed by Solomita. Therein, the 2Q19 10-Q highlighted Loop's technology, stating: "Loop has created a ***technology poised to disrupt the plastics industry***[.]"

72. Also on October 10, 2018, Loop issued a press release containing its financial results for the second quarter of fiscal 2019, ended August 31, 2018, which was also filed with the SEC as Exhibit 99.1 to Form 8-K on that day (the "2Q19 PR"). The 2Q19 PR headlined certain of its deals made during the quarter including that Loop "[a]nnounced multi-year supply agreement with Pepsico for ***Loop branded 100% sustainable plastic*** from Loop's joint venture facility in the United States."

73. At the beginning of the 2Q19 PR, Solomita provided comment, wherein he stated: "We successfully finalized a 50:50 joint venture to commercialize ***our breakthrough technology*** with Indorama Ventures[.]"

---

[7] Loop's fiscal year ends on the last day of February of the respective year. For example, Loop's 2020 fiscal year ended on February 29, 2020, and its first quarter of 2021 ended on May 31, 2020.

74.     The 2Q19 PR further highlighted the sustainable nature of Loop's PET plastic resin and polyester and Loop's supposed "revolutionary" technology in discussing the execution of certain of Loop's strategic goals and describing the Company, stating:

a.      "In September 2018, the Company announced a joint venture with a subsidiary of IVL [Indorama] to manufacture and commercialize Loop's technology to meet the growing global demand from beverage and consumer packaged goods companies for ***100% sustainable recycled PET and polyester fiber***[;]"

b.      "PepsiCo Secures Multi-Year Supply Agreement for ***Loop Branded 100% Sustainable Plastic***[;]" and

c.      "Loop has created a ***revolutionary technology poised to transform the plastics industry***.  This ***ground-breaking technology*** decouples plastic from fossil fuels by depolymerizing waste polyester plastic to its base building blocks (monomers)."

75.     On October 29, 2018, Loop issued a press release announcing that it endorses the New Plastics Global Commitment developed by the Ellen MacArthur Foundation in collaboration with United Nations Environment.  This press release, which contained statements it attributed to Defendant Solomita, highlighted the sustainable nature of Loop's PET plastic resin and polyester and Loop's supposed "revolutionary" technology, stating:

a.      "Loop Industries has emerged with ***truly transformational technology*** that allows no and low value plastics to be diverted, recovered and recycled endlessly into new, virgin-quality Loop™ PET plastic[;]"

b.      "Loop has created a ***revolutionary technology poised to transform the plastics industry***.  This ***ground-breaking technology*** decouples plastic from fossil fuels by depolymerizing waste polyester plastic to its base building blocks (monomers)."

76.     On November 13, 2018, Loop issued two press releases announcing the closing of a $2.45 private placement and the changing of its CFO.  Both of these announcements were also filed with the SEC as Exhibits 99.1 and 99.2, respectively, to Form 8-K on that same day.  Both of these press releases highlighted the sustainable nature of Loop's PET plastic resin and polyester and Loop's supposed "revolutionary" technology, stating: "Loop has created a *revolutionary technology poised to transform the plastics industry*.  This *ground-breaking technology* decouples plastic from fossil fuels by depolymerizing waste polyester plastic to its base building blocks (monomers)."

77.     The November 13, 2018 press release announcing the closing of the private placements also included a statement from Solomita: "Having reached key milestones along our commercialization strategy including a joint venture agreement with Indorama Ventures and a multi-year supply agreement with PepsiCo, Loop is in a stronger position than ever to transform the global PET market and *meet the demand for 100% sustainable PET* from global consumer packaged goods companies."

78.     On November 29, 2018, Loop announced that it had entered into a multi-year supply framework with Coca-Cola in a press release that was also filed with the SEC as Exhibit 99.1 to Form 8-K on that day.  The subheading of the press release stated: "New Agreement Enables Authorized Coca-Cola Bottlers to Enter into Supply Agreements to Secure *100% Sustainable Loop™ Branded PET Plastic Resin*[.]"

79.     The press release, which contained statements it attributed to Defendant Solomita, further highlighted the sustainable nature of Loop's PET plastic resin and polyester and Loop's supposed "revolutionary" technology, stating:

        a.      "Loop … today announced that they have entered into a multi-year supply

framework with the Coca-Cola system's Cross Enterprise Procurement Group ("CEPG") to supply ***100%*** recycled and ***sustainable Loop™ PET plastic***[;]"

b.      "This arrangement continues the rapid and exciting progress being made by Loop as it commercializes its ***breakthrough depolymerization technology*** which will help reduce global plastic waste and enable major global brands to meet their sustainability goals.  As the demand for sustainable packaging solutions continues to grow, Loop Industries has emerged with ***transformational technology*** that allows no and low value plastics to be diverted, recovered and recycled endlessly into new, virgin-quality Loop™ PET plastic[;]" and

c.      "Loop has created a ***revolutionary technology poised to transform the plastics industry***."

80.      On December 17, 2018, Loop announced the appointment of a new board member to its Board of Directors in a press release that was also filed with the SEC as Exhibit 99.1 to Form 8-K on that day.  Within the press release, Solomita provided comment, stating: "Our Company is making rapid and exciting progress in executing our strategic plan as we continue the commercialization of our ***breakthrough*** depolymerization technology[.]"

81.      The December 17, 2018 press release also stated: "We believe Loop has created a ***revolutionary technology poised to transform the plastics industry***."

