**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LOOP INDUSTRIES, INC. SECURITIES LITIGATION | Case No.: 7:20-cv-08538-NSR<br><br>Consolidated with:<br>Case No.: 7:20-cv-09031-NSR |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Sheryl Shapiro Bassin
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
sbassin@wsgr.com

Keith E. Eggleton (admitted *pro hac vice*)
David A. McCarthy (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
keggleton@wsgr.com
dmccarthy@wsgr.com

*Attorneys for Defendants Loop Industries, Inc.,*
*Daniel Solomita, and Nelson Gentiletti*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

ARGUMENT ...................................................................................................................... 6

I.  THE LEGAL STANDARDS APPLICABLE TO THIS PSLRA CASE .......................... 6

II.  THE COMPLAINT FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT
    OR OMISSION.......................................................................................................... 8

    A.  Plaintiffs May Not Rely on the Hindenburg Report ................................................. 8

    B.  The Challenged Statements Are Not Actionable ................................................... 12

        1.  Statements Touting "Innovative" and "Ground-breaking"
            Technology ...................................................................................... 12

        2.  Statements Regarding Loop's "Commercially Viable Technology"........ 15

        3.  Statements Regarding Sustainability of Loop's Resin and Products........ 17

        4.  Statements Regarding Loop's "High Monomer Yields" .......................... 18

        5.  Statements Regarding Loop's Energy Use ............................................. 19

III.  THE COMPLAINT FAILS TO ALLEGE PARTICULARIZED FACTS GIVING
    RISE TO A STRONG INFERENCE OF SCIENTER ..................................................... 20

    A.  Plaintiffs Fail to Allege Scienter as to CEO Solomita ......................................... 21

    B.  Plaintiffs Fail to Allege Scienter as to Former CFO Gentiletti............................. 24

    C.  Scienter May Not Be Inferred from the SEC's Investigation of Loop ................. 25

    D.  Plaintiffs Fail to Allege Scienter as to Defendant Loop ....................................... 25

IV.  THE COMPLAINT FAILS TO STATE A VIOLATION OF SECTION 20(A) ............. 25

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
    No. 19 Civ. 10067 (PAE),
    2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020)...............................................................9, 23

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)......................................................................................2, 25

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)........................................................................................14

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v.*
    *Nat'l Gen. Holdings Corp.*,
    No. 19-CV-10825 (JPO),
    2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ...............................................................20, 21

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
    --- F. Supp. 3d ----,
    2021 WL 567239 (E.D.N.Y. Feb. 16, 2021).................................................................19

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    No. 16 Civ. 3495 (AT),
    2017 WL 4049253 (S.D.N.Y. June 28, 2017),
    *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
    729 F. App'x 55 (2d Cir. 2018) .................................................................................13

*Diaz v. N. Dynasty Mins. Ltd.*,
    No. 17-CV-1241 PSG (SS),
    2018 WL 5099749 (C.D. Cal. Apr. 30, 2018) ...............................................................12

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................................6, 20

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................................................9, 11, 21

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019)........................................................................................6, 7

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).........................................................................10

ii

*Gregory v. Pronai Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y.),
   *aff'd*, 757 F. App'x 35 (2d Cir. 2018)...................................................................14

*Harris v. AmTrust Fin. Servs., Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015),
   *aff'd*, 649 F. App'x 7 (2d Cir. 2016)...............................................................2, 8

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020)...........................................................................25

*Johnson v. Sequans Commc'ns S.A.*,
   No. 11 Civ. 6341 (PAC),
   2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ....................................................14

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ........................................................19, 22

*In re Lehman Bros. Sec. & ERISA Litig.*,
   Nos. 10 Civ. 6637(LAK), 09 MD 2017(LAK),
   2013 WL 3989066 (S.D.N.Y. July 31, 2013) ....................................................10

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015)...........................................................25

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   --- F. Supp. 3d ----,
   2021 WL 517934 (S.D.N.Y. Feb. 10, 2021)......................................................23

*In re Manulife Fin. Corp. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2011) ...................................................................25

*In re MBIA, Inc. Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)...........................................................25

*Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)..............................................8, 9, 10, 23

*Noel v. Wal-Mart Stores, E. LP*,
   764 F. App'x 17 (2d Cir. 2019) .....................................................................2

*In re NVE Corp. Sec. Litig.*,
   551 F. Supp. 2d 871 (D. Minn. 2007),
   *aff'd*, 527 F.3d 749 (8th Cir. 2008)............................................................15, 16

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018),
    *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*,
    771 F. App'x 51 (2d Cir. 2019) ..................................................................14, 17, 18

*In re PetroChina Co. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015),
    *aff'd sub nom. Klein v. PetroChina Co.*,
    644 F. App'x 13 (2d Cir. 2016) ..................................................................................22

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y.),
    *aff'd sub nom. Condra v. PXRE Grp. Ltd.*,
    357 F. App'x 393 (2d Cir. 2009) ...................................................................................7

*In re Rockwell Med., Inc. Sec. Litig.*,
    No. 16 Civ. 1691 (RJS),
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ...............................................................22

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...............................................................................7, 13, 14

*Shemian v. Research in Motion Ltd.*,
    570 F. App'x 32 (2d Cir. 2014) ...................................................................................20

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007)..........................................................................16

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
    No. C-05-0295 PJH,
    2007 WL 760535 (N.D. Cal. Mar. 9, 2007)...................................................................11

*Sinclair & Carroll Co. v. Interchemical Corp.*,
    325 U.S. 327 (1945)......................................................................................................13

*Steinberg v. Ericsson LM Tel. Co.*,
    No. 07 CV. 9615,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008),
    *aff'd sub nom. Furher v. Ericsson LM Tel. Co.*,
    363 F. App'x 763 (2d Cir. 2009) ..................................................................................15

*Tabor v. Bodisen Biotech, Inc.*,
    579 F. Supp. 2d 438 (S.D.N.Y. 2008)......................................................................17, 18

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*,
    531 F.3d 190 (2d Cir. 2008)..........................................................................................25

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................6, 7, 20

*Titanium Metals Corp. of Am. v. Banner*,
   778 F.2d 775 (Fed. Cir. 1985)..............................................................................13

*Turner v. magicJack VocalTec, Ltd.*,
   No. 13 Civ. 0448,
   2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)..........................................................21

*Ulbricht v. Ternium S.A.*,
   No. 18-CV-6801 (PKC) (RLM),
   2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020) ....................................................20

*In re Veon Ltd. Sec. Litig.*,
   No. 15-cv-08672 (ALC),
   2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018)......................................................24

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
   No. 19cv2005,
   2020 WL 7029134 (S.D.N.Y. Nov. 30, 2020)................................................16, 23

