**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE LOOP INDUSTRIES, INC. SECURITIES LITIGATION | Case No. 7:20-cv-8538-NSR<br><br>Consolidated with:<br>Case No. 7:20-cv-9031-NSR |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**POMERANTZ LLP**
Jeremy A. Lieberman
Murielle J. Steven Walsh
Eric D. Gottlieb
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
　　　 mjsteven@pomlaw.com
　　　 egottlieb@pomlaw.com

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: glinkh@glancylaw.com

*Counsel for Lead Plaintiffs Sakari Johansson and John Jay Cappa and Co-Lead Counsel for the proposed Class*

*(Additional Counsel on Signature Page)*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

      A.      The Company and Its Business................................................................ 3

      B.      Defendants Misled Investors About Loop's Technology .......................... 4

      C.      Hindenburg Research Issues A Report Concluding the Company is "Smoke and Mirrors" And Lacks "Viable Technology" ........................... 6

      D.      The Hindenburg Report's Revelations Prompt An SEC Investigation and Other Fallout .................................................................. 7

ARGUMENT ....................................................................................................................... 8

    I.      APPLICABLE STANDARDS ........................................................................ 8

    II.     PLAINTIFFS STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5 ............................................................................................................... 9

      A.      The AC Adequately Alleges Material Misstatements and Omissions ................................................................................................. 9

            1.      Plaintiffs Can Rely on the Report For Pleading Purposes ............ 11

            2.      Plaintiffs Adequately Allege Materially False and Misleading Statements and Omissions by Defendants Concerning the Company's Technology ...................................... 13

                  a.      The Complaint Alleges Why Each of the Statements was False and Misleading ................................................ 13

                  b.      The Alleged Misstatements Are Not Puffery.................... 18

                  c.      Risk Disclosures Do Not Shield Defendants From Liability ............................................................................ 19

      B.      The AC Sufficiently Alleges Defendants' Scienter ................................. 20

            1.      The AC Alleges Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ..................................... 21

             2.      The AC Sufficiently Alleges Motive and Opportunity ................. 24

             3.      The AC Pleads Corporate Scienter ............................................. 25

    III.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(A) ............................ 25

CONCLUSION.................................................................................................................. 25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Asar*,
   768 Fed. App'x 175 (5th Cir. 2019) ......................................................................22

*Ark. Tchr. Ret. Sys. v. Bankrate, Inc.*,
   18 F. Supp. 3d 482 (S.D.N.Y. 2014)......................................................................22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)......................................................................................9

*Bell Atl. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................1, 8

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014)...................................................................................18

*City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)..................................................................2, 20

*City of Warren Police & Fire Retirement Sys. v. World Wrestling Entm't, Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020)....................................................................13

*Cohen v. Kitov Pharm. Holdings, Ltd.*,
   2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .......................................................22

*Diaz v. N. Dynasty Mins. Ltd.*,
   No. 17-CV-1241, 2018 WL 5099749 (C.D. Cal. Apr. 30, 2018) ...........................12

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   847 F. Supp. 2d 624 (S.D.N.Y. 2012)....................................................................19

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014) .....................................................................25

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 ...............................................................................................20

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000)...............................................................................18, 19

*Gauquie v. Albany Molecular Rsch., Inc.*,
No. 14 CV 6637(FB)(SMG), 2016 WL 4007591 (E.D.N.Y. July 26, 2016)..........................23

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002)...................................................................................................20

*Harris v. AmTrust Financial Services*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015) (Br. ) ..........................................................................12

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
422 F.Supp. 3d 821 (S.D.N.Y. 2019).....................................................................................21

*Ho v. Duoyuan Glob. Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012).............................................................................11, 12

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
Scot. Grp., PLC*,
783 F. 3d 383 (2d Cir. 2015).................................................................................................10

*In re Allergan PLS Sec. Litig.*,
No. 18 Civ. 12089 (CM), 2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) ..............................16

*In re Aphria, Inc. Sec. Litig.*,
No. 18 CIV. 11376 (GBD), 2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020)......................11, 13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)...............................................................................21, 22

*In re Banc of Cal. Sec. Litig.*,
2017 WL 3972456 (C.D. Cal. Sept. 16, 2017) .......................................................................11

*In re Carter-Wallace, Inc., Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000).....................................................................................................21

*In re China Educ. Alliance, Inc. Sec. Litig.*,
No. CV 10-9239, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ............................................11

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
--- F. Supp. 3d ----, 2021 WL 567239 (E.D.N.Y. Feb. 16, 2021)...........................................15

*In re Eros Int'l Plc Sec. Litig.*,
No. CV 19-14125, 2021 WL 1560728 (D.N.J. Apr. 20, 2021) ...............................................11

*In re Ibis Tech. Sec. Litig.*,
422 F. Supp. 2d 294 (D. Mass. 2006) ....................................................................................25

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017).....................................................................................10

*In re ITT Educ. Servs., Sec. Litig.*,
34 F. Supp. 3d 298 (S.D.N.Y. 2014)....................................................................................24

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................................................15

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
No. 13-CV-214 (HB), 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ................................11, 12

*In re NTL, Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y 2004)....................................................................................10

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d 871 (D. Minn. 2007).................................................................................18

*In re Portal Software, Inc. Sec. Litig.*,
No. 03-cv-5138, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) .............................................24

*In re Reserve Fund Sec. & Derivative Litig.*,
732 F. Supp. 2d 310 (S.D.N.Y. 2010).............................................................................24, 25

*In re Sanofi-Aventis Sec. Litig.*,
774 F. Supp. 2d 549 (S.D.N.Y. 2011).................................................................................14

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)..................................................................................................9

*In re Sequans Commc'nsuns. S.A. Sec. Litig.*,
2019 WL 4805072 (E.D.N.Y. Sept. 30, 2019) ....................................................................22

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)................................................................................................14

*In re Warnaco Grp. Inc. Sec. Litig. (II)*,
388 F.Supp. 2d 307 (S.D.N.Y. 2005), *aff'd sub nom. Lattanzio v. Deloitte &
Touche LLP*, 476 F.3d 147 (2d Cir. 2007).............................................................................10

*Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010)................................................................................................19

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011)................................................................................................15

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).............................................................................................................9

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013)........................................................................11, 12, 13

iv

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)...................................................................................................18

*Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................................................................................12

*New Orleans Emps' Ret. Sys. v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) .............................................................................................22

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018), *aff'd on other grounds sub nom.*
   *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020).....................................13

*Norfolk Cnty. Ret. Sys. v. Ustian*,
   No. 07 Civ. 7014, 2009 WL 2386156 (N.D. Ill. July 28, 2009)............................................24

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...............................................................................................9, 19

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018) (Br. ) .........................................................................17

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)..............................................................................................................18

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)...................................10

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)......................................................................................21

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by City of Dearborn*
   *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th
   Cir. 2017) ..............................................................................................................................23

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..................................................................................................20

*SEC v. Rio Tinto PLC*,
   No. 17-cv-7994, 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019), *reconsid'n*
   *denied*, 2021 WL 818745 (S.D.N.Y. Mar. 3, 2021), *mot. to cert. app. granted*,
   2021 WL 1893165 (S.D.N.Y. May 11, 2021) ........................................................................19

