**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LOOP INDUSTRIES, INC. SECURITIES LITIGATION | Case No. 7:20-cv-08538-NSR<br><br>Consolidated with:<br>Case No. 7:20-cv-09031-NSR |

**JOINT DECLARATION OF LEANNE H. SOLISH AND MURIELLE J. STEVEN WALSH IN SUPPORT OF: (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND <u>REIMBURSEMENT OF LITIGATION EXPENSES</u>**

## TABLE OF CONTENTS

_Toc120028822

I.      INTRODUCTION ........................................................................................................ 2

II.     PROSECUTION OF THE ACTION ........................................................................... 5

        A.      Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead
                Counsel .............................................................................................................. 5

        B.      The Comprehensive Pre-Filing Investigation And The Preparation Of The
                Complaint ........................................................................................................... 5

        C.      Defendants' Motion To Dismiss The Complaint And Lead Plaintiffs' Response.. 6

        D.      Mediation Efforts, Settlement Negotiations, And The Settlement's Preliminary
                Approval ............................................................................................................. 8

III.    THE RISKS OF CONTINUED LITIGATION ......................................................... 10

        A.      Risks Faced In Proving Liability ..................................................................... 10

        B.      Risks To Proving Loss Causation And Damages .............................................. 12

        C.      Risks Faced In Obtaining And Maintaining Class Action Status ........................ 13

        D.      Other Risks....................................................................................................... 14

        E.      The Settlement Is Reasonable In Light Of Potential Recovery In The Action..... 16

IV.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURTS PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE............................ 16

V.      ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ......................... 20

VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT
        OF LITIGATION EXPENSES .................................................................................. 22

        A.      The Fee Application .......................................................................................... 23

                1.      The Favorable Outcome Achieved is the Result of the Significant Time and
                        Labor That Plaintiffs' Counsel Devoted to the Class Actions.................. 24

                2.      The Magnitude and Complexity of the Action ........................................ 27

                3.      The Significant Risks Borne By Plaintiffs' Counsel ............................... 27

4. The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel .................................................................................. 28

5. The Requested Fee In Relation to the Settlement .................................... 29

6. Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases ............. 29

7. The Reaction of the Class Supports Class Counsel's Fee Request ........... 30

8. Lead Plaintiffs Support Lead Counsel's Fee Request .............................. 30

B. Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable 31

VII. CONCLUSION ........................................................................................................... 34

**TABLE OF EXHIBITS TO DECLARATION**

| EXHIBIT | TITLE |
|---------|-------|
| 1 | Declaration Of Josephine Bravata Concerning: (A) Mailing Of The Postcard Notice; (B) Publication Of The Summary Notice; And (C) Report On Requests For Exclusion And Objections |
| 2 | Declaration Of Sakari Johansson In Support Of: (1) Lead Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 3 | Declaration Of John Jay Cappa In Support Of: (1) Lead Plaintiffs' Motion For Final Approval Of Class Action Settlement And Plan Of Allocation; And (2) Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses |
| 4 | Declaration Of Leanne H. Solish, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Glancy Prongay & Murray LLP |
| 5 | Declaration Of Murielle J. Steven Walsh, Esq. In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses Filed On Behalf Of Pomerantz LLP |
| 6 | *Levy v. Loop Industries Inc. et al.* (July 29, 2022), File No.: 700-06-000012-205, Judgment (Can. Que. Sup. Ct. J.) |
| 7 | Excerpts From Janeen McIntosh And Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review*, NERA Economic Consulting (2022) |
| 8 | Excerpts From *Securities Class Action Filings: 2020 Year in Review*, Cornerstone Research (2021) |
| 9 | Press Release Issued by Loop Industries on October 13, 2020 |
| 10 | Table compiled by Lead Counsel collecting Second Circuit cases with 33% or higher fee awards |
| 11 | Table compiled by Lead Counsel with: (1) billing rates for plaintiffs' firms in cases involving securities and other comparable complex class actions; and (2) billing rates of law firms that regularly defend securities and comparable class actions from fee applications submitted by such firms |

| EXHIBIT | TITLE |
|---|---|
| 12 | *In re NYSE Specialists Sec. Litig.*, No. 03-cv-8264, ECF No. 38 (S.D.N.Y. June 10, 2013) |
| 13 | *In re van der Moolen Holding N.V. Sec. Litig.*, No. 03 Civ. 8284 (S.D.N.Y. Dec. 6, 2006) |
| 14 | *In re Cnova N.V. Sec. Litig.*, No. 1:16-cv-00444-LTS-OTW, ECF No. 148 (S.D.N.Y. Mar. 20, 2018) |
| 15 | *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 18-cv-01620 (VM), ECF No. 49 (S.D.N.Y. March 27, 2020) |
| 16 | *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, ECF No. 82 (S.D.N.Y. Mar. 17, 2011) |
| 17 | *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), ECF No. 170 (S.D.N.Y. July 18, 2007) |
| 18 | *Levine* v. *Atricure, Inc.*, No. 1:06-cv-14324-RJH, ECF No. 85 (S.D.N.Y. May 27, 2011) |

We, Leanne H. Solish and Murielle J. Steven Walsh, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      We, Leanne H. Solish and Murielle J. Steven Walsh, are partners in the law firms of Glancy Prongay & Murray LLP ("GPM") and Pomerantz LLP ("Pomerantz"), respectively. GPM and Pomerantz are the Court-appointed Lead Counsel ("Lead Counsel") for the Court-appointed Lead Plaintiffs Sakari Johansson and John Jay Cappa ("Lead Plaintiffs" or "Plaintiffs") in the above-captioned action (the "Action").[1]  ECF No. 16.  We have personal knowledge of the matters set forth herein based on our participation in the prosecution and settlement of the claims asserted on behalf of the Settlement Class in this Action.