82.      On December 19, 2018, Loop announced a "Global Alliance Agreement" with thyssenkrupp to combine Loop and thyssenkrupp's technologies in a press release that was also filed with the SEC as Exhibit 99.1 to Form 8-K on that day.  The press release, which contained statements it attributed to Defendant Solomita, highlighted the sustainable nature of Loop's PET plastic resin and polyester and Loop's supposed "revolutionary" technology, stating:

a.      "Integration of technologies is intended to provide rapidly scalable Waste-

to-Resin ('WTR™') solution to supply the global demand for **100% sustainable PET and Polyester**[;]" and

     b.    "Loop has created a **revolutionary technology poised to transform the plastics industry**. This **ground-breaking technology** decouples plastic from fossil fuels by depolymerizing waste polyester plastic to its base building blocks (monomers)."

    83.    On December 20, 2018, Loop announced that Defendant Gentiletti would join the Company as COO and CFO at the beginning of 2019 in a press release that was also filed with the SEC as Exhibit 99.1 to Form 8-K on that day. The press release, which contained statements it attributed to Defendants Solomita and Gentiletti, in relevant part, stated therein:

     a.    "[Mr. Gentiletti] will also draw upon his strong background in operations management and business development to support the Company in the rollout of the recently announced joint venture with Indorama Ventures and the development of Waste-to-Resin plants for the **large scale commercialization of Loop's groundbreaking technology for production of sustainable plastics**[;]" and

     b.    "We believe Loop has created a **revolutionary technology poised to transform the plastics industry**."

    84.    Defendants' statements describing Loop's technology and process as revolutionary, groundbreaking, and/or transformational and its PET as "100% sustainable" in ¶¶68-83 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (a) that Defendants have not demonstrated that Loop's technology is new, groundbreaking, unique, or "revolutionary," or demonstrably different from the well-known and decades-old depolymerization recycling process; and (b) that Loop's PET

plastic resin and polyester fiber was not 100% sustainably produced and instances of applying

both pressure and heat, inputs obtained from external sources, are replete in Loop's patents.

**B.      Defendants' Materially False And/Or Misleading Statements Issued During
The First Half Of 2019**

85.      On January 9, 2019, Loop issued its report of financial results for its third quarter

of fiscal 2019, ended November 30, 2018, on SEC Form 10-Q (the "3Q19 10-Q"), which was

signed by Solomita and Gentiletti.  Therein, the 3Q19 10-Q stated, in relevant part:

a.      "On November 29, 2018 the Company entered into a multi-year supply

framework with certain members of the Coca-Cola Cross Enterprise Procurement Group to

*supply 100%* recycled and *sustainable Loop™ PET plastic* from our joint venture facility with

IVL in the United States to authorized Coca-Cola bottlers who enter into supply agreements with

the company[;] and

b.      "On December 19, 2018 we announced an agreement with thyssenkrupp

….  The Global Alliance Agreement advances the integration of our respective technologies

intended to provide a turn-key industrial solution for license to manufacturing companies seeking

a *commercially viable technology to produce sustainable PET and polyester plastic*."

86.      Also on January 9, 2019, Loop issued a press release containing its financial

results for the second quarter of fiscal 2019, ended November 30, 2018, which was also filed

with the SEC as Exhibit 99.1 to Form 8-K on that day and signed by Gentiletti (the "3Q19 PR").

The 3Q19 PR included comment from Solomita, who stated in relevant part that the agreement

with thyssenkrupp "is intended to provide a turn-key Waste-to-Resin industrial solution for

license to manufacturing companies seeking a *commercially viable technology to produce

sustainable PET and polyester plastic*."

87.      The 3Q19 PR further highlighted the sustainable nature of Loop's PET plastic

resin and polyester and the commercial viability of Loop's technology in discussing the execution of certain of Loop's strategic goals and describing the Company, stating:

   a. "In September 2018, the Company announced a joint venture with a subsidiary of IVL [Indorama] to manufacture and commercialize the Company's technology to meet the growing global demand from beverage and consumer packaged goods companies for ***100% sustainable recycled PET and polyester fiber***[;]"

   b. "On November 29, 2018 the Company entered into a multi-year supply framework with certain members of the Coca-Cola Cross Enterprise Procurement Group to ***supply 100%*** recycled and ***sustainable Loop™ PET plastic*** from our joint venture facility with IVL in the United States to authorized Coca-Cola bottlers who enter into supply agreements with the company[;]" and

   c. "On December 19, 2018 the Company announced an agreement with thyssenkrupp…. The Global Alliance Agreement advances the integration of our respective technologies intended to provide a turn-key WTR™ industrial solution for license to manufacturing companies seeking a ***commercially viable technology to produce sustainable PET and polyester plastic***[.]"

  88. On January 15, 2019, Loop issued a press release announcing the closure of a $4.5 million private placement, which was also filed with the SEC as Exhibit 99.1 to Form 8-K on that January 16, 2019. This press release included comment from Solomita, who stated in relevant part: "We continue to make meaningful progress to commercialize our ***groundbreaking technology*** including a new alliance agreement with thyssenkrupp and a multi-year framework agreement with the Coca-Cola system's Cross Enterprise Procurement Group. With this momentum behind us, I am more confident than ever that Loop is well positioned to transform

the global PET plastic and polyester fiber market and meet the demand from global consumer brands for *100% sustainable PET*."