*Wyche v. Advanced Drainage Sys., Inc.*,
   710 F. App'x 471 (2d Cir. 2017) ..........................................................................22

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
   No. 07 Civ. 3994 (LTS) (AJP),
   2009 WL 464934 (S.D.N.Y. Feb. 25, 2009)........................................................14

## STATUTES

Private Securities Litigation Reform Act of 1995,
   15 U.S.C. § 78u-4(a) *et seq.*............................................................... *passim*

15 U.S.C. § 78u-4(b).....................................................................................................7

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) .................................................................................................1, 6, 7

Fed. R. Civ. P. 12(b)(6)...............................................................................................1

Defendants Loop Industries, Inc. ("Loop" or the "Company"), Daniel Solomita, and Nelson Gentiletti (collectively, "Defendants") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Amended Consolidated Class Action Complaint ("Complaint") filed by Co-Lead Plaintiffs Sakari Johansson and John Jay Cappa ("Plaintiffs") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a) *et seq.* ("PSLRA").[1]

## PRELIMINARY STATEMENT

Hindenburg Research ("Hindenburg") is an activist firm that generates profits by (i) taking "short positions" in select public companies (*i.e.*, betting that the value of those companies will decline); (ii) publishing tabloid-like "reports" announcing to the world that those same companies are overvalued; and (iii) reaping a windfall if and when its reports are successful at causing the value of Hindenburg's "shorted" companies to collapse.

Loop, a development-stage company seeking to lead a global change in sustainable recycling technology, was unfortunate enough to be selected as a Hindenburg target.  On October 13, 2020, Hindenburg published one of its "reports" (the "Hindenburg Report" or "Report") claiming that Loop has "no viable technology" and will "never generate any meaningful revenue."  The Report relied almost exclusively on anonymous sources and misrepresentation of cherry-picked documents.  Nevertheless, Loop's stock dropped by approximately 32.5% that day, allowing Hindenburg to profit at the expense of Loop's other shareholders.  This lawsuit was filed against Loop after market close the very same day.

The Complaint does not come close to stating a viable claim and should be dismissed.

---

[1] Citations in the form of "¶ _" refer to the numbered paragraphs of the Complaint (ECF No. 25).  "Ex. 1" refers to Exhibit 1 to the Complaint.  "Ex." followed by a letter, refers to the exhibits to the Declaration of Sheryl Shapiro Bassin filed concurrently herewith.

The risks associated with investment in Loop's securities, which the Hindenburg Report purported to uncover, were expressly and repeatedly disclosed in Loop's public filings.  Loop's Form 10-Ks for Fiscal Years 2019 and 2020, for example, stated in bolded font that the Company, like many development stage companies, has "***never generated revenue and may never be profitable***"; expects "***to incur losses for the foreseeable future and may never achieve or maintain profitability***"; and "***may not be successful in developing commercial products***."[2]

Given Loop's disclosures, Plaintiffs were forced to scramble to identify allegedly false or misleading statements that could form the basis of a securities fraud claim.  They were not targeted in that effort – Plaintiffs challenge more than 100 statements in 39 documents.  The resulting Complaint falls far short of the heightened pleading standards of the PSLRA, which, requires Plaintiffs to plead ***facts*** establishing that each challenged statement was false when made.  Rather than allege such facts, and to the extent any reason is given for the claimed falsity of the myriad statements Plaintiffs challenge, it is, in sum and substance, "because the Hindenburg Report says so."  But parroting a biased, financially motivated "short-seller" report, which relies on allegations of unnamed sources, is not sufficient to plead securities fraud.

Beyond their failure to plead any actionable misstatement or omission, Plaintiffs also have not – and cannot – plead the required "strong inference" of fraudulent intent or "scienter" as to any Defendant.  Plaintiffs plead no facts that any Defendant knew or was reckless in not knowing that any statement they made was false.  Moreover, Plaintiffs do not allege any facts to

---

[2] Ex. A at 9-10; Ex. B at 10-11.  Loop's Fiscal Year ends on the last day of February of each year.  ¶ 71 n.7.  In deciding this motion, the Court may properly consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, [and] legally required public disclosure documents filed with the SEC."  *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 168 (S.D.N.Y. 2015) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)), *aff'd*, 649 F. App'x 7 (2d Cir. 2016); *see also Noel v. Wal-Mart Stores, E. LP*, 764 F. App'x 17, 19-20 (2d Cir. 2019).

2

support a motive to defraud – neither of the Individual Defendants is alleged to have sold stock or otherwise benefited from the alleged fraud.

## STATEMENT OF FACTS

**Defendants.**  Loop is a development-stage technology company based in Canada and incorporated in Nevada.  ¶¶ 2, 4, 18.  Its stock trades on the Nasdaq exchange under the symbol "LOOP."  ¶¶ 14, 18.  Loop's mission is to accelerate the world's shift toward sustainable plastic and polyester fiber and away from dependence on fossil fuels.  ¶¶ 2, 24-25.

Loop was founded in 2014 by Daniel Solomita.  ¶ 27.  Mr. Solomita is the Company's President, Chief Executive Officer, and Board Chairman.  ¶ 19.  Nelson Gentiletti is the Company's former Chief Financial Officer and Chief Operations Officer, positions he held from January 2019 until February 2021.  ¶ 21.

**Loop's Patented and Proprietary Technology.**  Loop developed and owns patented technology that uses chemicals to aid in the recycling of polyethylene terephthalate ("PET") plastic and polyester fiber.  Loop's technology does so by breaking down no- and low-value PET plastic and polyester fiber, often found in plastic bottles, packaging, carpets, and textiles, into base building blocks known as "monomers."  ¶¶ 3, 24, 26, 34.  The monomers are filtered and purified and are then polymerized to create virgin-quality PET resin that can be used to manufacture food-grade packaging and polyester fiber.  ¶¶ 26, 34.

Loop holds U.S. patents for its technology for depolymerizing PET, which it refers to as the first-generation technology ("GEN I") and the second-generation technology ("GEN II").  Ex. 1 at 14; *see also* ¶¶ 4, 6, 9, 27, 29.  Loop's first patent had issued before Loop made any of the statements challenged in this case.  Ex. D at 5.  In June 2018, Loop announced its transition from GEN I to GEN II.  ¶¶ 4, 29.

**Loop's Strategic Partnerships.**  Following Loop's transition to GEN II, Loop took steps

3

toward commercializing its technology. ¶ 5.  In September 2018, Loop announced that it had entered into a joint venture agreement with Indorama Ventures Public Company Limited, a petrochemical company, to manufacture and commercialize sustainable polyester resin, relying on a worldwide license to use Loop's technology.  ¶ 68.  Three months later, in December 2018, Loop announced it had entered an agreement with Thyssenkrupp Industrial Solutions AG ("Thyssenkrupp"), a global polyester technology provider and polyester plant engineering firm, to integrate their respective technologies to provide a turnkey solution for license to manufacturing companies seeking to produce sustainable PET and polyester plastic.  ¶ 82.