*Shanawaz v. Intellipharmaceutics Int. Inc.*,
   348 F.Supp.3d 313 (S.D.N.Y. 2018)......................................................................................24

*Sinclair & Carroll Co. v. Interchemical Corp.*,
  325 U.S. 327 (1945) ......................................................................................................18

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ...........................................................................................10

*Skiadas v. Acer Therapeutics Inc.*,
  No. 19-CV-6137 (GHW), 2020 WL 3268495 (S.D.N.Y. June 16, 2020),
  *reconsid'n denied*, 2020 WL 4208442 (July 21, 2020) .......................................2, 9, 10

*Snellink v. Gulf Res., Inc.*,
  870 F. Supp. 2d 930 (C.D. Cal. 2012) ...........................................................................11

*Steginsky v. Xcelera Inc.*,
  741 F.3d 365 (2d Cir. 2014) .............................................................................................8

*Tabor v. Bodisen Biotech, Inc.*,
  579 F. Supp. 2d 438 (S.D.N.Y. 2008) ............................................................................16

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) .....................................................................................21, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................................10, 20, 23, 24

*Titanium Metals Corp. of Am. v. Banner*,
  778 F.2d 775 (Fed. Cir. 1985) .......................................................................................18

*Uxin Ltd. Sec. Litig. v. XXX*,
  125 N.Y.S.3d 537 (N.Y. Sup. Ct. 2020) ........................................................................12

*Van Buskirk v. N.Y. Times Co.*,
  325 F.3d 87 (2d Cir. 2003) .............................................................................................25

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
  28 F. Supp. 3d 93 (D. Mass. 2014) ................................................................................24

**Statutes**

15 U.S.C. § 78u-4(b) ............................................................................................9, 10, 20

Private Securities Litigation Reform Act of 1995 ................................................... *passim*

**Rules**

Fed. R. Civ. P. 9(b) .........................................................................................................9, 10

Fed. R. Civ. P. 12(b)(6) ...................................................................................................8, 18

vii

Fed. R. Civ. P. 15(a)(2)..........................................................................................................25

**Other Authorities**

17 C.F.R. § 240.10b-5.........................................................................................................9, 10

## GLOSSARY OF TERMS

**"AC" or "Complaint"** – refers to Amended Consolidated Class Action Complaint (Dkt. No. 25)

**"Br. at _"** – refers to pages in Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint, dated April 27, 2021.

**"CEO"** – means Chief Executive Officer

**"CFO"** – means Chief Financial Officer

**"COO"** – means Chief Operating Officer

**"Company"** – refers to Defendant Loop Industries, Inc.

**"Defendants"** – refers to Defendants Loop Industries, Inc., Daniel Solomita, and Nelson Gentiletti

**"Defs Ex. _"** – refers to the exhibits to the Declaration of of Sheryl Shapiro Bassin filed with Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint, dated April 27, 2021

**"Ex. _"** – refers to exhibits

**"FE"** – refers to former employee

**"Individual Defendants"** – refers to Defendants Daniel Solomita, Loop's founder, CEO, President and Chairman of the Board of Directors at all relevant times, and Nelson Gentiletti, Loop's CFO and COO since January 1, 2019

**"Loop"** – refers to Defendant Loop Industries, Inc.

**"Plaintiffs"** – means Co-Lead Plaintiffs Sakari Johansson and John Jay Cappa

**"Pls Ex. _"** – refers to exhibits the to the Declaration of Murielle J. Steven Walsh filed concurrently herewith

**"PET"** – means polyethylene terephthalate

**"PSLRA"** – means the Private Securities Litigation Reform Act of 1995

**"Report"** – refers to Hindenburg Research's report, entitled "*Loop Industries: Former Employees and Plastics Experts Blow The Whistle on This 'Recycled' Smoke And Mirrors Show*," published on October 13, 2020, which was attached as Exhibit 1 to the Complaint (Dkt. No. 25-1)

**"¶__"** – refers to paragraphs in the AC (Dkt. No. 25)

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Amended Consolidated Class Action Complaint ("Complaint" or "AC").[1]

## PRELIMINARY STATEMENT

This is a securities fraud class action on behalf of investors who purchased Loop securities between September 23, 2018 and October 12, 2020, inclusive ("Class Period"). Loop is a development-stage company focused on recycling technology intended to address the world's plastic crisis. It has yet to earn revenues. During the Class Period, Defendants issued statements that led investors to believe that their plastic recycling technology was "groundbreaking," used little to no energy and no pressure, and was on track to be commercially scalable in short order. Loop's public statements also convinced prominent companies, such as Danone and Coca-Cola, to enter into potentially highly lucrative agreements with Loop using its technology.

Those claims were revealed to be false however when, on October 13, 2020, Hindenburg Research ("Hindenburg") published a report (the "Report") exposing Loop as "smoke and mirrors with no viable technology" based on an extensive investigation that involved, *inter alia*, interviews with former Loop employees, competitors, partners, experts, and analysis of Loop's representations made in its patent filings for its technology. The Report caused Loop's stock price to fall approximately 32.5%, or $3.78 per share. The Report caused significant negative fallout for Loop: the SEC launched an investigation, contract partner Coca-Cola dumped its supply agreement with Loop, and media soon corroborated certain of the Report's findings.

Unable to squarely address the AC, which alleges "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007), Defendants ask the Court to ignore the well-pled allegations, and instead choose Defendants' preferred set of alternate

---

[1] Unless otherwise indicated, internal quotations and citations are omitted and emphasis is added.

facts to find for them at the pleading stage. These strained arguments ignore the basic rule that the Court cannot resolve factual disputes at this stage, and that well-pled allegations must be construed in Plaintiffs' favor. *See Skiadas v. Acer Therapeutics Inc.*, No. 19-CV-6137 (GHW), 2020 WL 3268495, at *9 (S.D.N.Y. June 16, 2020), *reconsid'n denied*, 2020 WL 4208442 (July 21, 2020).

In their Motion, Defendants challenge the falsity and scienter elements of Plaintiffs' securities fraud claim—these arguments for dismissal should be rejected. First, contrary to Defendants' suggestion, securities fraud complaints can base their factual allegations on short seller reports. Any questions regarding the reliability of the Report present an issue of fact, inappropriate for resolution at this stage. Second, Defendants mainly challenge falsity on puffery grounds, but the challenged statements about Loop's technology and products, such as that its technology required "zero energy" and "no pressure" are concretely verifiable statements of fact and cannot be dismissed summarily as mere "puffery." The same is true of Loop's statements about its partnerships and collaborations with manufacturers and supply chain management companies to manufacture Loop's PET resin, and agreements with global consumer goods companies to purchase Loop's PET resin. The well-pleaded facts demonstrate Loop's purportedly revolutionary technology was more akin to medieval alchemy than modern day science.

Defendants' scienter attacks should likewise be rejected. The Individual Defendants were hands-on managers in a tiny company. And, Loop's sole focus was its supposedly "revolutionary" technology, which was critical to its ability to generate future revenues and stay afloat. The AC's allegations, viewed collectively and holistically as they must be, under the totality of the circumstances, support an inference of knowing or reckless conduct that is at least as compelling as a competing inference. A tie on scienter goes to Plaintiffs. *E.g.*, *City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

2

The Court should deny Defendants' Motion to Dismiss.