2.      We respectfully submit this Declaration in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $3,100,000 settlement (the "Settlement") that the Court preliminarily approved by Order dated September 16, 2022 (the "Preliminary Approval Order") (ECF No. 49); as well as final approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (collectively, the "Final Approval Motion").

3.      We also respectfully submit this Declaration in support of Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] for an award of attorneys' fees amount of 33⅓% of the Settlement Fund, which equates to $1,033,333, plus interest earned at the same rate as the Settlement Fund; reimbursement of Lead Counsel's out-of-pocket expenses in the amount of $60,791.39; and a total of $10,000 to Lead Plaintiffs ($5,000 to each Lead Plaintiff), in accordance

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation and Agreement of Settlement, dated May 17, 2022 (the "Stipulation").  ECF No. 47-1.

[2] Plaintiffs' Counsel consists of Lead Counsel as well as the Law Offices of Howard G. Smith and Bronstein, Gewirtz & Grossman, LLC.

with the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses, including lost wages, incurred in connection with their representation of the Settlement Class (the "Fee and Expense Application").

4.      As part of the Preliminary Approval Order, the Court directed notice of the Settlement to be disseminated to the Settlement Class.  *See* ECF No. 49.  Pursuant to the Preliminary Approval Order, Strategic Claims Services ("SCS") the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and/or email and by publication.

5.      In total, more than 8,250 copies of the Postcard Notice or Notice and Claim Form have been disseminated to potential Settlement Class Members, and, to date, no requests for exclusion have been received and no objections have been filed with Court or received by Lead Counsel.

## I.      INTRODUCTION

6.      This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act.  Plaintiffs asserted claims against defendant Loop Industries, Inc. ("Loop" or the "Company"), and defendants Daniel Solomita and Nelson Gentiletti (collectively, the "Individual Defendants," and, together with Loop, the "Defendants").

7.      On February 18, 2021, Lead Plaintiffs filed their Amended Consolidated Class Action Complaint (the "Complaint") asserting claims against all Defendants under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.  The Complaint alleged, among other things,

that Defendants made materially false and misleading statements and/or omitted material facts with respect to Loop's recycling technology, including its sustainability, the amount of energy input required in the process, and the commercial viability thereof.  The Complaint further alleged that the price of Loop's common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed.  ECF No. 25.

8.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $3.1 million (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement represents an excellent result for the Settlement Class considering the posture of the Action, as well as the significant risks of continued litigation.

9.      The Settlement was reached after eighteen months of contested litigation. Plaintiffs' Counsel's efforts involved, among other things: (a) conducting a detailed and substantive investigation into Loop, the Individual Defendants, and the facts forming the basis for the claims asserted in the Action, including retaining and working with private investigators who conducted interviews with former employees; (b) consulting with experts in the fields of damages and loss causation; (c) based on the foregoing investigation and consultations, drafting and filing the 59-page Complaint; (d) researching, drafting, and filing an opposition to Defendants' motion to dismiss; and (e) engaging in extensive mediation efforts and further negotiations with a well-respected neutral.

10.      In preparation for the mediation, Lead Counsel drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement. Following the exchange of detailed mediation statements addressing both liability and damages, Lead Counsel prepared for and engaged in full-day mediation session overseen by an experienced mediator of

complex cases, Jed Melnick, Esq. of JAMS, which resulted in an agreement in principle to settle the Action for $3.1 million.

11.     Based on the foregoing efforts, Lead Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents an extremely favorable outcome for the Settlement Class and is in the best interests of its members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

12.     In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' damages consultant.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

13.     Finally, Lead Counsel, on behalf of all Plaintiffs' Counsel, seek approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee and Expense Application.  As discussed in detail in the accompanying Fee and Expense Application, the requested 33⅓% fee is within the range of percentage awards granted by courts in this Circuit in comparable complex litigation.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested out-of-pocket litigation costs of $60,791.39 and the requested reimbursements of costs of $5,000 to each Lead Plaintiff pursuant to the PSLRA are also fair and reasonable.  Accordingly, for the reasons set forth in the

4

Fee and Expense Application and for the additional reasons set forth herein, Lead Counsel respectfully submit that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II. PROSECUTION OF THE ACTION

### A. Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead Counsel

14. Two class action complaints were filed in the United States District Court for the Southern District of New York (the "Court"). The first, filed on October 13, 2020, was styled *Tremblay v. Loop Industries Inc., et al.*, Case No. 7:20-cv-08538-NSR. The second, filed on October 28, 2020, was styled *Bazzini v. Loop Industries Inc., et al.*, Case No. 7:20-cv-09031-NSR.

15. On December 14, 2020, Sakari Johansson and John Jay Cappa filed motions to be appointed lead plaintiff under the PSLRA and for appointment of their selected counsel to serve as lead counsel. *See* ECF Nos. 6-12.

16. On January 4, 2021, the Court consolidated the cases and recaptioned the Action as *In re Loop Industries, Inc. Securities Litigation*, Master File No. 7:20-cv-08538-NSR; appointed Sakari Johansson and John Jay Cappa as Lead Plaintiffs for the consolidated action; and approved Lead Plaintiffs' selection of GPM and Pomerantz as Lead Counsel for the putative class. ECF No. 16.

### B. The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint

17. Lead Counsel conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Loop's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) research reports prepared by securities and financial analysts, and news and industry articles, concerning Loop, (iii) press releases published by and regarding Loop; (iv) Loop's website, including previous versions thereof,

(v) reports concerning the chemical or advanced recycling industry, and (vi) other publicly available material related to Loop; (b) retaining and working with private investigators who conducted investigations that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; and (c) working with a damages and loss causation expert to analyze Loop's stock price movements.

18.    On February 18, 2021, Lead Plaintiffs filed and served their comprehensive 59-page Complaint.  The Complaint asserted claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.