89.   On January 16, 2019, Loop issued a letter to shareholders, from and signed by Solomita, which was also filed with the SEC as Exhibit 99.1 to Form 8-K on that same day (the "January 2019 Shareholder Letter").  Within the letter, Solomita referred to Loop's technology and intellectual property as "*breakthrough*" three times, and described Loop's PET plastic resin and polyester fiber as "sustainable" six times, three of which Solomita described Loop's PET plastic resin as "*100% sustainable*."

90.   On February 4, 2019, Loop announced that it had signed a multi-year supply agreement with L'OCCITANE in a press release.  The press release, which contained statements it attributed to Defendant Solomita, stated in relevant part:

a.   "The L'OCCITANE Group has selected Loop Industries as a key supplier of *100%* recycled *sustainable PET plastic*[;]"

b.   "The L'OCCITANE Group, a global manufacturer and retailer of natural cosmetics and well-being products with five leading brands, and Loop … announced today the signing of a multi-year take or pay supply agreement for *Loop™ branded 100% sustainable PET plastic*[;]" and

c.   As the demand for sustainable packaging solutions continues to grow, Loop Industries has emerged with *transformational upcycling technology*[.]"

91.   On February 12, 2019, Loop announced that it had signed a multi-year supply agreement with Danone SA in a press release.  The press release, which contained statements it attributed to Defendant Solomita, stated in relevant part: Danone will purchase *100% sustainable* and upcycled *Loop™ branded PET* from Loop's joint venture facility with

Indorama Ventures Limited in the United States for use in brands across its portfolio including

evian®, Danone's iconic natural spring water."

92.     On February 29, 2019, Loop filed a prospectus supplement to its prospectus dated

August 10, 2018 on Form 424B5 with the SEC (the "February 2019 Prospectus"), which stated

in relevant part:

a.     Since June 2018, when we transitioned to our newly built Generation II

industrial pilot plant, we continue to see ***consistently high monomer yields*** and excellent purity.

b.     "The 50/50 joint venture [with Indorama] has an exclusive world-wide

license to use our technology to retrofit existing IVL facilities, so each can produce ***100%***

***sustainable Loop™ PET plastic resin and polyester fiber***[;]"

c.     We believe the WtR™ solution [with thyssenkrupp] will result in a highly

scalable recurring revenue licensing model to supply the global demand for ***100% sustainable***

***Loop™ PET plastic resin and polyester fiber***[;]" and

d.     Multi-year supply framework with the Coca-Cola system's Cross

Enterprise Procurement Group to supply ***100%*** recycled and ***sustainable Loop™ PET plastic***

***resin*** from our joint venture facility with Indorama Ventures Limited in the United States to

authorized Coca-Cola bottlers who enter into supply agreements with us[.]"

93.     On May 7, 2019, Loop issued a press release announcing its financial results for

its fourth quarter and fiscal year ended February 28, 2019, which was also filed with the SEC as

Exhibit 99.1 to Form 8-K and signed by Gentiletti on that same day (the "FY2019 PR").  Within

the FY2019 PR, which contained statements it attributed to Defendant Solomita, Loop listed its

some of its "achievements" from fiscal 2019, and stated in relevant part:

a.     "The 50/50 joint venture [with Indorama] has an exclusive world-wide

license to use our technology to retrofit existing IVL facilities, so each retrofitted facility can produce ***100% sustainable Loop™ PET plastic resin and polyester fiber***;"

      b.    "Multi-year supply agreement with Danone SA, one of the world's leading global food and beverage companies.  Danone will purchase ***100% sustainable*** and upcycled ***Loop™ branded PET***[;]"

      c.    "Multi-year supply framework with the Coca-Cola system's Cross Enterprise Procurement Group to supply ***100%*** recycled and ***sustainable Loop™ PET plastic resin*** from our joint venture facility with IVL in the United States to authorized Coca-Cola bottlers who enter into supply agreements with us;"

      d.    "Multi-year supply agreement with L'Occitane to supply ***100%*** recycled and ***sustainable Loop™ PET plastic resin*** from our first European production facility;" and

      e.    "We successfully completed our Generation II industrial pilot plant, which continues to see ***consistently high monomer yields*** and excellent purity."

94.    On May 8, 2019, Loop issued its report of financial results for its fourth quarter and  fiscal year ended February 28, 2019, on SEC Form 10-K (the "2019 10-K"), which was signed by Solomita and Gentiletti.  Therein, the 2019 10-K stated, in relevant part:

      a.    "Since June 2018, when we transitioned to our Generation II technology and our newly built industrial pilot plant, we continue to see ***consistently high monomer yields***, excellent purity and improved conversion costs[;]"

      b.    "The 50/50 joint venture [with Indorama] has an exclusive world-wide license to use our technology to retrofit existing IVL facilities, so each can produce ***100% sustainable Loop™ PET plastic resin and polyester fiber***[;]"

      c.    "Multi-year supply agreement with Danone SA, one of the world's leading

global food and beverage companies.  Danone will purchase **100% sustainable** and upcycled **Loop™ branded PET**[;]"

   d.   "Multi-year supply framework with the Coca-Cola system's Cross Enterprise Procurement Group to supply **100%** recycled and **sustainable Loop™ PET plastic resin** from our joint venture facility with IVL in the United States to authorized Coca-Cola bottlers who enter into supply agreements with us;"

   e.   "Multi-year supply agreement with L'Occitane to supply **100%** recycled and **sustainable Loop™ PET plastic resin** from our first European production facility;" and

   f.   In again discussing the joint venture with Indorama, "[t]his partnership brings together Indorama Venture's manufacturing footprint and Loop's proprietary science and technology to become a supplier in the 'circular' economy for **100% sustainable** and recycled **PET resin and polyester fiber**.  The Company is contributing to the 50/50 joint venture an exclusive world-wide royalty-free license to use its proprietary technology to produce **100% sustainably produced PET resin and polyester fiber**.