In addition, between October 2018 and February 2019, Loop entered into prospective multi-year supply agreements with several companies, including PepsiCo, Coca-Cola, The L'OCCITANE Group, and Danone SA, pursuant to which Loop agreed to the future supply of its recycled and sustainable PET resin and plastic.  ¶¶ 69, 72, 78-79, 90-91.  More recently, in September 2020, Loop entered into a licensing agreement with Chemtex Global Corporation and an agreement with SUEZ Groupe to build a Loop recycling facility in Europe.  ¶¶ 108-109.

Throughout this period, however, Loop cautioned investors that its "technology may not be successful in developing commercial products" and "may never be successfully commercialized."  Ex. A at 9-10; Ex. B at 10-11.

**The Short-Seller Report and Loop's Response.**  On October 13, 2020, Hindenburg, a firm that had "taken a short position in shares of Loop" stock and stood to profit from a decline in Loop's stock price, published a "report" alleging that Loop "is smoke and mirrors with no viable technology."  ¶¶ 6, 129; Ex. 1 at 2, 27.  The Report alleged that the Company's technology was "basic stuff" and questioned whether Loop's process was commercially viable and the level of energy input it required.  ¶¶ 6-9; Ex. 1 at 2-3, 14, 23, 28.  The Report relied

4

almost entirely on anonymous sources – unnamed former Loop employees and so-called "experts" – and cherry-picked, publicly available documents.  *See* Ex. 1.  The Report would not even vouch for its own accuracy, noting that Hindenburg "makes no representation, express or implied, as to the ***accuracy, timeliness, or completeness*** of [the information in the Report]," and it acknowledged that Hindenburg "stands to realize significant gains in the event that the price of any stock covered herein declines."  Ex. 1 at 28 (emphasis added).

The Hindenburg Report was successful in prompting a sharp decline in the price of Loop's stock, which fell approximately 32.5% that day.  ¶¶ 10, 130.

Loop responded to the Hindenburg Report within hours of its release, stating that it contained "factual inaccuracies" and calling its claims "unfounded" and "incorrect."  ¶ 55.  Loop also commissioned Kemitek, a not-for-profit research organization specializing in sustainable chemistry to independently investigate the Hindenburg Report's allegations about Loop's technology.  ¶¶ 63-64.  Kemitek concluded that "Loop demonstrated a working process that produced significant quantities of [monomers] from post-consumer waste PET."  ¶ 64.

**The Complaint.**  This lawsuit was filed after market close on October 13, 2020, the day that the Hindenburg Report was published.  ECF. No. 1.  Plaintiffs subsequently amended the Complaint.  ECF No. 25.  The Complaint largely parrots the Report.  *Compare* ¶¶ 9, 38-41, 43-45, 47-49, 52-54, 138, 140-142, *with* Ex. 1 at 4, 13-16, 18, 21-23, 26.

Plaintiffs proffer that between September 24, 2018 and October 12, 2020 (the "Class Period") dozens of Loop's press releases, SEC filings, and other statements – most in the context of its commercialization efforts – were materially false or misleading because they did not disclose "material adverse information regarding the Company's business operations and financial prospects."  ¶¶ 1, 156; *see also* ¶ 153.  In particular, Plaintiffs allege that Loop's

statements were materially false and/or misleading because (i) Loop has not demonstrated that its technology is "new, groundbreaking, unique, or 'revolutionary'"; (ii) Loop "underestimated the cost in scaling up and commercializing its technology and product"; (iii) Loop's "PET plastic resin and polyester fiber was not 100% sustainably produced"; (iv) Loop's "technology and process did not produce consistently high monomer yields"; and (v) Loop's technology and process "did use energy inputs."  ¶¶ 84, 96, 100, 105, 113, 125.

**ARGUMENT**

## I.     THE LEGAL STANDARDS APPLICABLE TO THIS PSLRA CASE

To state a Section 10(b) and Rule 10b-5 claim, Plaintiffs must plead specific facts that show "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff."  *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted).

A "complaint alleging securities fraud must [also] satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud."  *ECA*, 553 F.3d at 196.  As the Second Circuit has explained, the particularity requirements imposed by the PSLRA "comport[] with the stated intent and public policy rationale" to "deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries."  *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 464 (2d Cir. 2019) (citation omitted); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (noting Congress's concern that "if not adequately contained," securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law").

To plead a materially false statement or omission, "the complaint shall specify each

6

statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Where, as here, a complaint is pled on "information and belief" (Compl. at 1), "the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so"); *Gamm*, 944 F.3d at 462 ("Rule 9(b) and the PSLRA require a securities fraud complaint to . . . '(4) explain why the statements were fraudulent.'" (citation omitted)).

Scienter refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted).  A plaintiff must "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A); *see Tellabs*, 551 U.S. at 314, 323-24.  The PSLRA's heightened requirements for scienter pleading go beyond Rule 9(b), which permits intent to be alleged generally, and require the court to consider inferences favorable to the defendant.  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 524, 528 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009); *Tellab*s, 551 U.S. at 321, 324 (explaining that the "'strong inference' standard 'unequivocally raise[d] the bar for pleading scienter'" (citation omitted) and "a court must consider plausible, nonculpable explanations for the defendant's conduct").  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.

The PSLRA provides that a complaint not meeting these requirements "shall" be dismissed.  15 U.S.C. § 78u-4(b)(3)(A).

7

II.   **THE COMPLAINT FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION**

A.   **Plaintiffs May Not Rely on the Hindenburg Report**

Plaintiffs' blind reliance on the Hindenburg Report falls far short of the PSLRA's demands.  "Short sellers, [who] 'operate by speculating that the price of a security will decrease' . . . 'have an obvious motive to exaggerate the infirmities of the securities in which they speculate.'"  *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (citation omitted). For this reason, to survive a motion to dismiss, a plaintiff relying on such a report must provide "independent factual allegations corroborat[ing] the factual allegation[s] in the complaint drawn from short-sellers' reports."  *Id.* at 801-02 (dismissing complaint reliant on uncorroborated short-seller reports to allege falsity); *Harris*, 135 F. Supp. 3d at 159, 163 (dismissing complaint that "[r]el[ied] almost entirely on a negative report published by a short seller").