## STATEMENT OF FACTS

### A.    The Company and Its Business

Loop is a development-stage company based in Canada that focuses on recycling waste PET plastics and polyester fiber, such as plastic bottles, using its proprietary recycling technology. ¶¶2, 24-26; *see also, e.g.*, ¶68. Loop has yet to earn any revenue, but it has led investors to believe its "revolutionary technology", on which its profitability and viability depended, was "poised to transform the plastics industry" and would be commercially scalable in short order. ¶¶4, 68.

Loop's self-declared "revolutionary" technology involves a form of chemical recycling. According to Loop, its "ground-breaking," technology depolymerizes, or breaks down, no- and low-value waste PET plastic and polyester fiber to its monomers (*i.e.*, PET's basic components)— dimethyl terephthalate ("DMT") and monoethylene glycol ("MEG")—which are then filtered, purified and repolymerized to create virgin-quality Loop branded PET plastic resin and polyester fiber that the Company claims is suitable for use in food-grade packaging. ¶26.

"Advanced" or "chemical" recycling processes, such as Loop's purported Gen II depolymerization technology, seek to recover recycled plastics' original raw material, so they can be remade into high-quality resins or otherwise reused. ¶32. These techniques aim to minimize the use of heat and pressure. *Id.* Loop's Gen II technology is a chemical recycling process in which waste PET is depolymerized to isolate DMT and MEG monomers that are then purified to remover coloring, additives, and impurities, and lastly repolymerized into PET resin. ¶34.

Shortly before the Class Period, in June 2018, the Company announced that it had successfully activated its second generation ("Gen II") depolymerization technology, which described as "significantly more streamlined and efficient than the [Company's] Generation I process, including a considerable reduction in energy use and the complete elimination of water

3

indicating that it may be the most resource efficient process for upcycling PET and polyester fiber in the world." ¶29. At the same time, Defendant Solomita characterized Loop's Gen II technology as a "major step forward in sustainable plastic[.]" ¶29.

Companies such as Coca-Cola and Unilever have made ambitious commitments to incorporate recycled material into their packaging, and have touted "advanced" or "chemical" recycling processes as the solution to the plastics crisis. ¶¶30-31. This is because "advanced" or "chemical" recycling processes supposedly would address a number of the shortcomings of traditional, or "mechanical," recycling methods that are economically and environmentally costly. Such traditional methods also come with other drawbacks, including that mechanically recycled plastics are downcycled, or made into products that have less exacting specifications than what the virgin materials were designed for. ¶31. Large chemical companies and small start-ups—including Loop—have all sought to develop advanced recycling processes that would fill this niche need and unlock immense profits.

Loop has never earned any revenue and was burning through cash; thus it was critical that it succeed in commercializing its technology. To assure investors that this could be done, Defendants continually touted Loop's "groundbreaking" technology and commercialization efforts. However, unbeknownst to investors, the recycling technology on which Loop's viability depended was not what Defendants claimed. As the Report later revealed, "Loop is smoke and mirrors with no viable technology." ¶6.

**B.     Defendants Misled Investors About Loop's Technology**

Defendants duped investors into believing that it has done what no one else—including the world's largest chemical companies—has accomplished: a revolutionary, sustainable solution to the ever-worsening plastics crisis with technology that breaks down all forms of waste PET plastic into clean, high-quality material with zero, or minimal, energy input. *E.g.*, ¶36. Defendants made

4

statements during the Class Period highlighting the "revolutionary" and "ground-breaking" nature of its process (*e.g.*, ¶¶68(c), 70-71, 73-75, 80, 89) and touting its commercialization plans such as announcing collaborations with multinational manufacturers and supply chain management companies to manufacture Loop's PET resin and entering into supply contracts with global consumer goods companies to purchase Loop's PET resin, such as Danone-owned evian®, PepsiCo, Coca-Cola, and L'Oréal Group (*e.g.*, ¶¶68-70, 72-74, 77-79, 82, 85, 91, 94). For instance, Loop opened the Class Period on September 24, 2018 with a press release announcing its first strategic step in its global commercialization plan with its joint venture with Indorama Ventures Public Company Limited ("Indorama"), stating:

- "The 50/50 joint venture will have an exclusive world-wide license to use Loop's technology to ***produce 100% sustainably produced PET resin and polyester fiber*** with plans to begin commercial production in Q1 2020[;]" and
- "Loop has created a ***revolutionary technology poised to transform the plastics industry***. This ***ground-breaking technology*** decouples plastic from fossil fuels …."

¶68 (emphasis in AC). Similarly, on December 19, 2018, Loop announced a "Global Alliance Agreement" with thyssenkrupp to combine Loop and thyssenkrupp's technologies in a press release highlighting Loop's supposed "revolutionary technology" and the "100% sustainable" nature of Loop's PET and polyester. ¶¶43, 82.

Defendants also made materially misleading claims about the energy inputs in Loop's technology. More specifically, Defendants explained that its "process achieves full depolymerization of waste plastic with ***zero energy input***" (¶114), claimed the mixture of PET plastic and Loop's proprietary formula is "broken down without using heat or pressure" (¶115; *see also* ¶116), referred to its technology as "zero energy" (¶¶114, 117-119, 122-23), and claimed its process was revolutionary in part because it used "low heat and no pressure" (¶¶120-21, 123-24).

Investors bought into Loop's claims, which enabled Defendants to raise desperately needed cash from multiple stock offerings during the Class Period. *E.g.*, ¶¶ 37, 77.

C.      Hindenburg Research Issues A Report Concluding the Company is "Smoke and Mirrors" And Lacks "Viable Technology"

The first hint of fraud emerged on October 13, 2020, when Hindenburg, a market analyst and investment research firm founded by Nathan Anderson, issued its Report, which was based on an extensive months' long investigation that involved interviews with former Loop employees, competitors and industry experts, as well as a review of Loop's patent filings. The Report revealed that (i) Defendants' claims that Loop's Gen II technology is a "revolutionary technology poised to transform the plastics industry" were unsubstantiated, (ii) "Loop's supposed proprietary process is a black box that has not shown itself to be more efficient or cost effective than comparable solutions, contrary to the company's claims", and (iii) Loop's sustainability claims were largely unfounded. ¶¶37, 129; Report (ECF No. 25-1) at 2, 14.

The Report's investigation uncovered the fact that the Company's "miraculous" results came from a separate R&D facility that was operated by members of the Essadam family who had invented Loop's Gen I and Gen II processes. ¶50. However, other Loop scientists were not permitted to enter this lab, and, according to the Report, were unable to replicate in their corporate lab the results claimed by the Essadam family. *See e.g.*, ¶¶50-54.

The Report also stunned the market by revealing that Loop's efforts to scale its process and make it commercially feasible have proven to be economically unviable. ¶¶8, 43. For instance, the Report cited the accounts of executives from a division of key partner ThyssenKrupp, who reportedly informed Hindenburg that ThyssenKrupp's partnership with Loop is on "indefinite" hold and that Loop had underestimated both costs and complexities of its process. *E.g.*, ¶8; Report at 1. The Report also revealed that Loop's claims (i) that its product was "100% sustainable" and (ii) about its technology's energy use and inputs—including its claims that its technology uses no added pressure and low energy—were misleading, given that Loop's process requires inputs of

6

both heat and pressure that must be obtained from external sources, which would be quite energy intensive at larger scales, and that Loop's monomer yields were quite low, meaning that not all waste PET plastic recycled was being reused. *E.g.*, ¶¶45, 47; Report at 13-14 & n.5.