19.    Among other things, the Complaint alleged that Defendants made materially false and misleading statements and omissions concerning Loop's recycling technology, including its sustainability, the amount of energy input required in the process, and the commercial viability thereof.

20.    As a result of these materially false and misleading statements, Lead Plaintiffs allege that the price of Loop's common stock was artificially inflated and declined when the truth was revealed and the concealed risks materialized through a disclosure on October 13, 2020, damaging investors.

**C.    Defendants' Motion To Dismiss The Complaint And Lead Plaintiffs' Response**

21.    On March 22, 2021, Defendants filed a letter seeking to schedule a pre-motion conference in anticipation of filing a motion to dismiss the Complaint, or in the alternative, seeking a briefing schedule for Defendants' anticipated motion to dismiss.  ECF No. 26.  On March 23, 2021, the Court entered an order setting a briefing schedule for Defendants' anticipated motion to dismiss.  ECF No. 27.

22.    In accordance with the Court-ordered schedule, Defendants served their motion to

dismiss the Complaint on April 27, 2021. Among other things, Defendants argued that Lead Plaintiffs failed to plead: (a) the existence of a materially misleading statement or omission, and (b) a strong inference of scienter. Specifically, Defendants argued that Plaintiffs may not rely on Hindenburg Research's claims in its October 13, 2020 report (the "Hindenburg Report"), because Hindenburg is a short-seller and had a financial incentive to paint the Company in a negative light. Thus, according to Defendants, the Hindenburg Report was, *inter alia*, biased and unreliable. Defendants further argued that the challenged statements were not actionable because they were soft descriptions of Loop's technology that were too general and not objectively verifiable, were forward-looking, and that Defendants had publicly warned of the exact risk that Lead Plaintiffs allege to be false and misleading.

23.    Defendants also argued that Plaintiffs failed to plead a strong inference of scienter because Lead Plaintiffs did not allege that Individual Defendants received a concrete and personal benefit from the alleged fraud, and that Lead Plaintiffs' other allegations did not sufficiently support scienter.

24.    On May 27, 2021, Lead Plaintiffs served their opposition to Defendants' motion to dismiss. With respect to Lead Plaintiffs' reliance on the Hindenburg Research report's contents, Lead Plaintiffs responded to Defendants' arguments by noting that courts have repeatedly held that short-seller reports can suffice to establish falsity, and contrary to Defendants' assertions otherwise, Lead Plaintiffs did not rely exclusively on the Hindenburg Research report's contents for their allegations in the Complaint. Lead Plaintiffs responded to Defendants' falsity arguments by arguing that each of the challenged statements failed to disclose that Defendants had not demonstrated Loop's technology was new, revolutionary, sustainable, and commercially viable, Lead Plaintiffs alleged facts demonstrating that Loop's technology was not new, revolutionary,

sustainable, and commercially viable, and Defendants' failure to disclose these facts was both material and actionable.  Moreover, Lead Plaintiffs responded that Defendants addressed the falsity of each challenged statement piecemeal, divorcing the statements from their context, and when considered in their actual context and in their totality, the statements Defendants made were, in fact, false.

25.    Lead Plaintiffs asserted that the well-pleaded facts in the Complaint also raised a strong inference of scienter.  In particular, Lead Plaintiffs argued that a strong inference of scienter arises because the challenged statements concerned Loop's technology, the supposed success of which supported the Company's very existence, and that, under the core operations doctrine, an inference that Defendants knew or should have known that the statements were false can be inferred.  Moreover, Lead Plaintiffs argued that as the class period progressed, Defendants refined the language they used to describe Loop's technology, providing strong circumstantial evidence that Defendants were aware of the misleading nature of the challenged statements when they were made, which further supported an inference of scienter.  In addition, Lead Plaintiffs argued that although a concrete and personal benefit is not required to adequately allege a strong inference of scienter, Defendants were motivated to misrepresent its technology in order to sell stock in secondary offerings during the class period, which was one of Loop's only ways to raise cash due to its lack of revenue.

26.    On June 11, 2021, the Parties filed their motion to dismiss and opposition papers.  ECF Nos. 32-36.  Also on this day, Defendants filed and served their reply papers in support of their motion to dismiss.  ECF No. 37.

**D.    Mediation Efforts, Settlement Negotiations, And The Settlement's Preliminary Approval**

27.    On January 12, 2022, the Parties requested that the Court stay all proceedings

pending their participation in a mediation session in early March 2022.  ECF No. 38.

28.    In advance of the mediation session, Lead Counsel dedicated substantial efforts to preparing a persuasive mediation statement setting forth the facts relevant to the underlying alleged misrepresentations, and analyzing applicable facts, law, and damages issues.  The Parties then exchanged mediation statements.

29.    On March 1, 2022, Lead Counsel and Defendants' Counsel participated in a full-day, virtual mediation session in conjunction with Mr. Melnick.  During the mediation session, the Parties engaged in full and frank discussions concerning the merits of this Action, including, for example, the facts alleged to support Plaintiffs' claims.  This negotiation process enabled the Parties to meaningfully assess the relative strengths and weaknesses of their respective claims and defenses.

30.    The session resulted in an agreement in principle to settle the Action, and the Parties thereafter memorialized the substantive terms of the settlement in a confidential Term Sheet to Settle the Action (the "Term Sheet") on March 3, 2022.  The Term Sheet sets forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $3,100,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

31.    On March 4, 2022, counsel for the Parties jointly updated the Court that the Parties had reached an agreement-in-principle to settle the Action, and requested that the Court stay the issuance of any decision and order on the pending motion to dismiss while the Parties worked to finalize the stipulation and agreement of settlement and related papers.  ECF No. 39.

32.    Thereafter, the Parties exchanged multiple drafts of—and ultimately executed—the

Stipulation dated May 17, 2022. On May 24, 2022, Lead Plaintiffs submitted their Unopposed Motion for: (I) Preliminary Approval of Class Action Settlement; (II) Certification of the Settlement Class; and (III) Approval of Notice to the Settlement Class. ECF Nos. 48-49.