   95.   On May 29, 2019, Loop filed a prospectus supplement to its prospectus dated August 10, 2018 on Form 424B5 with the SEC (the "May 2019 Prospectus"), which stated in relevant part: "Since June 2018, when we transitioned to our Generation II technology and our newly built industrial pilot plant, we continue to see **consistently high monomer yields** and excellent purity, and improved conversion costs."

   96.   Defendants' statements describing Loop's technology and process as revolutionary, groundbreaking, transformational, and/or commercially viable, its PET as "100% sustainable," and its process as producing high monomer yields in ¶¶85-95 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the

statements not misleading, because they failed to disclose, among other things, the following adverse facts: (a) that Defendants have not demonstrated that Loop's technology is new, groundbreaking, unique, or "revolutionary," or demonstrably different from the well-known and decades-old depolymerization recycling process; (b) that Loop's PET plastic resin and polyester fiber was not 100% sustainably produced and instances of applying both pressure and heat, inputs obtained from external sources, are replete in Loop's patents; (c) that Loop has underestimated the cost in scaling up and commercializing its technology and product; and (d) that Loop's technology and process did not produce consistently high monomer yields, but rather saw monomer yields as low as 70% after just one distillation.

### C.    Defendants' Materially False And/Or Misleading Statements Issued During The Second Half Of 2019

97.    On July 8, 2019, Loop issued its report of financial results for the first quarter of fiscal 2020, ended May 31, 2019, on SEC Form 10-Q (the "1Q20 10-Q"), which was signed by Solomita and Gentiletti.  The 1Q20 10-Q stated, in relevant part:

a.    "Specifically, the Company is contributing an exclusive world-wide royalty-free license to ILT [the Indorama joint venture] to use its proprietary technology to produce ***100% sustainably produced PET resin and polyester fiber***[;]"

b.    "The 50/50 joint venture [with Indorama] has an exclusive world-wide license to use our technology to retrofit existing IVL facilities, so each can produce ***100% sustainable Loop™ PET plastic resin and polyester fiber***[;]"

c.    "Multi-year supply agreement with Danone SA, one of the world's leading global food and beverage companies.  Danone will purchase ***100% sustainable*** and upcycled ***Loop™ branded PET***[;]"

d.    "Multi-year supply framework with the Coca-Cola system's Cross

Enterprise Procurement Group to supply **100%** recycled and **sustainable Loop™ PET plastic resin** from our joint venture facility with IVL in the United States to authorized Coca-Cola bottlers who enter into supply agreements with us;" and

        e.     "Multi-year supply agreement with L'Occitane to supply **100%** recycled and **sustainable Loop™ PET plastic resin** from our first European production facility[.]"

        98.     On October 8, 2019, Loop issued its report of financial results for the second quarter of fiscal 2020, ended August 31, 2019, on SEC Form 10-Q (the "2Q20 10-Q"), which was signed by Solomita and Gentiletti.  The 2Q20 10-Q stated, in relevant part: "Specifically, the Company is contributing an exclusive world-wide royalty-free license to ILT [the Indorama joint venture] to use its proprietary technology to produce **100% sustainably produced PET resin and polyester fiber**."

        99.     On November 13, 2019, Loop announced the expansion of their supply agreement with L'OCCITANE en Provence.  This press release stated, in relevant part that:

        a.     "Thanks to this extended partnership, L'OCCITANE expects to accelerate the transition to **100% sustainable PET plastic** in all its bottles[;]" and

        b.     "In February 2019, Loop Industries and L'OCCITANE announced the signing of a multi-year take or pay supply agreement for **Loop™ branded 100% sustainable PET plastic resin**[;]"

        100.    Defendants' statements describing Loop's PET as "100% sustainable" in ¶¶97-99 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that Loop's PET plastic resin and polyester fiber was not 100% sustainably produced and instances of applying both pressure and heat, inputs obtained from external sources, are replete in

Loop's patents.

**D.     Defendants' Materially False And/Or Misleading Statements Issued During The First Half Of 2020**

101.    On January 9, 2020, Loop issued its report of financial results for the third quarter of fiscal 2020, ended November 30, 2019, on SEC Form 10-Q (the "3Q20 10-Q"), which was signed by Solomita and Gentiletti.  The 3Q20 10-Q stated, in relevant part:

a.      "Specifically, the Company is contributing an exclusive world-wide royalty-free license to ILT [the Indorama joint venture] to use its proprietary technology to produce ***100% sustainably produced PET resin and polyester fiber***[;]" and

b.      "During the three months ended November 30, 2019, the Company and L'OCCITANE en Provence, a global manufacturer and retailer of natural beauty and well-being products, announced that they are expanding their supply agreement to accelerate L'OCCITANE en Provence's transition to ***100% sustainable PET plastic*** in all its bottles.  Loop Industries and L'OCCITANE en Provence's supply agreement for ***Loop™ branded 100% sustainable PET plastic resin*** was to be supplied from Loop's first European PET manufacturing facility."