The Complaint here contains no independent factual allegations corroborating Hindenburg's claims on which Plaintiffs rely.  Plaintiffs identify three articles published in the wake of the Report that simply re-state the Hindenburg Report's allegations and do not independently corroborate them.  *See* ¶¶ 57-61.  Plaintiffs also reference two studies about the chemical recycling industry, published by GAIA and The Pew Charitable Trusts respectively, neither of which is alleged to demonstrate the falsity of any challenged statement.  ¶¶ 42, 46. Plaintiffs do not claim that any of these articles or studies corroborate the Hindenburg Report. ¶¶ 42, 46, 57-61.  And Plaintiffs' only "witness" from outside of the Report, Former Employee 1 ("FE1"), speaks only to Mr. Solomita's management style and says nothing about any of the bases of Plaintiffs' falsity claims based on the Report.  ¶ 139; *see infra* p. 23.  Thus, the Hindenburg Report itself cannot be the basis for Plaintiffs' claims.

Moreover, this Court has recognized the "particular need for close scrutiny where a short-

8

seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration." *Miao*, 442 F. Supp. 3d at 801. "In that circumstance, [the exact circumstance here,] the risk of motivated reporting by the author of the short-seller report is twinned with the reliability concerns presented by anonymous sourcing[.]" *Id.* Those reliability concerns have led the courts in this Circuit to require that confidential sources be described in the complaint with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) (citation omitted); *see also Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19 Civ. 10067 (PAE), 2020 WL 4734989, at *10-12, *34-42 (S.D.N.Y. Aug. 14, 2020) (explaining that "courts have tended not to credit uncorroborated statements of CWs who are sourced secondhand – with whom plaintiffs' counsel have not themselves interacted").

The Complaint's allegations come nowhere close to satisfying these heightened pleading requirements for confidential witnesses. Plaintiffs do no more than parrot the Hindenburg Report's characterization of purported interviews with anonymous sources, including an unknown number of former employees,[3] purported experts, and alleged competitors. *See* ¶ 6. Specifically, the Complaint relies on allegations from alleged "former Loop employees" lifted directly from the Hindenburg Report who question Loop's laboratory test results (¶¶ 50-53; Ex. 1 at 11-13, 16), opine that a "100% recovery rate was 'technically impossible'" (¶ 140; Ex. 1 at 13), opine that there were "issues" with the GEN I process (¶¶ 141-142; Ex. 1 at 13), and describe Mr. Solomita's management style (¶ 138; Ex. 1 at 10-11). These allegations sourced exclusively to the Hindenburg Report should be disregarded.

---

[3] It is impossible to discern the number of unique "former Loop employees" the Hindenburg Report quotes and paraphrases, and, in turn, the number of unique "former Loop employees" lifted from the Hindenburg Report that Plaintiffs rely upon in the Complaint. *See* ¶¶ 50-53, 138, 140-142; Ex. 1 at 2, 4, 10-13, 15-16, 18, 23-24, 27.

Virtually all of these allegations are attributed to "former Loop employees" with *no further information* provided as to the employees' identities. *See, e.g.*, ¶ 52 ("a former Loop employee told Hindenburg Research"); ¶ 53 ("another former Loop employee told Hindenburg Research"); ¶ 141 ("a former Loop employee stated"). The Complaint – and the Report – does not identify when the individuals worked at Loop, for how long, their positions, their job responsibilities, their reporting structure, or any information from which to infer personal knowledge.[4] No basis is provided to "indicate a high likelihood that [the former employees] actually knew facts underlying their allegations" or "had personal knowledge of [their] allegations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590, 595 (S.D.N.Y. 2011). In addition, the Complaint provides no indication that Plaintiffs' counsel did anything to confirm the identities and statements of these unnamed former employees. *Cf. In re Lehman Bros. Sec. & ERISA Litig.*, Nos. 10 Civ. 6637(LAK), 09 MD 2017(LAK), 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("Allowing counsel to rely on confidential witness statements recounted in a separate complaint would provide the Court little assurance that the factual contentions have any evidentiary support."). Finally, the Complaint does not contain "'independent [well-pled] factual allegations' that 'corroborate [the] confidential source[s'] statements.'" *Miao*, 442 F. Supp. 3d at 803 (quoting *Glaser*, 772 F. Supp. 2d at 590).

Likewise, the Complaint relies on allegations sourced to purported, unnamed "experts" lifted directly from the Report without any verification effort by Plaintiffs. *See, e.g.*, ¶ 40 ("Hindenburg Research consulted with a polymers/plastic expert"); ¶ 47 ("Hindenburg Research's expert explained"); ¶ 54 ("according to the Hindenburg Report, one expert noted");

---

[4] The only named former employee witness is Loop's former Chief Growth Officer, Nelson Switzer, who makes a single allegation that Loop's partnership deals with large multinational corporations required years of due diligence. ¶ 48; Ex. 1 at 15-16. This allegation is unrelated to any of Loop's statements that Plaintiffs challenge as false or misleading in this case.

¶ 140 ("Hindenburg Research's polymer expert").  These "experts" allegedly questioned Loop's claim that its process is "revolutionary" or "new," that its monomer yields were "high," and why Loop stopped reporting the analytics of its process.  ¶¶ 40-41, 47, 54, 140.  Plaintiffs appear to rely on two "experts": (1) a purported polymers/plastic expert and (2) "[a]nother expert."  ¶ 40; *see also* ¶¶ 41, 47, 54, 140.  Neither "expert" is described in the Complaint with sufficient particularity to support the probability that a person in his position would possess the information alleged.  *See Francisco*, 481 F. Supp. 3d at 208; *see also In re Silicon Storage Tech., Inc., Sec. Litig.*, No. C-05-0295 PJH, 2007 WL 760535, at *30 (N.D. Cal. Mar. 9, 2007) (courts may "consider allegations of data and information obtained from 'experts' – but . . . such factual allegations are subject to the same standard applied to evaluate facts alleged to have originated with any 'confidential informant' (or other witness)").

The Complaint identifies the first "expert" solely as "a polymers/plastic expert with over three decades of experience" (¶ 40); the Report adds that he has "30 years' experience," "worked as a chemist for over three decades, holds several patents and has specific experience working with advanced methods of plastic recycling."  Ex. 1 at 22.[5]  The Complaint identifies the second "expert" solely as "[a]nother expert with 45 years of experience" (¶ 40); the Report adds that he "has decades of experience with plastics" and has "worked in a number of positions in the industry, including as a project scientist for a company that merged with a $40 billion chemical company."  Ex. 1 at 22.  Even were the Court to credit the uncorroborated detail in the Report, this meager information is insufficient to satisfy the PSLRA.  Without the experts' names and resume information such as the companies where they worked, length of employment, positions and responsibilities, and prior expert engagements, it is impossible to discern if their experience

---

[5] This "expert" appears to be Hindenburg's reviewer of Loop's patents (*see* ¶¶ 6, 45-47; Ex. 1 at 14-15), a review that Plaintiffs' counsel did not independently corroborate.  *See* ¶¶ 6, 9, 45.

is at all relevant.  The allegations are insufficient to support the probability that these "experts" would possess the information Plaintiffs allege.[6]

Another district court recently dealt with this exact issue, dismissing a complaint where the plaintiff relied heavily on uncorroborated confidential witnesses in a short-seller report.  *See Diaz v. N. Dynasty Mins. Ltd.*, No. 17-CV-1241 PSG (SS), 2018 WL 5099749, at *7 (C.D. Cal. Apr. 30, 2018) ("Because Plaintiff's allegations rely wholly on the confidential sources quoted in the [Short Seller] Report, the Court determines that Plaintiff has not sufficiently plead the required falsity element.").  This Court should reach the same result here.