The Report's detailed revelations caused the price of Loop's stock to fall approximately 32.5%, or $3.78 per share, on October 13, 2020, damaging Loop's investors.

### D. The Hindenburg Report's Revelations Prompt An SEC Investigation and Other Fallout

The Company sought to downplay the Report hours after it was released (¶55), but only three days later it revealed that the SEC had initiated an investigation into the Company and had requested information regarding "testing, testing results and details of results from our Gen I and Gen II technologies and certain of our partnerships and agreements." ¶56. On this news, Loop's stock price fell approximately 11.8% per share, closing at $6.92 per share on October 19, 2020— the first trading day after Loop's announcement. ¶56.

The same day, news website Canada Live published responses to inquiries it had sent to Danone and the Autorité des marchés financiers ("AMF"), the financial regulator in Québec, in which Danone stated to CANADA LIVE that it intends to launch an internal investigation into Loop, with the AMF likewise stating that it "intends to examine the information which has circulated in recent hours with regard to Loop Industries." ¶57.

Other media outlets soon expressed additional doubts as to Loop's process and viability. *See* ¶¶58-60. An October 20, 2020 article questioned Loop's claims about its infinitely recyclable PET and called out that Loop's commercial viability claims seem to come from computer modeling of successful pilot plant results based on the author's own analysis, further corroborating the Report's claims. ¶¶58-59. Soon after, on November 4, 2020, Loop announced that Coca-Cola had terminated its supply agreement with Loop effective December 14, 2020.

In response, Loop commissioned Kemitek, a research group, to verify Loop's claims. But this post-hoc, self-serving report (the "Kemitek Report") provided cold comfort. While the Kemitek Report concluded that "Loop demonstrated a working process that produced significant quantities of MEG and DMT from post-consumer waste PET[,]" Kemitek *did not* examine the more important issues of scalability and commercial viability of Loop's process, and specifically stated that the report "was not intended to *certify the yields or economic viability of the process*." ¶64. Nor did Kemitek verify Loop's claims regarding its technology's energy inputs or sustainability, including Defendants' "zero energy" and "no pressure" characterizations.

The following day, on December 15, 2020, Hindenburg published a follow-up to its October report in which it addressed the Kemitek Report's findings and pointed out that that the Kemitek verification and analysis was largely meaningless due to its failure to certify the yields or economic viability of Loop's technology and process. ¶67. As Hindenburg put it, "[i]nformation on purity without cost and yield is incomplete to the point of being irrelevant." *Id.*[2]

## ARGUMENT

### I.  APPLICABLE STANDARDS

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must also "accept[] the complaint's factual allegations as true and draw[] all reasonable inferences in . . . plaintiff's favor." *Steginsky v. Xcelera Inc.*, 741 F.3d 365,

---

[2] Hindenburg's response, which is incorporated into the AC by reference, also noted "[t]he failure in this latest review to report an entire pilot run and the combining of pilot runs suggests the results may be inconsistent and that the company is facing operational challenges at the pilot scale", which "obviously bodes poorly for a commercial scale operation, the apparent premise of the company's existence." Pls Ex. A at 6.

368 (2d Cir. 2014). Defendants may not rewrite the AC with their own purported facts. *See Acer*, 2020 WL 3268495, at \*9.

To state a Section 10(b) and Rule 10b-5 claim, a plaintiff must allege the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[3] To state a Section 20(a) claim, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was … a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d87, 108 (2d Cir. 2007).

## II.    PLAINTIFFS STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5

### A.    The AC Adequately Alleges Material Misstatements and Omissions

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Under Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. However, plaintiffs need not plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but merely sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). "[W]hether a statement is misleading depends on

---

[3] Here, Defendants challenge only the first two elements—falsity and scienter. *See e.g.*, Br. at 1-2.

the perspective of a reasonable investor: The inquiry … is objective." *Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016). It is well settled that the issue of whether a statement is misleading is "evaluated not only by 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). "At the motion to dismiss stage of a securities fraud action, the court reads ambiguities in challenged statements in [the plaintiff's] favor." *Acer*, 2020 WL 3268495, at *9.

"A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F. 3d 383, 389 (2d Cir. 2015). The issue of materiality "is generally inappropriate for determination at the pleading stage." *In re Warnaco Grp. Inc. Sec. Litig. (II)*, 388 F. Supp. 2d 307, 313 (S.D.N.Y. 2005), *aff'd sub nom. Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007). "Thus, the matter must go to a jury unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).

As the PSLRA and Rule 9(b) require, the AC identifies each misleading statement, identifies who made the statement, and explains in detail why it was misleading. ¶¶68-125; 17 C.F.R. § 240.10b-5; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007); 15 U.S.C. § 78u–4(b)(1)). Specifically, the AC alleges that Defendants issued misleading statements regarding Loop's recycling technology on which its existence depended during the Class Period.[4]

---

[4] Defendants' assertion that the "Complaint's use of block quotes and bolding makes it difficult to determine exactly what statements Plaintiffs are challenging" (Br. at 12) is nonsense and does not provide a basis for dismissal. The Complaint identifies the misleading portion of block quotes, and other quotes, by bolding when necessary. That is sufficient. *See, e.g.*, *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y 2004) (declining to dismiss a complaint,

### 1.    Plaintiffs Can Rely on the Report For Pleading Purposes

Courts within this district and across the country have held that short-seller reports can suffice to establish falsity—even when based on anonymous sources such as interviews with unnamed former employees or other anonymous sources. *See, e.g.*, *In re Aphria, Inc. Sec. Litig.*, No. 18 CIV. 11376 (GBD), 2020 WL 5819548, at *3-4, *8-9 (S.D.N.Y. Sept. 30, 2020); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13-CV-214 (HB), 2014 WL 285103, at *3-4 (S.D.N.Y. Jan. 27, 2014); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123–24 (S.D.N.Y. 2013); *In re Eros Int'l Plc Sec. Litig.*, No. CV 19-14125, 2021 WL 1560728, at *8-9 (D.N.J. Apr. 20, 2021); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012); *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *6-7 (C.D. Cal. Sept. 16, 2017); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 938 (C.D. Cal. 2012); *In re China Educ. Alliance, Inc. Sec. Litig.,* No. CV 10-9239, 2011 WL 4978483, *4 (C.D. Cal. Oct. 11, 2011). Moreover, such sources are not—contrary to Defendants' arguments—subject to heightened particularity standards for confidential sources applicable under the PSLRA. *See McIntire*, 927 F. Supp. 2d at 123-24 ("The majority of courts that have addressed the issue have held that a short-seller report, … does not implicate the same skepticism as a 'traditional' anonymous source."). "'The rationale is that a ruling that finds financial analysts' reports as suspect would mean that a plaintiff would never be able to rely on an unsigned analyst's report to support a securities fraud allegation.'" *Id.*[5]

---

even when portions of long quotes were not identified as misleading, because plaintiffs identified the date, source, speaker and why the statements were misleading). Furthermore, this ignores Plaintiffs' allegations that specifically pinpoint which portions of their statements were misleading and why. ¶¶84, 96, 100, 105, 113, 125.