33.     On September 16, 2022, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice. ECF No. 49.

## III.    THE RISKS OF CONTINUED LITIGATION

34.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $3.1 million. As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals. Prior to trial and a potentially litigated verdict, the most immediate risk faced by the Settlement Class related to Defendants' pending motion to dismiss. There was no guarantee that Lead Plaintiffs and the Settlement Class would surmount this hurdle given the heightened pleading standards of the PSLRA and, even if they did, later achieve any recovery, let alone one greater than $3.1 million.

### A.    Risks Faced In Proving Liability

35.     Lead Plaintiffs and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability. At the time the Settlement was reached, the Court had not ruled on the Defendants' motion to dismiss. While Plaintiffs believe they had sufficiently plead materially false and misleading statements in violation of the federal securities laws, Defendants argued that their statements were not actionable because they were soft descriptions of Loop's technology that were too general and not objectively verifiable, were forward-looking, and that Defendants had publicly warned of the exact risk that Lead Plaintiffs allege to be false

10

and misleading.    Additionally, Defendants asserted that Lead Plaintiffs could not rely on Hindenburg Research's claims in its October 13, 2020 report, because Hindenburg is a short-seller and had financial incentive to paint the Company in a negative light.    Thus, according to Defendants, the Hindenburg Report was, *inter alia*, biased and unreliable.

36.    Additionally, Defendants contend that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged.    While Lead Counsel believes that the Complaint adequately alleges scienter, Lead Counsel was well aware of the high hurdle they would have to surmount in order to successfully allege (and then prove) that the Defendants acted with the intent to "deceive, manipulate, or defraud" investors under the federal securities laws.

37.    Here, Defendants argued that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged, because Lead Plaintiffs' Complaint did not allege that the Individual Defendants received a concrete and personal benefit from the alleged fraud, and that Lead Plaintiffs' other allegations did not sufficiently support scienter.

38.    Moreover, on July 29, 2022, the Superior Court of Québec dismissed the authorization of a securities class action in misrepresentations against a public issuer pursuant to the Québec *Securities Act*, among others.    Ex. 6; *see also* Stipulation, ¶¶1(oo), 5 (excluding claims brought under the proposed class action previously pending in the Superior Court of Québec). Although both the procedure and law differ in the proposed class action brought in the Superior Court of Québec, critically, in dismissing this Canadian action, the court found that the Hindenburg Report was not sufficient to support the alleged misrepresentations in the Canadian action, and particularly noted that Hindenburg Research was a short seller with an interest in seeing the Loop's

stock price fall, and that the report contained hearsay and did not offer any scientific evidence—crediting Defendants' main arguments made in this Action. *See generally* Ex. 6.

39.    Similarly, although the SEC began an investigation into Loop shortly after the release of the Hindenburg Report in October 2020 relating to Loop's technologies, partners, and agreements, Loop recently reported in its latest Form 10-Q filed with the SEC on October 12, 2022 that the SEC ultimately filed a complaint concerning actions unrelated to the contents of the Hindenburg Report.

### B.    Risks To Proving Loss Causation And Damages

40.    Even assuming that Lead Plaintiffs overcame the risk of establishing Defendants' liability, as discussed above, Lead Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.

41.    Lead Plaintiffs allege that on October 13, 2020, the Hindenburg Report corrected the misrepresentations alleged by Lead Plaintiffs. Following the release of the Hindenburg Report, Loop's stock price declined $3.78 per share, approximately 32.5%, to close at $7.83 on October 13, 2020.

42.    Pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is the plaintiff's burden to prove loss causation and damages. This would require Lead Plaintiffs to proffer expert testimony as to: (a) what the "true value" of Loop's stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of Loop's common stock was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the disclosure on October 13, 2020. Defendants almost certainly would have presented their own damages expert(s), who would have no doubt presented conflicting conclusions and theories for the price decline of Loop's common stock on the alleged disclosure date. For example, Defendants would have likely argued that the short-seller report

could not constitute a corrective disclosure under the federal securities laws both because: (a) it contained unproven opinions and negative speculation; and (b) it was a repackaging of already-public information, which many courts have found cannot constitute a corrective disclosure.  At bottom, the burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process.

43.     Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Lead Plaintiffs recognize that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and find there were no damages, or that they were only a fraction of the amount claimed by Lead Plaintiffs.  Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was no assurance that Lead Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial.  These issues could have seriously affected Lead Plaintiffs' ability to successfully prosecute this Action.

44.     In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated—any potential recovery by the Settlement Class.

### C.     Risks Faced In Obtaining And Maintaining Class Action Status

45.     Had this Action proceeded beyond the pleading stage, Defendants likely would have argued against class certification.  While Lead Counsel researched and analyzed class certification and are confident that all the Rule 23 requirements are satisfied, and that the Court would have certified the proposed class, Lead Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised a number of arguments challenging

the propriety of class certification.

46.     In addition, Defendants likely would have raised a challenge to class certification based on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  In *Comcast*, the Supreme Court held that one of the factors in determining whether common questions of law and fact predominate over individual questions is whether "damages are capable of measurement on a classwide basis." *Id.* at 34.  In *Comcast*, an antitrust case, the Supreme Court held that certification was inappropriate where the damages model that plaintiffs offered in support of class certification was not tied to their remaining theory of liability.  While Lead Counsel believes that any *Comcast* challenge would be unlikely to prevent class certification in this case, the prospect of such a challenge certainly presented another element of risk.  Additionally, even if Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery.  Class certification was, by no means, a foregone conclusion.

**D.     Other Risks**

47.     In addition to the pending motion to dismiss, Lead Plaintiffs would have had to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this.  For example, as detailed above, Lead Plaintiffs would have to satisfy the requirements of Rule 23 to prevail on a motion for class certification.