102.    On May 5, 2020, Loop issued its report of financial results for its fourth quarter and fiscal year ended February 29, 2020, on SEC Form 10-K (the "2020 10-K), which was signed by Solomita and Gentiletti.  Therein, the 2020 10-K discussed Loop's supply agreements with numerous companies for to supply Loop's PET stating, in relevant part:

a.      "Multi-year supply agreement with Danone SA, one of the world's leading global food and beverage companies.  Danone will purchase ***100% sustainable*** and upcycled ***Loop™ branded PET*** for use in brands across its portfolio including evian®, Danone's iconic natural spring water;"

b.      "Multi-year supply framework with the Coca-Cola system's Cross

Enterprise Procurement Group to supply **100%** recycled and ***sustainable Loop*™ *PET resin*** to authorized Coca-Cola bottlers who enter into supply agreements with us;" and

      c.     "Multi-year supply agreement with L'OCCITANE en Provence to supply **100%** recycled and ***sustainable Loop*™ *PET resin*** and incorporate Loop™ PET resin into its product packaging[.]"

103.     The 2020 10-K also discussed Loop's 50/50 joint venture with Indorama, stating in relevant part:

      a.     "This partnership brings together Indorama's manufacturing footprint and Loop Industries' proprietary science and technology to become a supplier in the 'circular' economy for **100% sustainable** and recycled ***PET resin and polyester fiber***[;]"

      b.     "We are contributing to the 50/50 joint venture an exclusive world-wide royalty-free license to use its proprietary technology to produce ***100% sustainably produced PET resin and polyester fiber*** in addition to its equity cash contribution[;]" and

      c.     "Specifically, the Company will contribute an exclusive world-wide royalty-free license for ILT to use its proprietary technology to produce ***100% sustainably produced PET resin and polyester fiber*** in addition to its cash contributions."

104.     On May 6, 2020, Loop issued with the SEC an amended report of financial results for its fourth quarter and fiscal year ended February 29, 2020, on SEC Form 10-K/A (the "2020 10-K/A), which was signed by Solomita and Gentiletti.  Therein, the 2020 10-K/A again discussed Loop's 50/50 joint venture with Indorama, stating in relevant part:

      a.     "This partnership brings together Indorama's manufacturing footprint and Loop Industries' proprietary science and technology to become a supplier in the 'circular' economy for **100% sustainable** and recycled ***PET resin and polyester fiber***[;]" and

b.      "We are contributing to the 50/50 joint venture an exclusive world-wide royalty-free license to use its proprietary technology to produce *100% sustainably produced PET resin and polyester fiber* in addition to its equity cash contribution."

105.    Defendants' statements describing Loop's PET as "100% sustainable" in ¶¶101-104 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that Loop's PET plastic resin and polyester fiber was not 100% sustainably produced and instances of applying both pressure and heat, inputs obtained from external sources, are replete in Loop's patents.

**E.      Defendants' Materially False And/Or Misleading Statements Issued During The Second Half Of 2020**

106.    On July 14, 2020, Loop issued its report of financial results for the first quarter of fiscal 2020, ended May 31, 2020, on SEC Form 10-Q (the "1Q21 10-Q"), which was signed by Solomita and Gentiletti.  The 1Q21 10-Q discussed Loop's 50/50 joint venture with Indorama, stating in relevant part:

a.      "Specifically, the Company is contributing an exclusive world-wide royalty-free license to ILT [the Indorama joint venture] to use its proprietary technology to produce *100% sustainably produced PET resin and polyester fiber*[;]"

b.      "This partnership brings together Indorama's manufacturing footprint and Loop Industries' proprietary science and technology to become a supplier in the 'circular' economy for *100% sustainable* and recycled *PET resin and polyester fiber*[;]" and

c.      "We are contributing to the 50/50 joint venture an exclusive world-wide royalty-free license to use its proprietary technology to produce *100% sustainably produced PET resin and polyester fiber* in addition to its equity cash contribution."

107.    The 1Q21 10-Q also discussed Loop's supply agreements with numerous companies to supply Loop's PET stating, in relevant part:

a.      "Multi-year supply agreement with Danone SA, one of the world's leading global food and beverage companies.  Danone will purchase *100% sustainable* and upcycled *Loop™ branded PET* for use in brands across its portfolio including evian®, Danone's iconic natural spring water;"

b.      "Multi-year supply framework with the Coca-Cola system's Cross Enterprise Procurement Group to supply *100%* recycled and *sustainable Loop™ PET resin* to authorized Coca-Cola bottlers who enter into supply agreements with us;" and

c.      "Multi-year supply agreement with L'OCCITANE en Provence to supply *100%* recycled and *sustainable Loop™ PET resin* and incorporate Loop™ PET resin into its product packaging[.]"

108.    On September 3, 2020, Loop announced a licensing agreement with Chemtex Global Corporation, which was also filed with the SEC as Exhibit 99.1 to Form 8-K and signed by Solomita on September 8, 2020.  The press release stated in relevant part that the agreement would manufacturing know-how "in support of Loop's strategy to commercialize its *breakthrough* depolymerization technology[.]"

109.    On September 9, 2020, Loop announced via a press release, which was also filed with the SEC on September 16, 2020 as Exhibit 99.1 to Form 8-K and signed by Solomita, that it had entered into an agreement with SUEZ Groupe to build the first Infinite Loop recycling facility in Europe.  The press release stated in relevant part that "the partnership will combine the resource management expertise of SUEZ and Loop's *unique breakthrough technology* for the production of virgin quality, food grade, 100% recycled and infinitely recyclable plastic."