### B.   The Challenged Statements Are Not Actionable

Even if the allegations lifted from the Hindenburg Report were presumed true and credited, the Complaint would still fail to allege a false or misleading statement.  The Complaint's use of block quotes and bolding makes it difficult to determine exactly what statements Plaintiffs are challenging.  Defendants believe it is more than 100 statements in 39 documents and Defendants address those statements in the categories below.

#### 1.   Statements Touting "Innovative" and "Ground-breaking" Technology

Plaintiffs allege that 22 statements, in 16 documents, were false and/or misleading because of Loop's description of its technology as "revolutionary," "ground-breaking," "innovative," or "breakthrough."  ¶¶ 68, 70-71, 73-76, 79-83, 88-90, 108-109.  Strikingly, nowhere do Plaintiffs specifically allege that Loop's technology was ***not*** revolutionary, ***not*** ground-breaking, or ***not*** innovative.  Instead, the Complaint impermissibly seeks to shift Plaintiffs' pleading burden onto Defendants – claiming only that these statements are actionable

---

[6] Plaintiffs also rely upon an unnamed "chemical recycling executive," described in the Report merely as "a C-suite employee of a competitor."  ¶ 41; Ex. 1 at 23.  Again, no information is provided about this person or his personal knowledge and area of expertise to support the probability that he has any basis for his opinion about Loop's processes or technology.  The allegations from this source too should not be credited.

12

because "***Defendants have not demonstrated*** that Loop's technology is new, groundbreaking, unique, or 'revolutionary.'" *See* ¶¶ 84, 96, 113 (emphasis added).

This maneuver violates a fundamental principle of securities fraud pleading under the PSLRA:  Plaintiffs are not permitted to blithely assert that statements are false and then demand – under threat of securities fraud liability – that Defendants prove that the statements are true. Rather, as "[t]he Second Circuit has repeatedly stated," it is the Plaintiffs' burden to "demonstrate with specificity why" a given "statement is false."  *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) (quoting *Rombach*, 355 F.3d at 174), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018).  As Plaintiffs have failed to carry this burden, as well as for the additional reasons below, the Complaint's falsity allegations as to Loop's descriptive terminology fail.

*First*, the challenged descriptive terms refer to Loop's technology that has been *patented*. *See, e.g.*, ¶¶ 96, 100, 105, 113.  There is nothing misleading about describing such technology as "revolutionary" or "innovative."  To the contrary, it is a bedrock principle of patent law that "an essential requirement" for a patent to issue is that the patented "subject-matter display 'invention,' . . . 'ingenuity' . . . [and] substantial ***innovation***."  *Sinclair & Carroll Co. v. Interchemical Corp.*, 325 U.S. 327, 330 (1945) (emphasis added); *see also Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 780 (Fed. Cir. 1985) ("The patent law imposes certain fundamental conditions for patentability, paramount among them being the condition that what is sought to be patented, as determined by the claims, *be new*." (emphasis added)).

*Second*, these descriptors are inactionable puffery, which are incapable of truth or falsity. The law recognizes that "[p]eople in charge of an enterprise are . . . expected to be confident

13

about . . . the business that they manage." *Rombach*, 355 F.3d at 174.  As such, statements of puffery, *i.e.* "enthusiastic[] descri[ptions]" of "performance" or "expectations of business success . . . do not give a reasonable investor meaningful information on which to rely," *see Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019), and "do not give rise to securities violations," *Rombach*, 355 F.3d at 174.  In particular, courts view the invocation of "soft adjectives" – descriptors that are generalized and not objectively verifiable – as paradigmatic examples of puffing.  *See, e.g.*, *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07 Civ. 3994 (LTS) (AJP), 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) (use of "soft adjectives" to describe a management team as "strong," "experienced," and "capable" are "nothing more than puffery"); *Johnson v. Sequans Commc'ns S.A.*, No. 11 Civ. 6341 (PAC), 2013 WL 214297, at *14 (S.D.N.Y. Jan. 17, 2013) (company's statement that it is an "early leader in [a technology] market" is "a non-actionable statement of puffery"); *see also Gregory v. Pronai Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y.) (a defendant company's "broad assertions" about the subjective qualities of its business and products "are not actionable") (collecting cases), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).  Loop's use of descriptors such as "revolutionary," "ground-breaking," and "breakthrough" are unverifiable "soft adjectives," which "enthusiastically" describe Loop's products and their performance, but do not give rise to securities fraud liability.

In fact, courts have found that several "soft adjective" descriptors used by Loop and challenged by Plaintiffs here are inactionable puffery.  *See, e.g.*, *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 173 (3d Cir. 2014) (statement describing a product "as a potential 'breakthrough' drug" was not actionable because it was "vague, non-specific, and forward-

14

looking"); *In re NVE Corp. Sec. Litig.,* 551 F. Supp. 2d 871, 902 (D. Minn. 2007) ("NVE's use of the word 'revolutionary' to characterize [its technology] was inactionable puffery."), *aff'd*, 527 F.3d 749 (8th Cir. 2008).  Thus, even if Plaintiffs had met their burden to plead falsity of the descriptors with particularity, the claims based on these statements should still be dismissed.

### 2.    Statements Regarding Loop's "Commercially Viable Technology"

Most of the statements that Plaintiffs challenge were, or relate to, announcements of partnerships aimed at eventually commercializing Loop's technology.[7]  But only three of these statements are alleged to contain false or misleading claims about commercialization, and all of these are in the context of discussing a single agreement with Thyssenkrupp.  *See* ¶ 85(b) (challenging the statement:  "The Global Alliance Agreement [with Thyssenkrupp] advances the integration of our respective technologies intended to provide a turn-key industrial solution for license to manufacturing companies seeking a ***commercially viable technology to produce sustainable PET and polyester plastic***"); ¶¶ 86, 87(c) (nearly identical statements).  No other Loop statements pertaining to the commercial viability of Loop's products are identified or challenged in the Complaint.  Plaintiffs allege that these three statements are "false and/or misleading" because "Loop has underestimated the cost in scaling up and commercializing its technology and product."  ¶ 96; *see also* ¶ 4. This claim is lifted directly from the Hindenburg Report, which in turn is sourced to two unnamed Thyssenkrupp "senior executives", whose allegations must be disregarded for failure to satisfy the PSLRA's particularity requirements.[8]

---

[7] *See* ¶¶ 68-70, 72-74, 77-79, 82-83, 85-88, 90-94, 97-99, 101-104, 106-112.