[5] This is especially true where, as is the case here, the Report was published in the name of Hindenburg and, as Defendants acknowledge, relies on information provided by at least one named source. Further, courts have found Hindenburg's reports about other companies to be of sufficient reliability to sustain claims that were based, at least in part, on those reports. *See Aphria*, 2020 WL 5819548, at *3-4, *8-9; *Eros*, 2021 WL 1560728, at *8-9.

But even assuming *arguendo* that they are subject to those standards, the Report satisfies them by providing information from former employees involved in developing Loop's technology, Loop's partners and competitors, and industry experts. *See Longwei*, 2014 WL 285103, at *3-4. The Report's claims are also corroborated by other facts outside of the Report, including media reports. Further evidencing the reliability of the Reports' claims is the fact that they prompted investigations by the SEC and Canadian regulators, as well as the termination of Loop's theoretically lucrative partnership with Coca-Cola. Thus, "'independent ... factual allegations' corroborate [the] confidential source[s'] statements." *Longwei*, 2014 WL 285103, at *3-4.

The Court should also reject Defendants' attacks on the Report's reliability—and Plaintiffs' ability to rely on it to allege falsity—on the basis that it was authored by a profit motive driven short-seller. "[T]his contention has been repeatedly rejected in prior cases… [as] [t]he truth of the … report is 'a factual dispute not appropriate for resolution at this stage.'" *McIntire*, 927 F. Supp. 2d at 124; *see also*, *e.g.*, *Ho*, 887 F.Supp.2d at 564.[6] Nor does *Diaz v. N. Dynasty Mins. Ltd.*, No. 17-CV-1241, 2018 WL 5099749, at *7 (C.D. Cal. Apr. 30, 2018) help Defendants here.[7]

Defendants are incorrect that Plaintiffs rely exclusively on the Report for their allegations, but even if that were true, courts have upheld complaints under similar circumstances. *See*

---

[6] Defendants' reliance on *Miao v. Fanhua, Inc*., 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) and *Harris v. AmTrust Financial Services*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015) (Br. at 8) is misplaced. *Fanhua* "simply does not stand for the proposition that allegations relying on a short seller's report are inherently unreliable and must be dismissed." *Uxin Ltd. Sec. Litig. v. XXX*, 125 N.Y.S.3d 537, at *10 (N.Y. Sup. Ct. 2020). Instead, it simply "acknowledge[d] that, generally, federal courts have sustained complaints that rely on short-seller reports … 'where independent factual allegations corroborate [ ] the factual allegations in the complaint drawn from short-sellers' reports'" (*id.*)—which is true here. *Harris* is also distinguishable given that the plaintiff conceded that the short seller's report may have been wrong in certain respects and was, in fact, "proven wrong in others by the passage of time." 135 F. Supp. 3d at 159. This is not the case here, where Hindenburg issued a rebuttal responding to Loop's self-serving denials and defenses.

[7] The *Diaz* court's decision runs contrary to authority within the Second Circuit cited above supporting the proposition that short seller reports are not subject to heightened particularity standards for confidential sources applicable under the PLSRA that were applied in *Diaz*. Moreover, the confidential sources in the Report here provided more specificity than those in *Diaz*, including details of who was involved in developing and testing Loop's technology and who at Loop knew of the adverse facts—at least Solomita and the Essadams. The AC also, unlike in *Diaz*, alleges corroborative facts outside of the Report.

12

*McIntire*, 927 F. Supp. 2d at 123–24; *Aphria*, 2020 WL 5819548, at *3-9. Finally, Defendants' attacks on allegations attributed to FE1 (*e.g.*, Br. at 8; *see also id.* at 9) should be rejected. FE1's statements are corroborative of information the Report attributes to former employees and other sources, and FE1 was well-positioned at the Company to "support the probability that [FE1] [ ] possess[es] the information alleged." *City of Warren Police & Fire Retirement Sys. v. World Wrestling Entm't, Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020).[8]

> ### 2. Plaintiffs Adequately Allege Materially False and Misleading Statements and Omissions by Defendants Concerning the Company's Technology
>
> #### a. The Complaint Alleges Why Each of the Statements was False and Misleading

During the Class Period, Defendants repeatedly made statements about the "sustainable" nature of Loop's PET plastic resin and polyester and the "zero energy" or low energy process it used in its recycling technology. Loop touted its "revolutionary" "ground-breaking" and "commercially viable technology", "consistently high monomer yields and excellent purity" (*e.g.*, ¶¶68(c), 70-71, 73-75, 80, 89). Defendants did so frequently in the context of touting collaborations with prominent companies to manufacture Loop's PET resin using Loop's technology or agreements with global consumer goods companies to purchase Loop's recycled PET resin, which were key to Loop's success (*e.g.*, ¶¶68-70, 72-74, 82, 85, 91)—as well as in connection with secondary offerings to raise much needed cash (*e.g.*, ¶¶37, 92, 95, 122-23).

---

[8] That FE1 reported directly to Defendant Gentiletti and not Solomita does not undermine allegations attributed to him, particularly given FE1's senior management status (Controller) in a company with less than 35 employees for much of the Class Period, and only 53 employees as of April 2020, according to Loop's annual reports. *See* Pls Exs. B-C; *see also* Defs Ex. C at 2 (28 employees as of May 2018). "[T]here is no baseline requirement of [contact with individual defendants] in order to allege sufficient particularity … A plaintiff need only plead the 'probability that [the CW] know[s] what [he or she] is talking about.'" *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018), *aff'd on other grounds sub nom. Abramson v. NewLink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020). "This liberal standard make[s] sense; the heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources…." *World Wrestling*, 477 F. Supp. 3d at 132.

Defendants' statements, however, failed to disclose that Loop had not demonstrated— through Loop's own internal tests or otherwise—that Loop's technology was new, unique, or "revolutionary". *E.g.*, ¶¶39-41, 84. Nor did they disclose that Loop's PET plastic resin and polyester fiber was not 100% sustainably produced and its technology involved applying both pressure and heat, inputs obtained from external sources that significantly increase costs, particularly at larger scales, and, by their very nature, make a product *not* 100% sustainable. *E.g.*, ¶¶45-46, 84. Defendants' statements also omitted that Loop had underestimated the cost in scaling up and commercializing its technology and product and that Loop's technology and process did not produce consistently high monomer yields. *E.g.*, ¶¶44, 47, 84, 96.

Defendants' failures to disclose those facts while touting their "new" and revolutionary technology were material and actionable. As the Second Circuit has affirmed:

> It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic.... That is because, at the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the 10(b) claim.

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (first emphasis added); *see also, e.g.*, *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011). Thus, Defendants' statements and omissions are actionable.