48.     Lead Plaintiffs would have also had to conduct substantial discovery, including comprehensive discovery on the Defendants located in Canada.  Indeed, because Loop's principle executive offices are in Québec, Canada, presumably, most of the witnesses and documentary evidence would be in Canada, and much of it in French, which would make the Action far more challenging.  Indeed, in conducting their investigation, many of the people interviewed by Lead Counsel's investigators spoke French with limited English proficiency.  Moreover, to obtain

14

documents and take depositions of third parties—including former employees—outside the United States, Plaintiffs would have to apply to this Court for letters rogatory, as Canada is not a signatory to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.

49.     Lead Plaintiffs would have to successfully navigate and prevail against Defendants' eventual motion(s) for summary judgment, and at trial.  Each of these several stages of litigation present significant risks in complex class actions such as this one.  Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.  In fact, approximately three years ago, GPM lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).  Lead Counsel GPM also litigated a securities class action in this District for approximately five years and, after surviving a motion to dismiss, successfully obtaining class certification and undertaking significant discovery efforts, which included depositions throughout the U.S. and in the U.K. and substantial document review, summary judgment was entered for defendants, and the judgment was affirmed on alternative grounds on appeal to the Second Circuit.  *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019).  Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

50.     Even if Lead Plaintiffs succeeded in proving all the elements of their case at trial and obtained a jury verdict, Defendants almost certainly would have appealed.  An appeal not only would have renewed the risks faced by Lead Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay and

further depletion of Loop's applicable insurance. Given these significant litigation risks, Lead Plaintiffs and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

**E.      The Settlement Is Reasonable In Light Of Potential Recovery In The Action**

51.      In addition to the risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Lead Plaintiffs had fully prevailed in each of their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Lead Plaintiffs' damages theory, including proof of loss causation as to the stock price drop date alleged in this case—***i.e., Lead Plaintiffs' best-case scenario***—estimated total maximum damages are approximately $26.7 million. Under this scenario, the $3.1 million Settlement represents a recovery of 11.6% of the Settlement Class's maximum estimated damages. In comparison, the median recovery in securities class actions in 2021 was approximately 1.8% of estimated damages. *See* Ex. 7 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022 at 24 (Fig. 22))); *see also id.* at 23 (Fig. 21) (median recovery was 5.2% for securities class actions with estimated damages between $20-$49 million that settled between December 2012-December 2021).

52.      However, if Defendants prevailed on any or all of their arguments concerning liability—which as explained above, some of which were recently accepted by the Superior Court of Québec, or likely arguments concerning loss causation, Lead Plaintiffs would have recovered far less, if anything.

**IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURTS PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE**

53.      Pursuant to the Preliminary Approval Order, Lead Counsel and the Court-approved

16

Claims Administrator, SCS, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail, email, and publication.

54.    The Preliminary Approval Order directed that the Postcard Notice be mailed to potential Settlement Class Members and set a deadline of December 8, 2022 (28 calendar days prior to the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final fairness hearing date of January 5, 2023 (the "Settlement Hearing").

55.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to disseminate copies of the Postcard Notice and publish the Summary Notice.  Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed SCS to post downloadable copies of the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Notice") and Claim Form online at www.LoopIndustriesSecuritiesSettlement.com (the "Settlement Website").  The Postcard Notice directed Settlement Class Members to the Settlement Website in order to obtain additional information on the Settlement, including how to file a claim, request exclusion or object to the Settlement, and access to downloadable copies of the Notice and Claim Form.

56.    The Notice disclosed, among other things, the following information to Settlement Class Members: (a) a summary of the Settlement, including the $3.1 million Settlement Amount; (b) the proposed Plan of Allocation; (c) that Lead Counsel would apply for an award of attorneys' fees on behalf of all Plaintiffs' Counsel in an amount not to exceed 33⅓% of the Settlement Fund

17

(*i.e.*, $1,033,333, plus interest), as well as Litigation Expenses in an amount not to exceed $140,000, which may include an application for reimbursement to Lead Plaintiffs for their costs and expenses related to their representation of the Settlement Class; (d) that any Settlement Class Member could object to the requested attorneys' fees and Litigation Expenses; (e) an explanation of the reasons for the Settlement; (f) that requests for exclusion from the Settlement must be submitted to the Claims Administrator no later than December 8, 2022; (g) that objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application must be filed with the Court no later than December 8, 2022; and (h) that the deadline for submitting a Claim Form is February 15, 2023.

57.    To disseminate the Postcard Notice, on October 3, 2022, SCS mailed a copy of the Postcard Notice to 147 individuals and organizations identified in the transfer agent records provided by Loop's counsel. *See* Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Bravata Decl."), attached hereto as Exhibit 1 at ¶5.

58.    In addition, SCS maintains a proprietary database with names and addresses of the largest and most common banks, brokerage firms, institutions and other third-party nominees. On October 3, 2022, SCS caused a letter to be mailed or emailed to the 1,773 nominees and institutional groups contained in the SCS master mailing list. Bravata Decl., ¶4 and Ex. B (copy of the letter sent to nominees). The letter directed nominees and institutional groups to: (a) send a Postcard Notice to their customers who may be beneficial purchasers/owners; (b) email a direct link to the Notice and Claim Form supplied by SCS to their beneficial purchasers/owners; or (c) provide SCS with a list of the names, mailing addresses, and email addresses, if available, of such beneficial purchasers/owners so SCS could promptly mail the Postcard Notice or email links to

18

the Notice and Claim Form directly to them.  Bravata Decl., ¶4.

59.    As of November 18, 2022, 8,251 potential Settlement Class Members have been mailed copies of the Postcard Notice or have received a link to the Notice and Claim Form.  *See id.* at ¶¶4-8.