110.    On September 21, 2020, Loop issued with the SEC a second amended report of financial results for its fourth quarter and fiscal year ended February 29, 2020, on SEC Form 10-K/A (the "Second 2020 10-K/A), which was signed by Solomita and Gentiletti.  Therein, the Second 2020 10-K/A discussed Loop's 50/50 joint venture with Indorama, stating in relevant part: "Specifically, the Company will contribute an exclusive world-wide royalty-free license for ILT to use its proprietary technology to produce *100% sustainably produced PET resin and polyester fiber* in addition to its cash contributions."

111.    On October 7, 2020, Loop issued its report of financial results for the second quarter of fiscal 2020, ended August 31, 2020, on SEC Form 10-Q (the "2Q21 10-Q"), which was signed by Solomita and Gentiletti.  The 2Q21 10-Q discussed Loop's 50/50 joint venture with Indorama, stating in relevant part:

a.    "Specifically, the Company is contributing an exclusive world-wide royalty-free license to ILT [the Indorama joint venture] to use its proprietary technology to produce *100% sustainably produced PET resin and polyester fiber*[;]"

b.    "This partnership brings together Indorama's manufacturing footprint and Loop Industries' proprietary science and technology to become a supplier in the 'circular' economy for *100% sustainable* and recycled *PET resin and polyester fiber*[;]" and

c.    "We are contributing to the 50/50 joint venture an exclusive world-wide royalty-free license to use its proprietary technology to produce *100% sustainably produced PET resin and polyester fiber* in addition to its equity cash contribution."

112.    The 2Q21 10-Q also discussed Loop's supply agreements with numerous companies for to supply Loop's PET stating, in relevant part:

a.      "Multi-year supply agreement with Danone SA, one of the world's leading global food and beverage companies. Danone will purchase *100% sustainable* and upcycled *Loop™ branded PET* for use in brands across its portfolio including evian®, Danone's iconic natural spring water;"

b.      "Multi-year supply framework with the Coca-Cola system's Cross Enterprise Procurement Group to supply *100%* recycled and *sustainable Loop™ PET resin* to authorized Coca-Cola bottlers who enter into supply agreements with us;" and

c.      "Multi-year supply agreement with L'OCCITANE en Provence to supply *100%* recycled and *sustainable Loop™ PET resin* and incorporate Loop™ PET resin into its product packaging[.]"

113.    Defendants' statements describing Loop's technology and process breakthrough and unique and its PET as "100% sustainable" in ¶¶106-112 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the following adverse facts: (a) that Defendants have not demonstrated that Loop's technology is new, groundbreaking, unique, or "revolutionary," or demonstrably different from the well-known and decades-old depolymerization recycling process; and (b) that Loop's PET plastic resin and polyester fiber was not 100% sustainably produced and instances of applying both pressure and heat, inputs obtained from external sources, are replete in Loop's patents.

F.    **Defendants' Materially False And/Or Misleading Statements About The Energy Inputs In Loop's Technology**

114.    At least until November 11, 2018, Loop's website[8] stated that its technology was

---

[8] Co-Lead Counsel was able to view previous versions of Loop's website using the Wayback Machine.  Through the Wayback Machine, more than twenty years of web history is accessible

revolutionary in part because the process had "zero energy input":



115.     On December 12, 2018, an article by Saabira Chaudhuri entitled "*Plastic Water Bottles, Which Enabled a Drinks Boom, Now Threaten a Crisis*" was published in THE WALL STREET JOURNAL.   The article provided a diagram of Loop's process that came from the Company (highlighting supplied):

---

to the public.  *See* https://archive.org/about/ (last accessed February 14, 2021).

**A New Look for Recycling**
Loop Industries says it has developed a new way to recycle PET plastic that separates contaminants, solving one of the biggest challenges in recycling.

1. Used PET plastic is shredded and combined with Loop's formula.

2. The mixture is broken down without using heat or pressure, the typical methods used in recycling that create quality issues...

3. ...and separated into its liquid and solid building blocks before impurities are removed.

4. The materials are then used to build new-quality PET plastic.

PET plastic

Proprietary formula

MEG
Monoethylene glycol

DMT
Dimethyl Terephthalate

PET plastic

Source: the company

116.    The January 2019 Shareholder Letter also referred investors to the December 2018 WALL STREET JOURNAL article.

117.    Loop's February 2019 Prospectus stated: "***Our zero energy depolymerization technology*** specifically targets PET/polyester, allowing for the removal of all waste impurities, such as colors/dyes, labels and non-PET plastic waste."

118.    Loop's 2019 10-K stated: "***The Company's zero energy depolymerization technology*** specifically targets PET/polyester, allowing for the removal of all waste impurities, such as colors/dyes, labels and non-PET plastic waste."

119.    Loop's May 2019 Prospectus stated: "***Our zero energy depolymerization technology*** specifically targets PET/polyester, allowing for the removal of all waste impurities, such as colors/dyes, labels and non-PET plastic waste."

120.    Loop's website, as of as late as November 17, 2019, stated that its technology was revolutionary in part because the process used "low heat and no pressure":



121.     On or around July 14, 2020, Loop posted a power point presentation on its website, which the Company referred to in its Form 8-K filed with the SEC on July 15, 2020 and which was signed by Gentiletti.  On page 12 of the presentation, Loop highlighted its innovative technology, stating that "Loop's depolymerization technology uses **_low heat and no added pressure_**":



122.   On September 21, 2020, Loop filed a preliminary prospectus supplement to its prospectus dated August 23, 2018 on Form 424B5 with the SEC which stated in relevant part: "***Our zero energy depolymerization technology*** specifically targets PET/polyester, allowing for the removal of all waste impurities, such as colors/dyes, labels and non-PET plastic waste."