[8] The Hindenburg Report says nothing about how these "senior executives" might have *learned* that Loop allegedly underestimated costs or why these "executives" in a third-party company would have had access to such information and fails to detail a basis for the executives' personal knowledge.  *See, e.g.*, *Steinberg v. Ericsson LM Tel. Co.*, No. 07 CV. 9615 (RPP), 2008 WL 5170640, at *6 (S.D.N.Y. Dec. 10, 2008) (rejecting allegations from confidential sources where "the confidential sources Plaintiff relies upon here are not shown to have direct

*See* Ex. 1 at 26; ¶¶ 8, 43-44; *supra* § II.A.

In reality, however, Loop repeatedly cautioned the market – in clear and unequivocal terms – that *the opposite* may be true.  In particular, Loop warned in its public filings that:

- "We *have not yet demonstrated the ability to manufacture a commercial-scale product* or conduct sales and marketing activities necessary for successful commercialization." Ex. A at 9; Ex. B at 10; Ex. C at 8 (emphasis added).

- "*Our technology may not be successful in developing commercial products*."  Ex. A at 10; Ex. B at 11; Ex. C at 9 (emphasis added).

- "*Our technology . . . may never be successfully commercialized*[.]"  Ex. A at 10; Ex. B at 11 (emphasis added); *see also* Ex. C at 9 ("Our technology may never become commercialized.").

- And, "*[o]ur technology may not be commercially successful*."  Ex. A at 10; Ex. B at 11; Ex. C at 9 (emphasis added).

Plaintiffs' suggestion to the contrary is unfounded.  *See* ¶ 4; *e.g.*, *In re Weight Watchers Int'l Inc. Sec. Litig.*, No. 19cv2005, 2020 WL 7029134, at *16 (S.D.N.Y. Nov. 30, 2020) (dismissing claim because defendant "disclose[d] the *exact* risk of which Plaintiffs complain"); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 380-82 (S.D.N.Y. 2007) (dismissing complaint where "[a] reasonable investor would have been on notice that [the] risk existed based on the cautionary statements accompanying [company's] announcements"); *cf. NVE Corp.*, 551 F. Supp. 2d at 897, 900 (finding that "the prediction of future commercialization, marketing, and selling is couched in qualified language, making it vague and immaterial").

Moreover, none of the challenged statements makes any reference to the "cost" of scaling up or commercializing Loop's technology.  Each merely states that the *Agreement* between Loop and Thyssenkrupp "advances the integration" of the companies' technologies and is "*intended*" to provide a solution to third parties seeking a commercially viable product.  ¶¶ 85(b), 86, 87(c).

---

knowledge" of the matters on which they commented), *aff'd sub nom. Furher v. Ericsson LM Tel. Co.*, 363 F. App'x 763 (2d Cir. 2009).

Even if it were true that Loop underestimated the costs of commercializing its technology in the context of the Thyssenkrupp partnership, that does nothing to undermine the claim that the Agreement was "***intended***" to provide a commercially viable technology.  The statements – which are only about the *intent* of the Agreement – are therefore not actionable.  *See Xerox Corp.*, 300 F. Supp. 3d at 580 (no falsity where plaintiffs ignored the full context of statements).

    3.        Statements Regarding Sustainability of Loop's Resin and Products

Plaintiffs challenge Loop's use of the phrase "100% sustainable" in 63 of its public statements contained in 24 documents[9] because allegedly "Loop's PET plastic resin and polyester fiber was not 100% sustainably produced and instances of applying both pressure and heat, inputs obtained from external sources, are replete in Loop's patents."  ¶¶ 84, 96, 100, 105, 113.  Loop's references to "100% sustainable" PET plastic resin appear in connection with the announcement of partnership and other commercial agreements with third parties.  *See, e.g.*, ¶¶ 69, 78 (announcement of agreements with PepsiCo and Coca-Cola).  Notably, each of the challenged statements is inherently forward-looking; each describes ***plans*** for a partnership with a third-party that will ***eventually*** market and/or rely upon Loop technology.

The allegation that these statements are false fails because, yet again, Plaintiffs shirk their burden to explain ***why*** or ***how*** Loop's PET plastic resin and polyester fiber was "not 100% sustainably produced," relying instead on their own *ipse dixit.*  This type of pleading is wholly insufficient to allege a false or misleading statement under the PSLRA.  *See supra* § II.B.1.

Judge Marrero's decision in *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438 (S.D.N.Y. 2008) is instructive.  In that case, the plaintiffs challenged the defendant company's use of the word "biotech" in its name and public disclosures as false or misleading, relying in

---

[9] *See* ¶¶ 68-69, 72, 74, 77-79, 82, 85, 87-94, 97-107, 110-112.

part on a newspaper article stating "Bodisen isn't biotech." *See Bodisen Biotech*, 579 F. Supp. 2d at 452. The *Bodisen* court rejected the plaintiffs' falsity allegations as to the word "biotech," because the plaintiffs "fail[ed] to allege in any detail how this use was false or misleading . . . Plaintiffs do not define biotech nor demonstrate how Bodisen Defendants' use of the term was incorrect." *Id.* For the same reason, the *Bodisen* court also rejected plaintiffs' challenge to the company's description of its products as "organic": "Plaintiffs fail to articulate their definition of organic, and do not make any specific statements as to how Bodisen's products fail to comply with any standard definition of organic." *Id.*; *see also Xerox Corp.*, 300 F. Supp. 3d at 580-81 (no falsity where Xerox described itself as having "flat profitability" as plaintiffs did not define this term nor "allege facts exposing as false [the] claim of 'flat profitability'"). The analysis in *Bodisen Biotech* is on all fours with respect to Plaintiffs' allegations about Loop's use of the phrase "100% sustainable." Here, too, Plaintiffs make no attempt to explain what it means for a product to be "100% sustainably produced" – either in their own view or according to some standard definition – and further say nothing about why or how Loop's products fall outside the scope of products that are "100% sustainably produced."

Accordingly, "Plaintiffs have failed to satisfy their pleading burden of explaining why the statements were fraudulent." *See Bodisen Biotech*, 579 F. Supp. 2d at 452.