Defendants' arguments in support of dismissal are unavailing and should be rejected. **First**, as a general matter, Defendants address each alleged misstatement piecemeal, for example, treating "commercially viable" and "100% sustainable" statements as their own categories—divorced from their context— and referring to energy input statements as their own category of "energy use" statements. However, this approach ignores settled caselaw that statements should be considered in the actual context in which the statements were made and is incorrect. *See e.g.*, *Vivendi*, 838

14

F.3d at 250 ("'The test for whether a statement [or omission] is materially misleading under Section 10(b)' is . . . 'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.'" (emphasis in original)).

**Second**, Defendants' attacks on the "zero" and "low energy" statements are meritless. Specifically, Defendants said that Loop's technology was revolutionary in part because its "elegant process achieves full depolymerization of waste plastic with ***zero energy input***" (¶114), claimed the mixture of PET plastic and Loop's proprietary formula is "broken down without using heat or pressure" (¶115; *see also* ¶116), referred to its technology as "zero energy" (¶¶114, 117-119, 122-23), and claimed its technology was revolutionary in part because its process used "low heat and ***no pressure***" (¶120) or "***no added pressure***" (¶¶121, 124). These statements are factual in nature, and their truth can be objectively verified. And they were false because—as Defendants do not seriously attempt to dispute—Loop's technology actually *did* require energy inputs, including both pressure and heat, impeding profitability and sustainability. *E.g.*, ¶¶9, 45, 125; Report at 13 & n.5 (Loop's patent filings contain numerous "examples of adding both heat and pressure to Loop's Process", which "require energy input, and thereby can substantially increase costs.").

Defendants argue that because Loop's patent filings are publicly available, the public was already aware of the true facts. Br. at 19 (citing *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003); *In re Curaleaf Holdings, Inc. Sec. Litig.*, --- F. Supp. 3d ----, 2021 WL 567239, at *6 (E.D.N.Y. Feb. 16, 2021)). But "[c]ase law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011).

Defendants similarly claim that investors were aware that the technology was not "zero" energy because Defendants made a few Class Period statements suggesting that they indeed used

15

low amounts of energy. *See* Br. at 19 (quoting Defs' Ex. E at 4). Both of these arguments are simply variations on the truth on the market defense, which is generally not determinable at the pleading stage. Indeed, the truth-on-the-market defense is "an 'intensely fact-specific' inquiry as it is—[that] is not applicable unless the truth conveyed to the public was done with a degree of intensity and credibility so as to counter-balance any misleading impression created by the defendant' fraud." *In re Allergan PLS Sec. Litig.*, No. 18 Civ. 12089 (CM), 2019 WL 4686445, at *28 (S.D.N.Y. Sept. 20, 2019). Here, at minimum, a question of fact remains as to whether investors were aware of the truth particularly given that defendants repeatedly made "zero energy" and "no added pressure" statements after October 10, 2018. *See id.*

**Third**, contrary to Defendants' arguments (Br. at 17-18), the AC clearly alleges why the statements using the phrase "100% sustainable" were materially misleading, including that Loop's technology required energy inputs (e.g., pressure) and energy usage, which, especially on a commercial scale, negatively impacts profitability and reduces the sustainability and potential net-positive environmental benefits of Loop's process. *See, e.g.*, ¶¶45-46. Defendants' attempts to analogize Loop's statements regarding sustainability to *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438 (S.D.N.Y. 2008) miss the mark. There, unlike here, plaintiffs' claims were predicated on a word in the company's name—the "biotech" in Bodisen Biotech—that was alleged to be false solely on the basis of an article that stated the Company "isn't biotech." *Id.* at 452. In *Bodisen*, unlike here, "[p]laintiffs fail[ed] to allege in any detail how this use was false or misleading." It was the Bodisen plaintiffs' failure to "demonstrate how [] Defendants' use of the term was incorrect," coupled with the failure to define "biotech," that proved fatal to their claims. *See id.* Here, however, the AC alleges facts demonstrating how the challenged statements containing the relevant language were materially misleading. Further, in *Tabor*, the claims predicated on

16

allegations that the defendants falsely described their products as "organic" because they do not meet U.S. and European standards were dismissed because the products were used solely in China, and the plaintiffs never defined the relevant Chinese standards for describing a product as organic.[9] Defendants make no serious attempt to challenge statements regarding Loop's high monomer yields, but instead rely on their attacks on statements using the phrase "100% sustainable."[10] Such statements are actionable given the omitted material information, as explained above.[11]

**Fourth**, Defendants' attacks on statements describing Loop's technology as "revolutionary," "ground-breaking," "innovative," or "breakthrough" are unpersuasive. *See* Br. at 12-13. Plaintiffs have clearly alleged these statements were false because, as the Report explained in detail, there is nothing "revolutionary" or "groundbreaking" about Loop's technology. *E.g.*, ¶¶39-40 (experts "said … there is nothing new or revolutionary about the idea of breaking down PET in the fashion Loop is claiming"; an expert stated "the chemistry is there and has been there. Implying that it is 'new' and implying that it is 'simple/easy,' and profitable as a standalone process, just isn't true.").

Defendants argue that there is nothing misleading about saying their technology is "new" or "groundbreaking" because it was able to secure a patent for it, which requires the applicant to demonstrate that the product is new. Their argument fails, however, because the technology was

---

[9] Defendants' reliance on *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 580 (S.D.N.Y. 2018) (Br. at 18) is similarly misplaced. The claims about Xerox's financial status and "flat profitability" were neither false nor misleading given that the statements were intended to address Xerox's entire segment, and not—as plaintiffs claimed—profitability in one state, and there, unlike here, the statements neither embedded any factual representations nor were made in the context of touting partnerships to create an illusion of legitimacy. *See id*. Defendants' challenge to energy input statements based on a purported failure to define terms (Br. at 19-20) fail for the same reasons.

[10] For example, Defendants point to an allegation that "Loop's technology produced monomer yield as high as 83% after one distillation" (Br. at 19 (citing ¶47)), but they ignore the very next sentence explaining that more distillations would be needed and further affect the ultimate monomer yield. ¶47.

[11] Further, according to the Report, "a former employee informed [Hindenburg] that the company's MEG yield was being reported in the [] GEN II patent in a way that exaggerated the effectiveness of Loop's process" but "[e]ven the inflated numbers do not qualify the process as high yielding, giving a false impression of the importance of the patent, the former employee said." Report at 14.

not "groundbreaking" or "revolutionary" under any reasonable definition, as explained above. In addition, these statements were misleading because they implied that the technology used innovative processes such as zero to low energy, which was not the case. Moreover, the technology had not been verified or demonstrated internally, according to the Report. *See, e.g.*, ¶¶37-38, 84.[12]

### b.    The Alleged Misstatements Are Not Puffery

Defendants' puffery arguments are similarly unconvincing. Determining whether a statement is actionable "always depends on context." *Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250-251 (2d Cir. 2014).[13] In addition, "when presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

Here, as already noted, Loop had no revenues, and its novel technology was the sole hope for it to become profitable and succeed. Indeed, the technology was the key factor leading to agreements or relationships with manufacturers and consumer goods companies, and Loop pointed to such agreements and relationships as supporting the viability of its technology. Defendants' alleged misstatements were all made to support and reinforce in investors' minds the supposed commercial viability of Loop's proprietary, revolutionary technology. For example, the statement

---

[12] Defendants cite in support of their argument (Br. at 13) patent law cases standing for the irrelevant and unremarkable proposition that a requirement for issuing a patent is that the subject matter at issue "be new" (*Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 780 (Fed. Cir. 1985)), or display "ingenuity" and "substantial innovation" (*Sinclair & Carroll Co. v. Interchemical Corp.*, 325 U.S. 327, 330 (1945)). Patents do not provide a license to mislead investors about the "groundbreaking" nature of the patented technology or omit material facts when publicly speaking about it.