60.    On October 31, 2022, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published once in *Investor's Business Daily* and to be transmitted over *PR Newswire*.  *See id.* at ¶10; Ex. D (confirmations of publications).

61.    Lead Counsel also caused SCS to establish the dedicated Settlement Website, which became operational on September 30, 2022, to provide potential Settlement Class Members with information concerning the Settlement, including exclusion, objection, and claim-filing deadlines for the case; the online claim filing link; the date and time of the Settlement Hearing; and downloadable versions of the Notice and Claim Form, as well as copies of the Stipulation and Preliminary Approval Order.  Bravata Decl., ¶12.

62.    SCS maintains a toll-free telephone number for potential Settlement Class Members to call and obtain information about the Settlement and/or request a Notice and Claim Form.  SCS promptly responds to each telephone inquiry and will continue to address potential Settlement Class Members' inquiries.  *Id.* at ¶11.

63.    As set forth above, the Postcard Notice and Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, is December 8, 2022.  To date, no requests for exclusion have been received.  *Id.* at ¶13. SCS will file a supplemental affidavit after the December 8, 2022 deadline addressing whether any requests for exclusion have been received.

64.    In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application have been entered on this Court's docket or have otherwise been received by Lead Counsel or SCS.  *Id.* at ¶14.  Lead Counsel will file reply papers by December 29, 2022 that will address any objections that may be received.

## V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

65.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than February 15, 2023.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

66.    Lead Plaintiffs' damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel.  Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

67.    The Plan of Allocation is set forth at pages 9 to 13 of the Notice.  *See* Notice, attached as Exhibit C to the Bravata Decl., at 9-13.  As described in the Notice, the calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial.  Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  The computations under the Plan of Allocation are only a method to weigh the claims of Authorized Claimants against one another for

20

the purposes of making *pro rata* allocations of the Net Settlement Fund.

68.    In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the amount of estimated alleged artificial inflation in the per share closing prices of Loop common stock that was allegedly proximately caused by Defendants' purportedly false or misleading statements and omissions.  In calculating the estimated artificial inflation caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiffs' damages expert considered the price change in Loop common stock that occurred on October 13, 2020, and adjusted the price change observed on this day for changes that were attributable to market or industry forces.

69.    Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase of Loop common stock during the Settlement Class Period (*i.e.*, from September 28, 2018 through and including October 12, 2020) that is listed in the Claim Form and for which adequate documentation is provided.  The calculation of Recognized Loss Amounts will depend upon several factors, including how many shares of Loop common stock the Claimant purchased, when the Loop common stock was bought, acquired or sold (or if it was still held at the end of Settlement Class Period), and the purchase price and sales price (if sold).  In general, the Recognized Loss Amount calculated will be the difference between the estimated artificial inflation on date of purchase and the estimated artificial inflation on date of sale (with certain adjustments based on the 90-day average price following the end of the Settlement Class Period if the stock was still held as of the end of the Settlement Class Period), or the difference between the actual purchase price and sales price of the stock, whichever is less.

70.    Claimants who purchased Loop common stock during the Settlement Class Period and sold those shares before the alleged corrective disclosure impacted the Company's share price (on October 13, 2020) will have no Recognized Loss Amount for those transactions.  The Plan of

21

Allocation also incorporates the "Lookback Period" damage claim ceiling provisions of the PSLRA. Recognized Loss Amounts for shares of Loop common stock sold during the 90-day period after the end of the Settlement Class Period or still held at the end of trading on January 8, 2021, the end of the 90-day period, are also limited by the difference between the purchase price and the average closing price of Loop common stock during that period, consistent with provisions of the PSLRA, 15 U.S.C. § 78u-4(e).

71. The sum of the Recognized Loss Amounts for all of a Claimant's purchases of Loop common stock during the Settlement Class Period is the Claimant's "Recognized Claim" and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

72. In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Loop common stock that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

73. To date, no objections to the proposed Plan of Allocation have been received by Lead Counsel or the Claims Administrator, or posted on the Court's docket. *See* Bravata Decl. at ¶14.

## VI. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

74. In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 33⅓% of the Settlement Fund (or $1,033,333, plus interest earned at the same rate as the Settlement Fund). Lead Counsel also request reimbursement of Litigation Expenses from the Settlement Fund in the amount of $70,791.39, which includes

22

$60,791.39 in out-of-pocket expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action, and $10,000 to Lead Plaintiffs ($5,000 for each Lead Plaintiff) for the reasonable costs incurred in connection with representing the Settlement Class. The total Litigation Expenses amount of $70,791.39 is below the maximum expense amount of $140,000 set forth in the Long Notice and Postcard Notice. The legal authorities supporting a 33⅓% fee award are set forth in the accompanying Fee and Expense Application, filed concurrently herewith. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.    The Fee Application

75.    Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the Settlement Class. As set forth in the accompanying Fee and Expense Application, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery. The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances. This paradigm minimizes unnecessary drain on the Court's resources. Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature. Furthermore, the requested fee is fully supported by a "lodestar multiplier cross-check."

76.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved. As discussed in the Fee and Expense Application, a 33⅓%

23

fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

### 1. The Favorable Outcome Achieved is the Result of the Significant Time and Labor That Plaintiffs' Counsel Devoted to the Class Actions

77. Plaintiffs' Counsel spent considerable time prosecuting this Action on behalf of the Settlement Class. As previously summarized above, Plaintiffs' Counsel, among other things:

- drafted the initial complaints in the Action and moved for consolidation and appointment of Lead Plaintiffs and Lead Counsel;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Loop's filings with the SEC, (ii) research reports prepared by securities and financial analysts, and news and industry articles, concerning Loop, (iii) press releases published by and regarding Loop; (iv) Loop's website, including any of its previous iterations; (v) reports concerning the chemical or advanced recycling industry; and (vi) other publicly available material related to Loop; (b) retaining and working with private investigators who conducted investigations that involved, *inter alia*, numerous interviews of former Company employees and other sources of relevant information; and (c) working with a damages and loss causation expert to analyze Loop's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the comprehensive 59-page Amended Complaint, which asserted claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act;