123.   The following day, on September 22, 2020, Loop filed a prospectus supplement to its prospectus dated August 23, 2018 on Form 424B5 with the SEC which again stated in relevant part: "***Our zero energy depolymerization technology*** specifically targets PET/polyester, allowing for the removal of all waste impurities, such as colors/dyes, labels and non-PET plastic waste."

124.   On or around October 8, 2020, Loop posted a power point presentation on its website, which the Company referred to in its Form 8-K filed with the SEC on October 8, 2020 and signed by Gentiletti.   On page 12 of the presentation, Loop highlighted its innovative technology, stating that "Loop's depolymerization technology uses ***low heat and no added pressure***":



125.   The statements in ¶¶114-124 concerning Loop's use of zero energy, heat, or pressure, or low heat were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that Loop's technology and process did use energy inputs, as evidenced by Loop's Gen II patents which are replete with instances of applying both pressure and heat, inputs obtained from external sources.

## VI.   LOSS CAUSATION

126.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

127.   During the Class Period, Plaintiffs and the Class purchased Loop's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed

or materialized, causing investors' losses.

128.    Artificial inflation in Loop's stock price was removed when concealed risks materialized and/or the truth about the material misrepresentations and omissions was revealed to the public on October 13, 2020.  As a direct result of this disclosure, the price of Loop's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

129.    On October 13, 2020, analyst firm Hindenburg Research issued a report on Loop. As discussed *supra* at Section IV.C, the Hindenburg Report revealed, based on its own unique and independent investigation, among other things, that the Company has not shown its proprietary process to be revolutionary or groundbreaking from other chemical recycling methods nor more efficient or cost effective than comparable solutions, and that Loop's sustainability claims are largely unfounded.

130.    In reaction to this news, the market drove down the value of Loop's shares.  Its stock declined $3.78 per share, approximately 32.5%, to a closing price of $7.83 on October 13, 2020, on extremely heavy volume.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

131.    As alleged herein, Defendants acted with scienter because Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

132.    As set forth elsewhere herein in detail, the Individual Defendants, by virtue of

their receipt of information reflecting the true facts regarding Loop, their control over, and/or receipt and/or modification of Loop's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Loop, participated in the fraudulent scheme alleged herein.

A.      **Defendants Continually Refined Their Descriptions Of Loop's Technology And Sustainability Of Its Product**

133.    At the beginning of the Class Period, the "About Loop Industries Inc." section of Loop press releases included the following language, alleged to be misleading in Section V, *supra* (including, *e.g.*, ¶¶68c, 70b, 74c, 75b, 76, 82b) "Loop has created a ***revolutionary technology poised to transform the plastics industry***.  This ***ground-breaking technology*** decouples plastic from fossil fuels by depolymerizing waste polyester plastic to its base building blocks (monomers)."  By November 2018, however, Defendants began to remove reference to its technology as "ground-breaking," and by January 2019, when Defendants issued the Company's 3Q19 10-Q, began to remove reference to Loop's technology as "revolutionary."

134.    In addition, by the beginning of 2019, Loop began to switch from describing its process as using zero energy inputs to low energy inputs, as detailed in Section V.F, *supra*. Moreover, in an October 7, 2020 article in RECYCLING TODAY entitled "*Better than before: Loop Industries says the recycled PET it will produce through its partnership with Suez in Europe will be a premium product*[,]"[9] Solomita clarified that Loop's chemical recycling process "does this at lower temperature than some other processes employ."

135.    The refining of the language Defendants used to describe the nature of Loop's technology and how much energy this process used reflects Defendants' awareness of the

---

[9]    Accessible    at    https://www.recyclingtoday.com/article/loop-suez-european-pet-recycling-partnership/.

misleading nature of their earlier statements.

**B.    Solomita Controlled Loop And Was Its Largest Shareholder**

136.    According to the Company, as of April 30, 2020, Solomita beneficially owns 18.8 million shares of common stock, or 47.1% of Loop's outstanding shares of common stock. Moreover, Solomita is the sole holder of a share of Series A preferred stock, which contains protective provisions precluding Loop to take certain actions without Solomita's approval and which affords Solomita a majority of the total voting powers so long as he holds not less than 7.5% of the shares of common stock issued and outstanding.  Combined, Solomita has 77.8% of the voting control of the Company.

137.    It is simply illogical that Solomita, who has a financial interest in almost half of the outstanding shares of Loop's stock, has more than 75% of the voting control of Loop, is the holder of the sole Series A preferred stock share—which further affords him the exclusive authority to direct Loop to or not to take certain actions, and his position as President, CEO, and Chairman of Loop, was not aware of the false and/or misleading nature of his and Loop's statements concerning Loop's sole technology and its viability.

138.    Solomita's control is illustrated clearly by former Loop employee statements published in the Hindenburg Report.  For example, one employee described Solomita's intimidating tone: "If you don't do what he expects you to do, not fast enough, or if the results are not good enough, he gets angry and he can yell at you for hours and hours and hours.  Yeah. I've seen one of his worst frustrations, he yelled at two people for three hours, non-stop." Another former employee, when asked whether Solomita would demand certain results, explained: "There's just facts and there's chemistry and there's certain things you can't like – even if you want something to happen, you're not going to get a resolution.  It has to come from

a scientific point of view in order to find resolution.  You can't just throw money at it, or just have a fit or something.  You can't direct the molecules to behave the way you want them to like you would, for an example, an employee showing bad behavior."