### 4. Statements Regarding Loop's "High Monomer Yields"

Plaintiffs challenge four statements that Loop made about its transition from GEN I to GEN II and its continuing to see "high monomer yields." *See* ¶¶ 92-95. In support of their challenge to these statements, Plaintiffs posit that "Loop's technology and process did not produce consistently high monomer yields, but rather saw monomer yields as low as 70% after just one distillation." ¶ 96. These question-begging allegations do not sufficiently plead a false statement. *See supra* § II.B.3. Plaintiffs, again, make no attempt to define what qualifies as a

18

"high monomer yield" in the context of chemical recycling – or in any context – and do not explain why a monomer yield between 70% and 83% is not "high." *See* ¶ 47.  In fact, Plaintiffs admit that Loop's technology produced monomer yields as high as 83% after one distillation. *Id.*  Accordingly, Plaintiffs fail to meet their pleading burden as to these challenged statements.

5.     Statements Regarding Loop's Energy Use

Plaintiffs challenge 11 statements regarding the use of energy in Loop's technology. Eight of those statements relate to Loop's use of the phrase "zero" energy.  ¶¶ 114-119, 122-123. The other three statements relate to Loop's use of the phrase "low heat and no added pressure." ¶¶ 121, 124; ¶ 120 ("low heat and no pressure").  These statements are not actionable.

With respect to the eight "zero" energy statements, Plaintiffs' challenges to these statements fail because, as noted above, Plaintiffs actually admit that Loop disclosed during the Class Period that its technology used "low" energy.  ¶¶ 120-121, 124.  Loop made numerous additional disclosures regarding its technology's energy use during the Class Period.  For example, on October 10, 2018, just after the start of the Class Period, Loop disclosed:  "Our *low energy* depolymerization technology specifically targets PET/Polyester plastic allowing for the removal of all impurities[.]"  Ex. E at 4 (emphasis added).

Moreover, Plaintiffs allege that Hindenburg purportedly "found" Loop's use of low energy inputs for its GEN II technology through a review of Loop's publicly available patents. ¶ 45.  A securities claim fails when it is based on information that was already publicly disclosed.  *See, e.g.*, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003); *see also In re Curaleaf Holdings, Inc. Sec. Litig.*, --- F. Supp. 3d ----, 2021 WL 567239, at *6 (E.D.N.Y. Feb. 16, 2021).

With respect to the statements referencing "low heat and no added pressure," Plaintiffs do not sufficiently plead that the statements were false.  There are no factual allegations in the

19

Complaint regarding when energy is used and how much energy is used in Loop's technology. Nor is there any effort to describe what constitutes "low" heat, "no pressure," or "no added pressure" in the context of chemical recycling.  *See supra* § II.B.3 (citing cases rejecting claims based on challenges to undefined terms).

## III.    THE COMPLAINT FAILS TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

As Plaintiffs have failed to plead an actionable misstatement or omission, the Court need not consider the Complaint's scienter allegations.  *See, e.g.*, *Ulbricht v. Ternium S.A.*, No. 18-CV-6801 (PKC) (RLM), 2020 WL 5517313, at \*11 (E.D.N.Y. Sept. 14, 2020).  Nonetheless, Plaintiffs' failure to plead particularized facts giving rise to the PSLRA's requisite strong inference of scienter provides an independent basis for dismissal.  *See Tellabs*, 551 U.S. at 319.

Scienter is adequately alleged only where a plaintiff pleads particularized facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198. Satisfying the motive and opportunity prong of scienter, requires Plaintiffs to allege that Defendants "benefitted in some concrete and personal way from the purported fraud."  *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at \*6, \*8 (S.D.N.Y. Jan. 21, 2021) (citation omitted).  But "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA*, 553 F.3d at 198.  Satisfying the conscious misbehavior or recklessness prong requires a plaintiff "to show, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  *Shemian v. Research in Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014).

20

Plaintiffs have not sufficiently pled either aspect of this test.  The absence of facts giving rise to the required strong inference of scienter for any Defendant dooms the Complaint.

### A.    Plaintiffs Fail to Allege Scienter as to CEO Solomita

The Complaint does not plead a motive for Mr. Solomita to commit fraud.  The Complaint is devoid of allegations that Mr. Solomita sold his "own shares at a profit," and, in fact, does not allege that Mr. Solomita sold *any* of his Loop shares during the Class Period.  *See Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at \*7 ("Since 'Plaintiffs make no allegation that any Defendant sold shares during the Class Period[,]' they 'fail to allege that Defendants received a 'concrete and personal' benefit from the alleged scheme[.]'" (citations omitted)).[10]

To the extent the Complaint contains *any* allegations of motive, they are limited to the claim that Mr. Solomita – Loop's Founder, President, CEO, and Chairman – is also the Company's controlling shareholder.  *See* ¶¶ 136-137.  But this unsurprising allegation (that the founder of a development-stage company owns much of that company's stock), without concurrent allegations of suspicious and profitable stock sales, is insufficient to show that Mr. Solomita "benefitted in some concrete and personal way from the purported fraud."  *See Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at \*6, \*8 (citation omitted).

The thrust of Plaintiffs' allegations are that Mr. Solomita must have known (or have been reckless in not knowing) that the challenged statements were false or misleading when made, because he (i) was Loop's President, CEO, and Chairman during the Class Period; (ii) employed a "hands-on" and "micromanaging" leadership style; and (iii) owned large quantities of Loop stock.  *See* ¶¶ 136-137, 139.  Notably, because Plaintiffs have not made a "showing of motive,"

---

[10] *See also Francisco*, 481 F. Supp. 3d at 213 (no scienter where Defendant CEO "is not alleged to have sold a single share of his own [company] stock . . . during the class period"); *Turner v. magicJack VocalTec, Ltd.*, No. 13 Civ. 0448, 2014 WL 406917, at \*11 (S.D.N.Y. Feb. 3, 2014) ("lack of stock sales tends to negate [an] inference of scienter").

21

Second Circuit law requires that "the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater," in order to raise a strong inference of scienter. *Wyche v. Advanced Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (citation omitted). Plaintiffs' allegations do not satisfy this standard.

*First*, Plaintiffs' allegations regarding Mr. Solomita's positions at Loop are inadequate to support an inference of scienter. *See* ¶¶ 132, 136-139. "[I]t is practically hornbook law" in this Circuit that scienter allegations "founded on nothing more than a defendant's corporate position" are "entitled to ***no weight***." *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (emphasis added) (citation omitted); *see also In re PetroChina Co. Sec. Litig.*, 120 F. Supp. 3d 340, 366 (S.D.N.Y. 2015) (to plead scienter, "Plaintiffs must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions"), *aff'd sub nom. Klein v. PetroChina Co.*, 644 F. App'x 13 (2d Cir. 2016); *KeySpan Corp.*, 383 F. Supp. 2d at 387 ("mere allegations defendants were senior executives and [thus had] access to inside information [is] insufficient" to establish scienter).