[13] Thus, the cases that Defendants rely on are inapposite and distinguishable. Further, the only two cases that Defendants acknowledge found descriptors "used by Loop and challenged by Plaintiffs here" to be inactionable (Def. Br. at 14 (citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 173 (3d Cir. 2014) and *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 902 (D. Minn. 2007)) are from outside this Circuit.

that Loop's technology was "zero energy" implied that the technology could be deployed in a cost-effective and commercially feasible manner, leading investors to expect it could be profitable. In this context, the challenged statements are unquestionably actionable. *See Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010) (finding actionable "characterizations of MF Global's risk-management system" as "robust"); *Novak*, 216 F.3d at 315 ("state[ments] that the inventory situation was 'in good shape' or 'under control'… were plainly false and misleading"); *SEC v. Rio Tinto PLC*, No. 17-cv-7994, 2019 WL 1244933, at *14-15 (S.D.N.Y. Mar. 18, 2019) ("world-class" statement actionable), *reconsid'n denied*, 2021 WL 818745 (S.D.N.Y. Mar. 3, 2021), *mot. to cert. app. granted*, 2021 WL 1893165 (S.D.N.Y. May 11, 2021).

Moreover, investors did not consider the statements mere puffery, as evidenced by Loop's steep stock drop following the Report's publication. *See Ganino*, 228 F.3d at 166 (a drop in stock price tends to establish that reasonable investors would consider the disclosed information "to be significant or to have altered the total mix of information affecting their investment decisions").

### c. Risk Disclosures Do Not Shield Defendants From Liability

Defendants' purported cautionary language does not insulate their statements from liability.[14] The risk disclosures upon which Defendants rely here (Br. at 16, quoting Exs. A-C) provided only vague warnings that the Company's technology may not be commercialized or commercially successful, without providing the requisite specifics needed to trigger the safe harbor. *See Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) ("[R]isk disclosures must accurately characterize the scope and specificity of the risk, as understood at the time the statements are made."). Defendants' cited risk disclosures do not disclose, for example, that: (i) Loop's technology was not demonstrated to be groundbreaking,

---

[14] Defendants argue such cautionary language insulates only three challenged statements (in ¶¶85(b), 86, 87(c)), that specifically refer to, or use the phrase "commercially viable technology" and refer to "cost", from liability.

19

unique or revolutionary; (ii) Loop had underestimated costs in scaling up and commercializing its technology; (iii) Loop's technology and process required energy inputs, including pressure and heat obtained from external sources and its PET plastic resin and polyester fiber was not 100% sustainably produced; or (iv) Loop's technology did not produce consistently high monomer yields, posing a key risk to the Company's commercialization efforts. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 ("[T]he law provides 'no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'"); *see also Halperin v. eBanker USA.com, Inc*., 295 F.3d 352, 359 (2d Cir. 2002) (plaintiff can overcome risk disclosures if "the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss").

## B.    The AC Sufficiently Alleges Defendants' Scienter

The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In its analysis, the court "must consider the complaint in its entirety" because the "inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.

The inference of "scienter need not be irrefutable, *i.e*., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324. Rather, an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. While the court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" (*id*.), "a tie on scienter goes to the plaintiff" at this stage (*Lockheed*, 875 F. Supp. 2d at 372).

20

A plaintiff can plead scienter "either '[]by alleging facts to show that defendants had both motive and opportunity to commit fraud, or … that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000). Reckless conduct gives rise to an inference of scienter if the complaint alleges "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care…." *Id*. In addition, while generally the most straightforward way to raise an inference of scienter for a corporate defendant is to plead it for an individual defendant whose intent could be imputed to the corporation, it is also possible to plead an inference of corporate scienter directly. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc*., 531 F.3d 190, 195-96 (2d Cir. 2008).

> **1.    The AC Alleges Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

The AC alleges sufficient facts giving rise to a strong inference that Defendants knew or were reckless in not knowing materially adverse information that rendered their statements regarding Loop's recycling technology misleading to investors. *See Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V*., 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015) (plaintiffs plead scienter when they specifically allege defendants "knowledge of facts or access to information contradicting their public statements.").

Core Operations: Loop is a one-product company whose very existence depends on the success of its recycling technology. Under these circumstances, a strong and compelling inference arises that the Individual Defendants were well aware of the material facts concerning Loop's technology. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("the fact that [defendant's allegedly false or misleading statements] statements concerned the core operations of the company supports the inference that the defendant

21

knew or should have known the statements were false when made"); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc*., 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019) ("a court may infer 'that a company and its [] executives have knowledge of information concerning the [business's] core operations'… such as 'events affecting a significant source of income.'").

In addition, while district courts within this Circuit have found an inference of scienter solely based on the core operations doctrine even after the PSLRA (*see Atlas*, 324 F. Supp. 2d at 491), the AC's other scienter allegations discussed below further bolster the inference of scienter. *See New Orleans Emps' Ret. Sys. v. Celestica, Inc*., 455 F. App'x 10, 14 n. 3 (2d Cir. 2011).

The Individual Defendants' Day-to-Day Involvement and Status With the Company: As noted, Loop is a tiny company consisting of less than 35 employees for much of the Class Period. *See supra* n. 8. The fact that the Individual Defendants were CEO and CFO of such a small company, combined with the FE's and other allegations regarding Solomita's hands-on role in overseeing the development of its technology (¶¶138-39), further contribute to an inference of scienter. The allegedly adverse undisclosed facts about Loop's key technology would invariably be at the forefront of senior executives' attention in a small company, and, if they were not, that is the definition of deliberate recklessness. *See Cohen v. Kitov Pharm. Holdings, Ltd.*, 2018 WL 1406619, at *9 (S.D.N.Y. Mar. 20, 2018) (considering defendant's "position as CEO in a small organization" in scienter analysis); *Ark. Tchr. Ret. Sys. v. Bankrate, Inc*., 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014) (defendants' personal involvement "directing hands-on efforts" to solve a company problem supported a "strong plausible inference of scienter"); *In re Sequans Commc'nsuns. S.A. Sec. Litig*., 2019 WL 4805072, at *2 (E.D.N.Y. Sept. 30, 2019) (finding scienter as to the defendant CEO, given that he "was personally involved"); *Alaska Elec. Pension Fund v. Asar*, 768 Fed. App'x 175, 188 (5th Cir. 2019) ("the smaller the company the more likely

22

it is that corporate executives would be familiar with the intricacies of day[-]to[-]day operations.").

In addition, Solomita has a financial interest in almost half of the outstanding shares of Loop's stock, has more than 75% of the voting control of Loop, and holds the sole Series A preferred stock share, which further affords him certain exclusive directional authority. ¶¶136-37.