- engaged in substantial briefing opposing Defendants' motion to dismiss;

- engaged in a mediation process overseen by a highly experienced third-party mediator, Jed Melnick, Esq., of JAMS, which involved an exchange of written submissions concerning the facts of the case, liability and damages, a full-day formal mediation session, and extensive consultation with Lead Plaintiffs' expert on damages and loss causation;

- negotiated a detailed confidential settlement term sheet with Defendants' counsel, which was executed on March 3, 2022;

- drafted and negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel;

- worked with a damages expert to craft a plan of allocation that treats Lead Plaintiffs and all other members of the proposed Settlement Class fairly;

- drafted the preliminary approval motion and supporting papers;

24

- oversaw the implementation of the notice process; and

- drafted the motion for final approval and supporting papers.

78. Attached here to as Exhibits 4 and 5 are declarations from Lead Counsel in support of an award of attorneys' fees and reimbursement of out-of-pocket expenses incurred in connection with prosecution of the Action. Included within each supporting declaration is a schedule summarizing the hours and lodestar of each firm, a summary of expenses by category, and a firm resume.[3] For the Court's convenience, the following is a chart of the lodestar amounts for the two Lead Counsel firms:

| LAW FIRM: | LODESTAR |
|---|---|
| Glancy Prongay & Murray LLP | $506,726.25 |
| Pomerantz LLP | $268,959.80 |
| TOTAL LODESTAR | $775,686.05 |

79. The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District in the context of a lodestar cross-check. Additionally, the rates billed by Lead Counsel attorneys (ranging from $415-$615 per hour for non-partners and $725-$1,050 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 11 attached hereto (table of peer law firm billing rates).

80. As set forth above and in detail in Exhibits 4 and 5, Lead Counsel collectively expended a total of 1,090.37 hours in the investigation and prosecution of the Action. The resulting total lodestar is $775,686.05. The requested fee amount of 33⅓% of the Settlement Fund currently equals $1,033,333 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 1.33 multiplier of Lead Counsel's lodestar.

---

[3] Time expended in preparing the Fee and Expense Application has not been included.

81.    Moreover, Plaintiffs' Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval.  Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member's claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process. *No additional compensation will be sought for this work.*

82.    As detailed above, throughout this litigation, Lead Counsel devoted substantial time to the prosecution of the Action.  Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case.  We personally devoted substantial time to this litigation and were personally involved in, among other things: (a) the investigation of the facts and applicable law; (b) drafting, reviewing and editing all pleadings, court filings, the meditation statement, and other correspondence prepared on behalf of Lead Plaintiffs; (c) engaging with damages and loss causation experts; (d) conducting discussions with counsel for Defendants on a variety of matters; and (e) were intimately involved in settlement negotiations.  Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, and the mediation submissions, communicating with Lead Plaintiffs, the mediation process, negotiating the terms of the Settlement, Term Sheet and Stipulation, and other matters.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

83.    Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, we

respectfully submit that the requested fee is reasonable and should be approved.

### 2.    The Magnitude and Complexity of the Action

84.    As detailed in the Fee and Expense Application, securities class action cases are known for their notorious complexity.  This case was no different.  As detailed above, this Action presented many novel and complex issues, including the need for Lead Counsel to understand chemical or advanced recycling technology, independently investigate the allegations of the Hindenburg Report, consult with experts, draft an amended complaint that would comply with the rigorous pleading standards of the PSLRA despite the PSLRA's automatic stay of discovery, and contest a motion to dismiss drafted by Defendants' counsel at Wilson Sonsini Goodrich & Rosati. Moreover, Lead Counsel anticipated that discovery in this matter would be particularly complex given the international dimension of this Action, including that: (a) the witnesses and documentary evidence were likely located in Canada, where Loop's principal executive offices are located; (b) there would likely be a language barrier; and (c) because Canada is not a signatory to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Lead Plaintiffs would have had to apply to this Court for letters rogatory in order to obtain documents and take depositions of third parties.

85.    Additionally, the mediation and settlement process in this Action was long and hard-fought.  The Parties zealously advocated their positions throughout the mediation process, and it took several months before the Parties reached complete agreement and executed the Stipulation.

### 3.    The Significant Risks Borne By Plaintiffs' Counsel

86.    This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis.  From the outset, there was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require.  In

27

undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a litigation like this one was covered.  With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel received no compensation during the course of the Action, and incurred $60,791.39 in out-of-pocket litigation-related expenses.

87.     Additionally, Lead Plaintiffs alleged their claims without information gained through subpoena power, as Defendants would likely have argued that any attempt to do so would have been precluded by the PSLRA's automatic stay of discovery.

88.     Plaintiffs' Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this litigation presented multiple risks and uncertainties that could have prevented any recovery whatsoever.

89.     Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured.  Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement.  *See supra*, ¶49.  On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

       **4.**      **The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel**

90.     As demonstrated by the firm resumes, attached hereto as Exhibits 4-C and 5-C, Lead Counsel are highly experienced and skilled laws firms that focus their practices on securities class action litigation.  Indeed, Lead Counsel have substantial experience in litigating securities

fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. Lead Counsel enjoy a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. We believe Lead Counsel's experience added valuable leverage in the settlement negotiations.

91.     Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Defendants were represented by Wilson Sonsini Goodrich & Rosati, a well-known international law firm that vigorously represented the interests of its clients throughout the Action. In the face of this experienced and formidable opposition, Plaintiffs' Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that we believe are highly favorable to the Settlement Class.

### 5.     The Requested Fee In Relation to the Settlement

92.     We believe that the amount of the fee requested (33⅓%) in relation to the Settlement Amount ($3.1 million) is fair and reasonable. Courts routinely award fees of one-third in securities class action settlements. *See* Fee and Expense Application at pp. 7-10; *see also* Ex. 10 (collecting cases).