139.     Likewise, according to Former Employee 1 ("FE1"),[10] Solomita was hands-on to the point of micromanaging operations and had his hands in everything.  FE1 also described Solomita as very autocratic and very domineering to employees.  FE1 further explained that Solomita expected certain results that didn't always conform to reality and when Solomita received news he did not like, he was prone to anger, and that numerous employees in research and developments and the highest levels of finance were fired unceremoniously by Solomita for reasons untied to concerns about, for instance, absences or skills.

**C.     Loop's Claims Concerning Results From Its Gen I Technology Were "Impossible" And Failing According To Former Employees And A Polymer Expert**

140.     In discussing its Gen I technology, Loop claimed, for example in its 2016 10-K issued on June 15, 2016, that it could break down PET into its base chemicals at a recovery rate of 100%.  A former Loop employee interviewed by Hindenburg Research stated that a "claim of a 100% recovery rate was 'technically impossible' and 'industrially impossible[,]'" and that "'yields were not even repeatably over 90% at the lab scale' in October 2016[.]"  Hindenburg Research's polymer expert backed up this claim, explaining in the Hindenburg Report that "a reclaim of 100% of PTA (purified terephthalic acid) and EG (ethylene glycol) base chemicals from PET is 'impossible'" and that "even 'over 90%' would be 'a stretch.'"

141.     Similarly, in Loop's 2017 10-K issued on May 30, 2017, the Company described the depolymerized PET from the Gen I process to be "suitable for use in commercial bottles,"

---

[10] FE1 worked for Loop as a corporate controller from February 2019 to May 2020, was based at Loop's headquarters, and reported to Defendant Gentiletti.

but at that time, a former Loop employee stated that the MEG "was not even isolated at that time … [and was] still mixed with dyes, water and solid wastes."

142.    A former Loop employee also told Hindenburg Research that there were "so many issues" with the Gen I process "that we left it alone and we started a new process, but it wasn't easier…I don't think that it will be successful."

## VIII.   CORPORATE SCIENTER ALLEGATIONS

143.    The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

144.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

145.    Aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Loop as an entity.  Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading.  Here, the statements alleged were made to the investing public regarding the Company's operations, internal controls, finances and business practices—all important topics that would necessarily require approval by appropriate corporate officers.

## IX.   CLASS ACTION ALLEGATIONS

146.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

purchased or otherwise acquired Loop securities between September 24, 2018 and October 12, 2020, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

147.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Loop's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Loop shares were traded publicly during the Class Period on the NASDAQ. As of October 7, 2020, Loop had 42,212,739 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Loop or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

148.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

149.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

150.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Loop; and

c.     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d.     whether Defendants engaged in a scheme to defraud investors;

e.     whether the price of Loop securities were artificially inflated because of Defendants' conduct complained of herein; and

f.     to what extent the members of the Class have sustained damages and the proper measure of damages.

151.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

152.    The market for Loop's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Loop's securities traded at artificially inflated prices during the Class Period.  On September 23, 2019, the Company's share price closed at a Class Period high of $17.98 per

share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Loop's securities and market information relating to Loop, and have been damaged thereby.

153.    During the Class Period, the artificial inflation of Loop's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Loop's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Loop and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

154.    At all relevant times, the market for Loop's securities was an efficient market for the following reasons, among others:

a.    Loop shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, Loop filed periodic public reports with the SEC and/or the NASDAQ;

c.    Loop regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.    Loop was followed by securities analysts employed by brokerage firms

who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and/or

   e. The average daily trading volume for Loop securities during the Class Period was approximately 67,586 shares with more than 42.2 million shares of stock outstanding as of October 7, 2020, and a market capitalization reaching $701.45 million during the Class Period.

  155. As a result of the foregoing, the market for Loop's securities promptly digested current information regarding Loop from all publicly available sources and reflected such information in Loop's share price.  Under these circumstances, all purchasers of Loop's securities during the Class Period suffered similar injury through their purchase of Loop's securities at artificially inflated prices and a presumption of reliance applies.

  156. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

  157. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-

looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

158.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

159.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Loop who knew that the statement was false when made.

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against Defendant Loop Industries And The Individual Defendants**

160.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

161.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Loop's securities at artificially inflated prices.  In

54

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

162.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Loop's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

163.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Loop's financial well-being and prospects, as specified herein.

164.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Loop's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Loop and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

165.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

166.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Loop's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

167.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Loop's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Loop's securities during the Class Period at artificially high prices and were damaged thereby.

168.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Loop was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Loop securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

169.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

170.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

171.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

172.    Individual Defendants acted as controlling persons of Loop within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

173.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

174.    As set forth above, Loop and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the

Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)     declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)     awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d)     awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

DATED: February 18, 2021                **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Leanne H. Solish*
Casey E. Sadler (admitted *pro hac vice*)
Leanne H. Solish (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
csadler@glancylaw.com
lsolish@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

and

**POMERANTZ LLP**
Jeremy A. Lieberman
Murielle J. Steven Walsh
Eric D. Gottlieb
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mjsteven@pomlaw.com
egottlieb@pomlaw.com

*Counsel for Lead Plaintiffs Sakari Johansson and John Jay Cappa and Co-Lead Counsel for the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
60

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On February 18, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 18, 2021.


                                                    *s/ Leanne H. Solish*
                                                    Leanne H. Solish