*Second*, Plaintiffs' *ipse dixit* claim that it is "simply illogical" that Mr. Solomita did not know his statements were false does not stand up to scrutiny. *See* ¶ 137. To support this conclusory allegation, Plaintiffs aver that Mr. Solomita's "hands-on" management style and holdings in Loop stock indicate that he *must* have been aware of the alleged falsity of his statements regarding "Loop's sole technology and its viability." ¶¶ 137-139. The PSLRA does not permit pleading scienter based on a mere assumption that senior executives must have known facts contrary to their public statements; rather, "[w]here plaintiffs allege that defendants knew about or had access to . . . facts" contrary to their public statements, plaintiffs "***must*** specifically

22

identify the reports or statements containing this information." *Weight Watchers*, 2020 WL 7029134, at *19 (emphasis added) (citation omitted). Here, the Complaint sets forth no facts "specifically identify[ing]" the source of any contrary information that Mr. Solomita accessed. Instead, all that is alleged is that Mr. Solomita employs a "hands on" style and uses an "intimidating tone." ¶¶ 138-139; *see also Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, --- F. Supp. 3d ----, 2021 WL 517934, at *6 (S.D.N.Y. Feb. 10, 2021) (rejecting plaintiffs' argument that defendant executives "must have been aware" of the alleged fraud because they were "tight-knit" and "hands-on"; explaining that "hands-on management" allegations are "insufficient to establish scienter on its own").[11] While Plaintiffs assert that Mr. Solomita must have known the falsity of his statements, they do not identify how or when he acquired this information. Courts reject this type of scienter allegation, based on conclusory claims of contrary knowledge, because crediting such allegations "would effectively vitiate scienter standards for any securities class action" as "merely naming senior executives as defendants would fulfill the Exchange Act and PSLRA's scienter element." *Weight Watchers*, 2020 WL 7029134, at *20.

*Finally*, Plaintiffs tack on the throw-away allegation that because Loop "refined" elements of its public descriptions of its technology over time – *e.g.*, by purportedly removing

---

[11] These allegations from FE1 and "former Loop employees" lifted from the Hindenburg Report should also be disregarded for failure to satisfy the Second Circuit's rigorous pleading standards for confidential sources. *See supra* § II.A; *Miao*, 442 F. Supp. 3d at 799 n.19 (for information from a confidential witness to establish scienter, the complaint "must describe the nature of the CW's contact with the individual defendants that would be probative of defendants' mental state"); *Altimeo*, 2020 WL 4734989, at *11 (courts do not credit statements from confidential witnesses where it is not alleged "that they were in a position to know the facts attributed to them"). FE1, who professes to know that Mr. Solomita "had his hands in everything," was "very autocratic," and was "prone to anger," never claims to have met, observed, interacted with, or otherwise apprehended Mr. Solomita's demeanor or management style. ¶ 139. In fact, FE1 reported to Mr. Gentiletti, *not* Mr. Solomita. ¶ 139 n.10. The Hindenburg Report's allegation of an insufficiently described former employee who said Mr. Solomita's tone was "intimidating" should be disregarded for the same reason. ¶ 138.

adjectives such as "revolutionary" and "ground-breaking" – that somehow demonstrates that Mr. Solomita had knowledge that earlier statements, still including those adjectives, were false or misleading when made. ¶¶ 133-135. This argument is unavailing: while Loop, later in the Class Period, began to use the terms "breakthrough" and "transformational" rather than "revolutionary," this substitution of synonyms hardly amounts to a tacit retraction of Loop's earlier statements. *See, e.g.*, ¶ 108 (using "breakthrough"); ¶ 90(c) (using "transformational"). Moreover, contrary to Plaintiffs' claim (*see* ¶¶ 134-135), Loop's statements regarding the use of energy in its technology cannot support an inference of scienter because Loop disclosed during the Class Period that its technology used low energy inputs. *See supra* § II.B.5.[12]

**B.      Plaintiffs Fail to Allege Scienter as to Former CFO Gentiletti**

The Complaint's failings are even more evident with respect to Mr. Gentiletti, who was not employed at Loop for the first three months of the Class Period. *See* ¶¶ 1, 21. In fact, Plaintiffs' **only** substantive allegations as to Mr. Gentiletti are that he signed certain public filings that contained challenged statements, and he "possessed the power and authority to control" the content of those filings. *See* ¶¶ 21-22. Nothing else – no stock sales, no actual knowledge of falsity, and no particularized evidence of recklessness – is alleged. Indeed, FE1, who allegedly reported to Mr. Gentiletti, provides no allegations as to Mr. Gentiletti's knowledge of any false statements. *See* ¶ 139 & n.10. The mere allegation that a defendant signed an SEC filing does not raise an inference of scienter as to the statements therein. *See, e.g.*, *In re Veon Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2018 WL 4168958, at *18 (S.D.N.Y. Aug. 30, 2018) ("a 'plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification

---

[12] Plaintiffs' claims concerning Loop's GEN I technology (¶¶ 140-142) also do not support an inference of scienter. The allegations are more of the same – allegations that rely on unnamed sources that may not be credited, which seem to allege, without the required specificity, that the Defendants must have known of falsity because of their mere positions at the Company.

24

without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements'" (citation omitted)); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010).  Plaintiffs' claim that Mr. Gentiletti acted with scienter fails.

### C.    Scienter May Not Be Inferred from the SEC's Investigation of Loop

The allegations of a post-Class Period SEC investigation into the Company also does not support a scienter inference.  ¶ 56.  Courts in this Circuit recognize both that "[s]ecurities regulators are obligated to examine the behavior of public corporations, and the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter," *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011), and that, standing alone, "government investigations are just that, investigations." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015).

### D.    Plaintiffs Fail to Allege Scienter as to Defendant Loop

Because Plaintiffs fail to allege scienter as to Messrs. Solomita and Gentiletti or any "senior officer" of Loop, they also fail to allege scienter as to Loop.  *See Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020) (plaintiff must plead "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" (citation omitted)); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

## IV.    THE COMPLAINT FAILS TO STATE A VIOLATION OF SECTION 20(A)

Because Plaintiffs fail to state a primary violation under Section 10(b), the Section 20(a) claim must also be dismissed.  *See ATSI Commc'ns*, 493 F.3d at 108.

### CONCLUSION

For the reasons stated, the Complaint should be dismissed.

Dated:  April 27, 2021

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*s/ Sheryl Shapiro Bassin*
Sheryl Shapiro Bassin
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
sbassin@wsgr.com

Keith E. Eggleton (admitted *pro hac vice*)
David A. McCarthy (admitted *pro hac vice*)
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
keggleton@wsgr.com
dmccarthy@wsgr.com

*Attorneys for Defendants Loop Industries, Inc.,
Daniel Solomita, and Nelson Gentiletti*

26