Further, many of the challenged statements are personally attributable to Solomita. *See, e.g.*, ¶¶20, 68. Other statements were signed by Solomita and Gentiletti. *See, e.g.*, ¶¶20, 22, 85. By speaking so specifically about the technology, the Individual Defendants implied that they had a reasonable basis for making those statements. *See, e.g.*, *Reese v. Malone*, 747 F.3d 557, 571-72 (9th Cir. 2014) (holding that when a defendant speaks on a particular topic it implies the defendant had investigated it and had access to information undermining or contradicting the accuracy of the defendant's statement), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *Gauquie v. Albany Molecular Rsch., Inc.*, No. 14 CV 6637(FB)(SMG), 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) (finding that "[a]ctively communicating with the public about [an] issue demonstrates defendants' sensitivity to it" and supports the inference that defendants' had knowledge of information contradicting such statements). These facts further support the inference of scienter.

Refinements of language used to describe Loop's technology and the sustainability of its product: As the Class Period progressed, Defendants began intermingling references to Loop's process as using "low energy" outputs while elsewhere continuing to reference it as "zero energy". *E.g.*, ¶¶114, 121, 123, 124, 134. In addition, Defendants dropped the reference to Loop's technology as "Revolutionary." *E.g.*, ¶134. Defendants' evolving and contradictory descriptions provide circumstantial evidence that Defendants were aware of the misleading nature of the challenged misstatements, providing further evidence of scienter. *See Tellabs*, 551 U.S. at 322-23.

Investigations and Other Fallout: The SEC, Danone, and AMF investigations, and Coca-Cola agreement termination spurred by the Report's claims, further contribute to an inference of scienter. *See, e.g.*, *In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 309-10 (S.D.N.Y. 2014) (allegation of pending investigations contributed to inference that "Defendants were behaving fraudulently" and listing cases); *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., In*c., 28 F. Supp. 3d 93, 115 (D. Mass. 2014) ("government investigation can be seen as one more piece of the puzzle … that add up to a strong inference of scienter"). Defendants are wrong to claim otherwise. *See Tellabs*, 551 U.S. at 322-23 (requiring holistic analysis of all scienter allegations).

### 2.    The AC Sufficiently Alleges Motive and Opportunity

The inference of scienter is also bolstered by allegations of motive and opportunity. "Insider trading is by no means the only way to allege scienter by raising motive." *Norfolk Cnty. Ret. Sys. v. Ustian*, No. 07 Civ. 7014, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009); *see also In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 320 n.6 (S.D.N.Y. 2010) (rejecting the argument that the absence of insider sales negates allegations of fraudulent intent).

Plaintiffs allege that the Company was motivated to misrepresent its technology to sell stock in secondary offerings during the Class Period, which was one of Loop's only ways to raise cash due to its lack of revenues. ¶¶36-37. These motive allegations are sufficient. *See Shanawaz v. Intellipharmaceutics Int. Inc.*, 348 F.Supp.3d 313, 325-26 (S.D.N.Y. 2018) (finding motive in part based on allegations describing dependence on sales of stock to cover company's operating losses); *In re Portal Software, Inc. Sec. Litig.*, No. 03-cv-5138, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (allegations that "defendants were motivated to inflate artificially [their company's] stock price in the short term…and obtain much-needed capital" through a secondary offering evidenced "a palpable motive for fraud" that was "stronger than the generic 'desire to

24

raise capital' which can be attributed to every company").[15] And, at a minimum, they bolster the inference of scienter. If anything, the lack of insider trading allegations is a neutral factor. *See Reserve Fund*, 732 F. Supp. 2d at 320 n.6.[16]

### 3.    The AC Pleads Corporate Scienter

Because the AC adequately alleged scienter against the Individual Defendants, it has alleged scienter against Loop as well. *See*, *e.g.*, *Dynex*, 531 F.3d at 195.[17] However, even assuming that the AC fails to plead scienter as to any Individual Defendants, "it is possible to raise the require[d] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id*. Loop's claims regarding its technology was akin to "General Motors announc[ing] that it had sold one million SUV's in 2006, [when] the actual number was zero." *Id*. Defendants' argument against the lack of an inference of corporate scienter as to Loop, thus fails.

## III.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(A)

Defendants' sole argument for dismissing the AC's § 20(a) claim incorrectly assumes Plaintiffs failed to allege a primary § 10(b) violation. The § 20(a) claim should thus be sustained.

## CONCLUSION

For all the above reasons, Defendants' motion to dismiss should be denied in its entirety.[18]

---

[15] *See also Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (finding scienter because the company "was…sufficiently short on cash at the time of the alleged misrepresentations that it could not afford to finance an additional clinical trial as the FDA had recommended, heightening its need for a lucrative stock sale"); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (scienter alleged in part because stock offering "was necessary to ensure that [the company] would not run out of cash and could fund ongoing operations.").

[16] This is particularly true where, as here, there is nothing indicating that Defendants had any awareness whether or when the Report would be published, foreclosing an opportunity to engage in trading at fraud inflated share prices.

[17] Defendants' sole argument as to Loop's scienter rests on the incorrect assumption that the AC failed to plead scienter as to either of the Individual Defendants. *See* Br. at 25.

[18] Should the Court find that the AC contains deficiencies, Plaintiffs request leave to amend, which shall be freely granted. *See* Fed. R. Civ. P. 15(a)(2). Granting leave to amend is often appropriate when granting a motion to dismiss for failure to state a claim (*Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003)), and Defendants have not pointed to any compelling reason why leave to amend should be denied. Further, developments that have transpired since the filing of the AC, such as Gentiletti's abrupt retirement announced on February 26, 2021, support this request.

Dated: May 27, 2021                     Respectfully submitted,

                                        **POMERANTZ LLP**
                                        */s/ Murielle J. Steven Walsh*
                                        Jeremy A. Lieberman
                                        Murielle J. Steven Walsh
                                        Eric D. Gottlieb
                                        600 Third Avenue, 20th Floor
                                        New York, NY 10016
                                        Telephone: (212) 661-1100
                                        Facsimile: (212) 661-8665
                                        Email: jalieberman@pomlaw.com
                                               mjsteven@pomlaw.com
                                               egottlieb@pomlaw.com

                                        **GLANCY PRONGAY & MURRAY LLP**
                                        Gregory B. Linkh (GL-0477)
                                        230 Park Ave., Suite 530
                                        New York, NY 10169
                                        Telephone: (212) 682-5340
                                        Facsimile: (212) 884-0988
                                        glinkh@glancylaw.com

                                                and

                                        Casey E. Sadler (admitted *pro hac vice*)
                                        Leanne H. Solish (admitted *pro hac vice*)
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, CA 90067
                                        Telephone: (310) 201-9150
                                        Facsimile: (310) 201-9160
                                        csadler@glancylaw.com
                                        lsolish@glancylaw.com

                                        *Counsel for Lead Plaintiffs Sakari Johansson and*
                                        *John Jay Cappa and Co-Lead Counsel for the Class*

                                        **LAW OFFICES OF HOWARD G.**
                                        **SMITH**
                                        Howard G. Smith
                                        3070 Bristol Pike, Suite 112
                                        Bensalem, PA 19020
                                        Telephone: (215) 638-4847
                                        Facsimile: (215) 638-4867

26

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel*

27