### 6.     Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases

93.     Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly large investors, take an active role in protecting the interests of shareholders. If this

important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel in consideration of the risks undertaken in prosecuting a particular securities class action.  Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

### 7.     The Reaction of the Class Supports Class Counsel's Fee Request

94.     As noted above, as of November 18, 2022, 8,251 copies of the Postcard Notice and/or Notice had been disseminated advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund. Bravata Decl. ¶8, Ex. A (Postcard Notice); Ex. C (Notice).  In addition, the Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  Bravata Decl. at ¶10; Ex. D (confirmation of Summary Notice publications).  To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice and Notice have been received or entered on this Court's docket.  Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers, set to be filed by December 29, 2022.

### 8.     Lead Plaintiffs Support Lead Counsel's Fee Request

95.     As set forth in their respective declarations submitted, Lead Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 2 ("Johansson Decl.") ¶¶9-11; Ex. 3 ("Cappa Decl.") ¶¶9-11.  Lead Plaintiffs have been involved in the litigation and settlement of the Action, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

96.     In sum, Plaintiffs' Counsel accepted the Action on a fully contingent basis, committed significant resources, and prosecuted the Action without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the litigation risks, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 33⅓% of the Settlement Fund, resulting in a multiplier of 1.33, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

**B.      Reimbursement Of The Requested Litigation Expenses Is Fair And Reasonable**

97.     Lead Counsel seek a total of $70,791.39 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes: $60,791.39 in out-of-pocket expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as $5,000 to each of the Lead Plaintiffs pursuant to 15 U.S.C. § 78u-4(a)(4) for the reasonable costs directly incurred, including the time and effort expended by Messrs. Johansson and Cappa in connection with representing the Settlement Class.  *See* Johansson Decl., ¶13; Cappa Decl., ¶13.

98.     Lead Counsel is seeking reimbursement of a total of $60,791.39 in out-of-pocket costs and expenses.  The following is a combined breakdown by category of all expenses incurred by Lead Counsel:

31

| CATEGORY OF EXPENSE | AMOUNT |
|---|---|
| COURIER & SPECIAL POSTAGE | $142.10 |
| COURT FILING FEES | $1,324.35 |
| EXPERTS | $30,472.00 |
| INVESTIGATIONS | $13,992.95 |
| MEDIATION | $12,155.83 |
| ONLINE RESEARCH | $1,830.60 |
| PHOTOCOPYING/IMAGING | $117.65 |
| PSLRA PRESS RELEASES | $420.00 |
| AUTOMOTIVE TRANSPORTATION | $153.84 |
| MEALS AND CONFERENCE | $182.07 |
| **GRAND TOTAL** | **$60,791.39** |

99.     The Postcard Notice and Long Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $140,000.  The total amount requested by Lead Counsel and Plaintiffs, $70,791.39, falls well below the $140,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Postcard Notice and Notice.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in its reply papers.

100.    From the commencement of this Action, Lead Counsel understood that they might not recover their out-of-pocket expenses.  Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action.  Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

101.    The largest component of expenses, $30,472 or approximately 50.13% of the total expenses, was expended on the retention of damages and loss causation experts.  These experts were consulted at different points throughout the litigation, including on matters related to the

preparation of the Complaint, on matters relating to the negotiation of the Settlement, and on preparation of the proposed Plan of Allocation.

102.    Another large component of expenses, $13,992.95, or approximately 23% of the total expenses, was expended on the retention of private investigators in connection with Lead Counsel's investigation.  Lead Plaintiffs retained the investigatory services of a U.S.-based investigator, On Point Investigations, in addition to a Canadian-based investigator, Scout Intelligence.  The investigation included numerous fact interviews with former Loop employees. The use of investigators is necessary in securities class actions given the PSLRA's high pleading standard and automatic stay of discovery pending the court's resolution of a motion to dismiss.

103.    Additionally, Lead Counsel paid $12,155.83 in mediation fees, which is approximately 20% of the total expenses incurred.

104.    The other litigation expenses for which Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things: (a) the use of online research databases to research many of the factual allegations alleged in the Complaint and to research and support Lead Plaintiffs' legal arguments; (b) court costs; (c) service of process costs; (d) photocopying; and (e) postage and delivery expenses.

105.    Finally, as stated above, Lead Counsel respectfully requests PSLRA awards in the amount of $5,000 for Mr. Johansson and $5,000 to Mr. Cappa to compensate them for their time and effort expended on behalf of the Settlement Class. *See* Johansson Decl., ¶¶12-13; Cappa Decl., ¶¶12 -13.  The efforts that Lead Plaintiffs devoted to this Action are detailed in their accompanying declarations.  Exs. 2, 3.  Based on the work performed by Lead Plaintiffs for the benefit of the Settlement Class, we believe the awards are justified and appropriate.

106.    To date, no objections to the Litigation Expenses have been filed on the Court's docket.  In our opinion, the Litigation Expenses incurred by Lead Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, we respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.    CONCLUSION

107.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, we respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable.  We further submit that the requested fee in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and that the request for reimbursement of $70,791.39 in Litigation Expenses, including PSLRA reimbursement for costs in the amount of $5,000 for each of the Lead Plaintiffs should also be approved.

We declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 22nd day of November 2022, at Los Angeles, California.

*/s/ Leanne H. Solish*
LEANNE H. SOLISH

Executed this 22nd day of November 2022, at New York, New York.

*/s/ Murielle J. Steven Walsh*
MURIELLE J. STEVEN WALSH

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was electronically filed with the Clerk of

Court via the CM/ECF system, which will send Notice of such filing to all counsel of record.


Dated: November 22, 2022                    */s/ Leanne H. Solish*
                                            Leanne H. Solish

35