EXHIBIT 6

# SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT OF TERREBONNE

No:    700-06-000012-205

DATE:  July 29, 2022

_____

**PRESIDING THE HONOURABLE   THOMAS M. DAVIS, J.S.C.**

_____

**RAN LEVY**
    Plaintiff

v.

**LOOP INDUSTRIES INC.**
-and-
**LOOP CANADA INC.**

**-and-**

**DANIEL SOLOMITA**

**-and-**

**JAY STUBINA**

**-and-**

**LAURENCE SELLYN**

**-and-**

**ANDREW LAPHAM**

JD2836

700-06-000012-205                                                    PAGE : 2

**-and-**

**NELSON GENTILETTI**
Defendants

---

## JUDGMENT

---

### OVERVIEW

[1]     Plaintiff, Ran Levy (**Mr. Levy**), presents an Application to Authorize a Class Action, under both the class action provisions of the *Code of Civil Procedure* and the relevant sections of the Quebec *Securities Act* (the "**QSA**").[1]

[2]     Mr. Levy is an investor in Defendant Loop Industries Inc. ("**Loop**") having purchased 300 shares on June 18, 2018 at a price of $10.15. He alleges that the share price was negatively affected by certain material misrepresentations made by Loop. Important to the claim under article 1457 of the Civil Code of Québec (**"C.C.Q."**), he still holds the shares.

[3]     Loop purports to have developed a process to create virgin quality Loop branded PET resin & polyester fiber made from 100% recycled content.[2]

[4]     Defendant, Loop Canada Inc., is a subsidiary of LOOP, with its head office in Quebec. It posits that it is not a proper defendant for the purposes of the present proceedings.

[5]     The remaining Defendants are directors and/or officers of LOOP. Mr. Levy alleges that they were all directors or officers of LOOP, at the relevant times of the release of the documents purporting to contain misrepresentations and that they authorized, permitted or acquiesced in the release of these documents.

[6]     Mr. Levy seeks to represent a class comprised of the following persons:

All persons and entities that acquired LOOP Industries Inc. securities during the Class Period.

Or, any other Class to be determined by the Court.

[7]     He initially asserted three causes of action: a statutory cause of action for primary market misrepresentations under the QSA, a statutory cause of action for secondary

---

[1]     RLRQ c V-1.1
[2]     Exhibit P-8.

700-06-000012-205                                                      PAGE : 3

market misrepresentations under the QSA, and a cause of action for extra-contractual liability under article 1457 C.C.Q..

[8]      The primary market claim was withdrawn during the authorization hearing.

## 1.    **THE ALLEGATIONS**

[9]      Loop is a reporting issuer in Quebec; the stock is traded on the NASDAQ.

[10]     The foundation of Mr. Levy's proposed action is that Loop made material misrepresentations about its technology that, when corrected, caused the stock price to fall.

[11]     Defendants describe Loop's manufacturing process in the following way:

> The Defendant Loop Industries, Inc. (i.e. Loop or the Company) owns patented and proprietary technology (the "Technology") which is used to recycle a type of plastic known as "PET". PET stands for polyethylene terephthalate, a resin and type of polyester commonly used in textiles and plastic packaging, including bottles for water and carbonated soft drinks, as well as containers for goods and other consumer products.
>
> [...]
>
> The Technology involves the depolymerization of waste PET plastic and polyester. Depolymerization is the chemical process of breaking a polymer, in this case PET, into its base building blocks known as monomers. The monomers are then filtered, purified, and polymerized to create virgin-quality PET resin. This resin can be used to manufacture food-grade packaging and polyester.[3]

[12]     Loop also describes its technology in certain documents. Here is some of that description, in a July 2020 document entitled "Leading The Sustainable Plastic Revolution":

> • Loop's proprietary depolymerization technology allows for all types of waste PET (polyethylene terephthalate) plastic & polyester fiber to be upcycled into high purity PET resin & polyester fiber.
>
> • Through our low energy depolymerization technology, the waste plastic is broken down into its monomers: Dimethyl Terephthalate (DMT) and Monoethylene Glycol (MEG).

---

[3]    Exhibit D-5, Defendants' written arguments par. 10 and 11.

700-06-000012-205                                                        PAGE : 4

> • The monomers are purified to remove all coloring, additives & organic or inorganic impurities. From there, the DMT & MEG are polymerized into virgin quality Loop™ branded PET resin.[4]

[13]    Mr. Levy argues that this document contains false information when it states that the technology is revolutionary and patented, including relating to the publication of patents in 2017.

[14]    This document was, however issued after the purchase of the shares, so it is of limited relevance in so far as the secondary market claim is concerned. It might also be considered in the context of the claim under article 1457 C.C.Q.

[15]    The Form 8 K, a press release and fourth quarter earnings report issued in May of 2018 (a non-core document),[5] before the purchase of the shares, is more relevant. Mr. Levy alleges the following misrepresentations:

> •      Loop™ Industries, Inc. (NASDAQ: LOOP) (the "Company" or "Loop"), an innovative technology company leading the sustainable plastic revolution, today announced financial results for its fourth quarter and fiscal year ended February 28, 2018.

> •      "We continue to make meaningful progress towards the expected commercialization of our revolutionary technology," said Daniel Solomita, Loop's Founder and CEO.

> •      Loop's mission is to accelerate the world's shift toward sustainable plastic and away from our dependence on fossil fuels. Loop has created a revolutionary technology poised to disrupt the plastics industry. This ground-breaking technology decouples plastic from fossil fuels by depolymerizing waste polyester plastic to its base building blocks (monomers). The monomers are then repolymerized to create virgin-quality polyester plastic that meets FDA requirements for use in food-grade packaging. Loop™ branded polyester resin enables consumer goods companies to meet and exceed their stated sustainability goals and circular ambitions.[6]

[16]    Then, Mr. Levy alleges that on October 13, 2020: "several media outlets published articles stating that LOOP's business "is smoke and mirrors" and that LOOP was inflating its technological capabilities."[7] He does not provide any corroborating evidence relating to the patents.

[17]    Mr. Levy only produced two such articles. One was on Business Insider.com which reported:

---

4    Exhibit P-8.
5    Exhibit P-11.
6    Amended authorization application par. 16.1.
7    *Ibid.* par. 7.

700-06-000012-205                                                PAGE : 5

Loop Industries plummets 39% after a short-seller report claims its plastic-recycling technology doesn't work.[8]

[18]    The short seller, Hindenburg, had prepared a report on the company which included the following:

• Loop Industries has never generated revenue, yet calls itself a technology innovator with a "proven" solution that is "leading the sustainable plastic revolution". Our research indicates that Loop is smoke and mirrors with no viable technology.

• As part of our investigation, we interviewed former employees, competitors, industry experts, and company partners. We also reviewed extensive company documentation and litigation records.

• Former employees revealed that Loop operated two labs: one reserved for the company's two twenty-something lead scientist brothers and their father, where incredible results were achieved, and a separate lab where rank-and-file employees were unable to replicate the supposedly breakthrough results.

• The two brothers who act as lead scientists for Loop and who co-invented Loop's recycling process appear to have no post-graduate education in chemistry and list no work experience other than Loop.

• A former Loop employee told us that Loop's scientists, under pressure from CEO Daniel Solomita, were tacitly encouraged to lie about the results of the company's process internally. We have obtained internal documents and photographs to support their claims.

• Loop focuses on recycling a common form of plastic called "PET". According to a former employee, Loop's previous claims of breaking PET down to its base chemicals at a recovery rate of 100% were "technically and industrially impossible". The same employee told us the company's claims of producing "industrial grade purity" base chemicals from PET were false.

• According to litigation records, Loop's CEO, Daniel Solomita hired a convict, who had previously pled guilty to stock manipulation, to help raise Loop's startup capital. That convict introduced Solomita to another convict who facilitated Loop's first investment.

• Solomita has no apparent formal science education but has a history of stock promotion at another publicly traded company that subsequently imploded.

• Executives from a division of key partner Thyssenkrupp, who Loop entered into a "global alliance agreement" with in December 2018, told us their partnership

---

[8]    Exhibit P-4.

700-06-000012-205                                                          PAGE : 6

is on "indefinite" hold and that Loop "underestimated" both costs and complexities of its process.

• We contacted Loop's other partners, including Coca-Cola and PepsiCo, most of whom refused to divulge whether any plastic had been recycled as part of their partnerships with Loop. Comments from Danone, owner of the Evian brand, suggested it had not bought any PET from Loop thus far. We suspect these partnerships have gone nowhere.

• Loop's JV with PET and chemical company Indorama, promoted frequently over the last two years as an imminent revenue stream, is "still being finalized", according to an employee, despite being announced in 2018. An Indorama employee told us no production has taken place thus far.

• We expect Loop will never generate any meaningful revenue. With a market cap of ~$515 million, we see 100% downside to Loop once it burns through its ~$48 million in balance sheet cash.

• We have submitted our findings to regulators.[9]

[19]    One can see that this is quite a damning report.

[20]    Another report, by Clare Goldsbury, in *Plastics Today* on October 20, 2018[10] seems to call into question some of Loop's claims about its technology. Yet, this article was somewhat more balanced,  and offered one contrary view to the Hindenburg claims:

An update to Hindenburg's report that appeared a day later in a Roth Capital Partners newsletter claimed that the "short report misses or misconstrues key acts from SEC filings" and takes "direct aim at Loop's technology, questioning its authenticity based on two former employees, one of whom questions whether the technology even exists." Roth insists that "based on our own due diligence with CPG [Consumer Products Groups], investors, and in particular Indorama, we question these claims."[11]

[21]    Curiously, Mr. Levy posits that a corrective disclosure is not required for the QSA action to move forward, despite section 225.8 of the QSA. His argument on whether these documents were corrective disclosures was laconic, at best.

[22]    Finally, a third article in La Presse, dated November 4, 2020 reported on the cancellation of a contract that Loop had signed with Coca-Cola in 2018. This article did not provide any new reporting on Loop's technology, but stated that the price of the shares had dropped to $6.08 USD, a decline of 9.1%.

---

[9]    Exhibit P-5.

[10]    Exhibit P-9.

[11]    *Ibid.* p. 6 (pdf).

## 2.    THE LAW

[23]    By way of introduction, it is useful at the outset, to set out certain provisions of the QSA, particularly in relation to the secondary market claim, which is the principle element of Mr. Levy's application.

[24]    The general obligation of issuers in respect of disclosure is described at section 73:

> **73.**    A reporting issuer shall provide periodic disclosure about its business and internal affairs, including its governance practices, timely disclosure of a material change and any other disclosure prescribed by regulation in accordance with the conditions determined by regulation.

[25]    Section 225.4 determines the test to be used by the Court to assess whether the action should be authorized in respect of the secondary market:

> **225.4.** No action for damages may be brought under this division without the prior authorization of the court.
>
> The request for authorization must state the facts giving rise to the action. It must be filed together with the projected statement of claim and be served by bailiff to the parties concerned, with a notice of at least 10 days of the date of presentation.
>
> The court grants authorization if it deems that the action is in good faith and there is a reasonable possibility that it will be resolved in favour of the plaintiff.
>
> The request for authorization and, if applicable, the application for authorization to institute a class action required under section 574 of the Code of Civil Procedure (chapter C-25.01) must be made to the court concomitantly.
>
> [The Court's underlining]

[26]    The relevant misrepresentation provisions are found in sections 225.8 and 225.11, which read in part as follows:

> **225.8.**    A person that acquires or disposes of an issuer's security during the period between the time when the issuer or a mandatary or other representative of the issuer released a document containing a misrepresentation and the time when the misrepresentation was publicly corrected may bring an action against
>
> (1)    the issuer, each director of the issuer at the time the document was released, and each officer of the issuer who authorized, permitted or acquiesced in the release of the document; [...]
>
> **225.11.** A person that acquires or disposes of an issuer's security during the period between the time when the issuer failed to make timely disclosure of a material change and the time when the material change was disclosed in the manner required under this Act or the regulations may bring an action against

700-06-000012-205                                                          PAGE : 8

(1)    the issuer and each director and officer of the issuer who authorized, permitted or acquiesced in the failure to make timely disclosure; [...]

[27]    Section 225.13 deals with the degree of knowledge that the representatives of the issuer must possess about the material fact, which is alleged to contain a misrepresentation, as well as the burden of proof. It reads as follows:

225.13. For the purposes of sections 225.8 to 225.10, unless the defendant is an expert or the misrepresentation was contained in a core document, the plaintiff must prove that the defendant

(1)    knew, at the time that the document was released or the public oral statement was made, that the document or public oral statement contained a misrepresentation or deliberately avoided acquiring such knowledge at or before that time; or

(2)    was guilty of a gross fault in connection with the release of the document or the making of the public oral statement.

[28]    One sees numerous concepts in these sections and several are defined. Perhaps the two that are most important for the purpose of the present matter are "misrepresentation" and "material change".

[29]    Misrepresentation is defined at section 5:

"misrepresentation" means any misleading information on a material fact as well as any pure and simple omission of a material fact; [...]

[30]    The meaning of misrepresentation, therefore, turns on the definition of "material fact", also set out in section 5 of the Act:

"material fact" means a fact that may reasonably be expected to have a significant effect on the market price or value of securities issued or securities proposed to be issued; [...] [The Court's underlining]

[31]    What is "timely disclosure of a material change"? Material change is found at section 5.3 of the Act:

5.3.    When used in relation to an issuer other than an investment fund, "material change" means a change in the business, operations or capital of the issuer that would reasonably be expected to have a significant effect on the market price or value of any of the securities of the issuer, or a decision to implement such a change made by the directors or by senior management of the issuer who believe that confirmation of the decision by the directors is probable. [...]

[32]    "Timely disclosure" is not defined.

[33]    The notion of "core document" is also important, as it has significant implications on a petitioner's burden of proof. It is defined at section 225.3:

> [...] "core document" means a prospectus, a take-over bid circular, an issuer bid circular, a directors' circular, a notice of change or variation in respect of a take-over bid circular, issuer bid circular or directors' circular, a rights offering circular, management's discussion and analysis, an annual information form, a proxy solicitation circular, the issuer's annual and interim financial statements and any other document determined by regulation, and a material change report, but only where used in relation to the issuer or the investment fund manager and their officers;

[34]    This definition can be contrasted with the definition of "document", found at the same section:

> "document" means any writing that is filed or required to be filed with the Authority, with a government or an agency of a government under applicable securities or corporate law, or with a stock exchange or quotation and trade reporting system under its by-laws, or the content of which would reasonably be expected to affect the market price or value of a security of the issuer;

[35]    Finally, "public correction" is an important concept, but is not defined in the QSA.

[36]    To summarize:  whether  a misrepresentation is contained in a core or non-core document, the main elements of the statutory cause of action are: (a) a document containing a misrepresentation; (b) a public correction of the misrepresentation; and (c) the acquisition or disposition by the investor, of the issuer's securities, between the time of the misrepresentation and the time of the public correction, or between the time when the issuer failed to make timely disclosure of a material change and the time when the material change was disclosed.

[37]    In taking stock of all of these sections of the QSA, with respect to the secondary market claim, the Court must answer the question of whether there is a reasonable possibility that the action will be resolved in favour of Mr. Levy. This notion, and the role of the Court in deciding what it means, has received only limited analysis in the courts of Quebec, but significant consideration in Ontario. It has also been considered by the Supreme Court of Canada in *Theratechnologies Inc.* v. *121851 Canada Inc.*, a Quebec case. The following words of Justice Abella characterize the role of the Court in the following way:

> [38]    In my view, as Belobaba J. suggested in *Ironworkers*, the threshold should be more than a "speed bump" (para. 39), and the courts must undertake a reasoned consideration of the evidence to ensure that the action has some merit. In other words, to promote the legislative objective of a robust deterrent screening mechanism so that cases without merit are prevented from proceeding, the threshold requires that there be a reasonable or realistic chance that the action will succeed.

[39]    A case with a reasonable possibility of success requires the claimant to offer both a plausible analysis of the applicable legislative provisions, and some credible evidence in support of the claim. This approach, in my view, best realizes the legislative intent of the screening mechanism: to ensure that cases with little chance of success — and the time and expense they impose — are avoided. I agree with the Court of Appeal, however, that the authorization stage under s. 225.4 should not be treated as a mini trial. A full analysis of the evidence is unnecessary. If the goal of the screening mechanism is to prevent costly strike suits and litigation with little chance of success, it follows that the evidentiary requirements should not be so onerous as to essentially replicate the demands of a trial. To impose such a requirement would undermine the objective of the screening mechanism, which is to protect reporting issuers from unsubstantiated strike suits and costly unmeritorious litigation. What is required is sufficient evidence to persuade the court that there is a reasonable possibility that the action will be resolved in the claimant's favour. [12]

[The Court's underlining]

## 3.    ANALYSIS

### 3.1 The Secondary Market Claim

[38]    The Court will first consider the various misrepresentations alleged by Mr. Levy that occurred prior to his purchase of the shares. There is really only one document of importance, the Form 8 K from May 2018.

[39]    Before discussing the content of Form 8 K from May 2018, some insight into the meaning of what is material is appropriate. It is essential that the misrepresentation be material, given the definitions of misrepresentation and material fact in the QSA. As Justice Chatelain said in *Catucci c. Valeant Pharmaceuticals International Inc.*: "There can only be an objectionable misrepresentation (which includes an omission) if it relates to a material fact. [...]."[13]

[40]    In the QSA, as we have seen, material fact is defined as a fact that: "may reasonably be expected to have a significant effect on the market price or value of securities issued".

[41]    In its decision in *Sharbern Holding Inc.* v. *Vancouver Airport Centre Ltd.*, the Supreme Court of Canada considered the issue of materiality as follows:

[61]   In sum, the important aspects of the test for materiality are as follows:

i.      Materiality is a question of mixed law and fact, determined objectively, from the perspective of a reasonable investor;

---

[12]    2015 CSC 18.
[13]    2017 QCCS 3870, par. 146.

700-06-000012-205                                                                  PAGE : 11

ii.    An omitted fact is material if there is a substantial likelihood that it would have been considered important by a reasonable investor in making his or her decision, rather than if the fact merely might have been considered important.  In other words, an omitted fact is material if there is a substantial likelihood that its disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information made available;

iii.    The proof required is not that the material fact would have changed the decision, but that there was a substantial likelihood it would have assumed actual significance in a reasonable investor's deliberations;

iv.    Materiality involves the application of a legal standard to particular facts.  It is a fact-specific inquiry, to be determined on a case-by-case basis in light of all of the relevant considerations and from the surrounding circumstances forming the total mix of information made available to investors; and

v.    The materiality of a fact, statement or omission must be proven through evidence by the party alleging materiality, except in those cases where common sense inferences are sufficient.  A court must first look at the disclosed information and the omitted information.  A court may also consider contextual evidence which helps to explain, interpret, or place the omitted information in a broader factual setting, provided it is viewed in the context of the disclosed information.  As well, evidence of concurrent or subsequent conduct or events that would shed light on potential or actual behaviour of persons in the same or similar situations is relevant to the materiality assessment.  However, the predominant focus must be on a contextual consideration of what information was disclosed, and what facts or information were omitted from the disclosure documents provided by the issuer.[14]

[The Court's underlining]

[42]    Nor is materiality presumed, as can be seen from the judgment in *Paniccia* v. *MDC Partners Inc.*:

[71]    Materiality is a contextual and fact-specific inquiry, determined on a case-by-case basis from the perspective of the reasonable investor and involves the application of a legal standard to specific facts in light of all of the relevant circumstances and the total mix of information. The court must therefore inquire into what the reasonable investor would consider as significantly altering the total mix of information made available to him or her in the particular circumstances; this is a fact-specific inquiry, and except in those cases where common sense inferences are sufficient, the party alleging materiality must provide evidence in support of that contention.[15]

[The Court's underlining]

---

[14]    2011 CSC 23.
[15]    2018 ONSC 3470.

700-06-000012-205                                                    PAGE : 12

[43]    Mr. Levy essentially posits that the statements, in the May 2018 press release, were material, as they misrepresented the true capabilities of Loop's technology. Were the statements something that a reasonable investor would have considered important to an investment decision in May of 2018?

[44]    Looking first at Loop's assertion of being an "an innovative technology company leading the sustainable plastic revolution" in the May 2018 Form 8 K,[16] in the Court's view, the materiality of this statement must be considered at the time it was made and without the influence of the later short seller report. In addition, the statement cannot be read in a vacuum. The report continued:

> "We continue to make meaningful progress towards the expected commercialization of our revolutionary technology," said Daniel Solomita, Loop's Founder and CEO. "We announced our partnership with evian®, and we were honored to demonstrate with them our technology for media outlets at the World Economic Forum Annual Meeting in Davos, Switzerland. We are expanding and upgrading our pilot plant to increase capacity and demonstrate continuous operations and are also in discussions to begin manufacturing of Loop branded PET plastic with potential manufacturing partners. We would like to thank our shareholders for their continued support and belief in Loop's potential to disrupt the global polyester plastics market."[17]

[45]    So one sees that the technology was not yet commercialized. Moreover, in the same report one sees that the company had no revenue but losses of $3,634,671 for the quarter and, of over $14 million for the year. It also speaks of Loop's market <u>potential</u>. The reasonable investor would be aware that the technology was still being developed for commercial purposes, might not be successful and that profitability was not assured. Some "revolutionary technologies" are never commercialized.

[46]    For the Court, without more evidence, there is not a reasonable chance, in the context of a start-up technology company, that Mr. Levy can demonstrate that the alleged misstatement was material at the time it was made. The Court takes as its own the following words of the Ontario Court of Appeal in *Drywall Acoustic Lathing and Insulation Local 675 Pension Fund (Trustees of) v. SNC-Lavalin Group Inc.*:

> 42 He explained, at para. 29, that to identify a misrepresentation, a plaintiff must specify the facts represented and why those facts are false. That is, the plaintiff must specify what makes the representation a misrepresentation. Each misrepresentation is distinct, even if the representation is the same. Therefore, he held at para. 34, a plaintiff applying for leave under s. 138.8(1) must lead evidence of each discrete allegation of misrepresentation that she wishes to pursue. He wrote, at para. 42, that whether a plaintiff requires leave under s. 138.8(1) to amend a statement of claim turns on the nature of the misrepresentation claim that was pleaded for the purpose of obtaining leave.

---

[16]   Exhibit P-11.
[17]   *Ibid.*

700-06-000012-205                                                        PAGE : 13

> 43 [...] I further agree that the plaintiff must lead sufficient evidence to satisfy the leave requirement for each discrete allegation of misrepresentation.[18]

[The Court's underlining]

[47]    One might also consider the following words in *Paniccia*:

> [29] I agree with the submissions of Ms. Young for the defendant Stéphane Roy and of Mr. Tenai for SNC-Lavalin and the outside directors that identifying a misrepresentation involves specifying what is represented (the representation) and specifying its falsity, i.e., what makes the representation a misrepresentation. [...][19]

[48]    Not only has Mr. Levy failed to provide cogent evidence of the falsity of the misrepresentations that he alleges, but it is also far from established that the statement about the technology was a misrepresentation.

[49]    The burden is – and remains – on Mr. Levy to show a reasonable possibility that the technology is *not* revolutionary. It is *not* the Defendants' burden to show that the technology *is* revolutionary. Justice Taylor described the obligation as follows in *Abdula v. Canadian Solar*:

> 64 There is no obligation on a defendant to file any material in opposition to the motion for leave to commence the statutory cause of action. The onus is on the plaintiff, and remains on the plaintiff, to produce satisfactory evidence, without the ability to obtain production or discovery from the defendant, to satisfy the relatively low threshold of showing a reasonable possibility of success trial. If the plaintiff is unable to do so, leave should not be granted.[20]

[The Court's underlining]

[50]    In this case, Loop has filed evidence, the Kemitek Report, which sets out that the technology does appear to work.[21]

[51]    The mandate and scope of the report are set out as follows:

> Loop Industries, Inc. ("Loop"), through its subsidiary Loop Canada Inc., approached Kemitek to conduct an independent verification of its Gen II polyethylene terephthalate (PET) depolymerization technology and to produce a report stating an opinion on the ability of the process to convert post-consumer waste PET plastic and polyester fiber into its primary monomer building blocks: dimethyl terephthalate (DMT) and monoethylene glycol (MEG).

---

[18]   2015 ONCA 718.
[19]   *Supra* note 15.
[20]   2014 ONSC 5167.
[21]   Exhibit D-9 – Kemitek Report, December 10, 2020.

700-06-000012-205                                                    PAGE : 14

The process verification was carried out on two different scales currently run at Loop's facilities: mini-pilot (in a 25-liter reactor) and pilot (in a 6000-liter reactor). The Kemitek team was mandated to understand, witness, control, and verify Loop's technology and characterize the quality of starting materials (post-consumer grade) and end products.  The verification was not intended to certify the yields or economic viability of the process.

[52]    The conclusion, in part, reads:

Kemitek's findings through this verification allow us to attest to the capacity of Loop's technology to produce pure monomers within their specifications. Kemitek conducted this verification in an independent manner using rigorous methodology and we ensured process integrity during the three-week testing period via surveillance, sampling and seals.

[53]    The only evidence offered by Mr. Levy are the claims in the Hindenburg report, prepared by a short seller with an interest in having the stock fall in price. The report is based solely on hearsay and does not offer any scientific evidence.

[54]    It is true that a short seller report might be a corrective disclosure, although this was not alleged. This said, it is also worth noting that on the financial prognosis for Loop, the report essentially confirms what Loop's documents had been reporting.

[55]    In addition, a short seller report will usually be part of a much broader corrective disclosure process, as was the case in *Catucci c. Valeant Pharmaceuticals International Inc.*,[22] where the Citron report was followed up by a much more extensive and complete series of disclosures.

[56]    The Court would add that the role of a short seller report, in securities litigation of this nature, must be looked at in light of the goal of the "more than speed-bump" test of the QSA, which is to prevent strike suits.

[57]    Yet Mr. Levy, referring the Court to the Court of Appeal's judgment in *Durand c. Subway Franchise Systems of Canada*,[23] argues that only the elements of the proof produced by him should be taken as true and not the Kemitek report. This may be so in relation to the regular class action application, unless Defendants' evidence demonstrates the falsity of Mr. Levy's, but not in respect of the application under the QSA, where the Court must evaluate the evidence presented by both sides. And, in any event, the Kemitek does allow a conclusion that the claims of the Hindenburg report are false.

[58]    To counter this, Mr. Levy produced another document from Hindenburg, entitled "Loop's "Independent Review" Of Its Technology Falls Flat",[24] dated December 20 2020,

---

[22]   2017 QCCS 3870.

[23]   2020 QCCA 1647.

[24]   Exhibit P-13.

700-06-000012-205                                                    PAGE : 15

in which the information is largely based on third party sources and no independent scientific evidence. The focus of the report is the commercialization of the product:

[59]    A former Loop employee told us that without quantitative details on the process yield **"the results mean nothing".** They pointed out that the testing left "a lot of room for interventions... from Loop's team".

[60]    This focus is most important, because the misrepresentations that Mr. Levy complains about are about the validity of the technology, not the economic viability of the process. As the Court will discuss below, the economic viability of the technology was always presented in the most cautionary language by Loop.

[61]    Mr. Levy also refers the Court to article 2849 C.C.Q. to argue that the Court might presume that Mr. Levy had all the information issued by Loop available to him when he purchased the shares. It is not necessary to consider this argument fully. While the Court will consider reliance below, Mr. Levy's primary burden is to demonstrate that Loop made a material misrepresentation to shareholders and the public. Based on the evidence offered, Mr. Levy does not have a reasonable chance of showing that the statements about the technology were materially misrepresentative of Loop's situation at the time that they were made.

[62]    The Kemitek Report also assists in determining the knowledge of the directors at the time the alleged misrepresentations were made. Insofar as non-core documents are concerned, section 225.13 of the QSA puts the burden on the petitioner to prove that the Defendants "knew", at the time the document was released or the public oral statement was made, that the document or public oral statement contained a misrepresentation".

[63]    The May 2018 8 K document[25] was a press release, so a non-core document. Mr. Levy does not offer one iota of evidence that the Defendants knew that the statements were misstatements and the fact that an independent report validates the technology makes it challenging to conclude that the Defendants would have known that the statements were false in May of 2018.

[64]    For argument's sake, what if the document did contain a material misrepresentation? Can Mr. Levy argue that the Hindenburg report was a public correction?

[65]    In the Court's view he cannot.

[66]    Although the allegations of the Authorization Application are unclear, Mr. Levy seems to rely on the Hindenburg Report to argue that Loop falsely claimed making progress towards commercialization, that Loop has never generated revenue and that

---

[25]    Exhibit P-11.

700-06-000012-205                                                        PAGE : 16

Loop has never produced any PET resin or polyester fiber pursuant to its partnerships with Coca-Cola, Pepsi, Danone, and Indorama.

[67]    Consider various documents issued by Loop since the May 2018 document.

[68]    Leaving aside the limitations of a short seller report as a public correction, the reality of Loop's business was already in the public record in October 2020. Here are some examples:

> In September of 2018, (...) we announced a joint venture with IVL to manufacture and commercialize sustainable Loop™ branded PET plastic resin and polyester fiber to meet the growing global demand from beverage and consumer packaged goods companies. The 50/50 joint venture has an exclusive world-wide license to use our technology to retrofit existing IVL facilities, so each can produce100% sustainable Loop™ PET plastic resin and polyester fiber. The first facility, in Spartanburg, South Carolina, is anticipated to begin commercial production in the second half of the calendar year 2020 and is expected to produce 20,700 metric tonnes of sustainable Loop™ PET plastic resin and is fully subscribed by leading global consumer brands.[26]

> [...]

> During the year ended February 29, 2020, we continued executing our corporate strategy where Loop Industries focused on developing two distinct business models for the commercialization of Loop™ PET resin and polyester fiber to customers: 1) from our joint venture with Indorama, and 2) from our Infinite LoopTM greenfield facilities. We continue to develop the engineering of the Infinite LoopTM platform and we have increased our focus on the development of Infinite LoopTM projects in Europe and in North America.[27]

> Since our inception in 2010, we have incurred net losses. Our net loss for the year ended February 29, 2020 was $14.51 million. We have five customer agreements signed, we have however earned no revenues to date. We have financed our operations primarily through sales of common stock and incurrence of debt and have devoted substantial efforts to research and development, as well as building our team. We expect to continue to incur significant expenses and increasing operating losses for the foreseeable future. The net losses we incur may fluctuate significantly from quarter to quarter. Although we believe that our business plan has significant profit potential, we may not attain profitable operations and management may not succeed in realizing our business objectives. Our ability to generate revenue depends on our ability to successfully complete the development of our products, obtain the regulatory approvals necessary to commercialize our products and attract additional customers. We expect to incur operating losses in future periods. These losses will occur as we do not have any revenues to offset the expenses associated with our business operations. We may not generate

---

[26]    Exhibit D-10, Form 10 K: For the fiscal year ended February 28, 2019, p. 5.
[27]    Exhibit D-5, Form 10 K: For the fiscal year ended February 29, 2020, p.6.

revenues from product sales for the next several years, if ever. <u>If we are not able to develop our business as anticipated, we may not be able to generate revenues or achieve profitability.</u> We cannot guarantee that we will ever be successful in generating revenues in the future. If we are unable to generate revenues, we will not be able to earn profits or continue operations.[28]

[…]

As reflected in the accompanying interim unaudited condensed consolidated financial statements, <u>we are a development stage company, we have not yet begun commercial operations and we do not have any sources of revenue.</u> Management believes that the Company has sufficient financial resources to fund planned operating and capital expenditures and other working capital needs for at least, but not limited to, the 12-month period from the date of issuance of the August 31, 2020 interim condensed consolidated financial statements. <u>There can be no assurance that any future financing will be available or, if available, that it will be on terms that are satisfactory to us.</u>[29]

[The Court's underlining]

[69]    And there were other disclosures, on the joint ventures which made it clear that manufacturing was in the future:

In the last years, we have made a significant number of announcements with some of the world's leading brands to be supplied from our planned first commercial facility from our joint venture with Indorama Ventures Holdings LP ("Indorama") in Spartanburg, South Carolina, including: [...][30]

[…]

On September 15, 2018, the Company, through its wholly-owned subsidiary Loop Innovations, LLC, a Delaware limited liability company, entered into a Joint Venture Agreement (the "Agreement") with Indorama Ventures Holdings LP, USA, an indirect subsidiary of Indorama Ventures Public Company Limited, to manufacture and commercialize sustainable polyester resin. Each company has a 50/50 equity interest in Loop Indorama Technologies, LLC ("ILT"), which was specifically formed to operate and execute the joint venture.[31]

[70]    In *Swisscanto* v *BlackBerry*,[32] Justice Belobaba stated the following in relation to the concept of public correction:

[63]    One can also add the following. The plain meaning of the word "corrected" means to "set right" or "mark the errors". <u>It follows from this that the public</u>

---

[28]    *Ibid.* p. 9.
[29]    Exhibit P-2, Form 10 Q, October 7, 2020, p. 14.
[30]    *Ibid.* p. 8.
[31]    Exhibit D-10, p. F-16.
[32]    2015 ONSC 6434

correction must be reasonably capable of revealing to the market the existence of an untrue statement of material fact or an omission to state a material fact – that is, the existence of a misrepresentation.

[...]

[65]     In my view, the public correction requirement in s. 138.3 of the OSA can be satisfied as follows:

(i)     The public correction must be pleaded with sufficient precision to provide fair notice to the defendant. The plaintiff must point to specific words or figures that allegedly constitute the public correction of the alleged misrepresentation. Because the function of the public correction requirement under s. 138.3(1) is to establish the second "time-post" for fixing liability, the plaintiff must also identify the timing of the public correction.

(ii)     The pleaded public correction need not be a "mirror-image" of the alleged misrepresentation or a direct admission that a previous statement is untrue. But there must be some linkage or connection between the pleaded public correction and the alleged misrepresentation – at the very least, the pleaded public correction must share the same subject matter as, and in some way relate back to, the misrepresentation. The fact that an alleged public correction is over or under-inclusive relative to the misrepresentation is not a bar to establishing that the words or figures constitute a public correction. Of course, the more tenuous the connection between the public correction and the misrepresentation, the more likely that the defendant will be able to show under s. 138.5(3) that shareholder losses were unrelated to the misrepresentation.

(iii)     The public correction must be reasonably capable of revealing to the market the existence of the alleged misrepresentation. However, the public correction need not prove, or help prove, that the earlier statement or omission was in fact a misrepresentation as defined by s. 1(1) of the OSA. Moreover, the public correction need not be understood by the ordinary investor as revelatory of the existence of a misrepresentation. It may be the case that only market participants with specialized knowledge and expertise (e.g., analysts or traders) are able to understand that particular words or figures constituted the public correction of a misrepresentation. But that will be sufficient.

(iv)     The public correction may take "any of a number of forms" and need not emanate from the defendant corporation. The source of the public correction can be third parties, including media reports or internet postings.[33]

[The Court's underlining; references omitted]

[71]     Given the previous disclosures, the Hindenburg report cannot be relied on by Mr. Levy as a public correction. If there had been misrepresentations in May 2018, at the time

---

[33]     *Ibid*.

that Mr. Levy purchased his shares, they had already been corrected at the time the Hindenburg report was released.

[72]    The secondary market claim has no reasonable chance of success.

### 3.2 The Claim under article 1457 C.C.Q.

[73]    Under article 1457 of the C.C.Q., the elements of a civil liability claim are the fault, the injury, and the causal link between the two. In this case, what is the fault? Here is what the Court said in *Nseir c. Barrick Gold Corporation*:

> [297]  As article 574(2) C.C.P. states, for a class action to be authorized, the facts alleged must appear to justify the conclusions sought. In the context of the present proceedings, any damages that might be awarded following a finding of fault under article 1457 C.C.Q., must result from more than a finding that Barrick made a simple misrepresentation. The misrepresentation must be material as outlined in the case law dealing with claims made under Canadian securities legislation. This is because the right to damages arising from a drop in the share price only exists when the misrepresentation has been shown to be material, in that it had a material effect on an investor's decision making.
>
> [298]  In the Court's view, where the legislator has set out a specific regime governing damage actions against issuers of securities who make misstatements or fail to provide information to the market, the fault giving rise to compensatory damages must be the one set out in the statutory regime.[34]

[74]    The Court must also be mindful of its role under article 575 C.C.P. It is well described by the Supreme Court of Canada in *L'Oratoire Saint-Joseph du Mont-Royal v. J.J.*:

> [56]                 Article 575(2) *C.C.P.* provides that the facts alleged in the application must "appear to justify" the conclusions being sought. This condition, which was not included in the original bill on class actions, was added in response to pressure from certain companies [translation] "that feared it would give rise to a significant volume of <u>frivolous actions</u>": V. Aimar, "L'autorisation de l'action collective: raisons d'être, application et changements à venir", in C. Piché, ed., *The Class Action Effect* (2018), 149, at p. 156 (emphasis added); P.-C. Lafond, "Le recours collectif: entre la commodité procédurale et la justice sociale" (1998-99), 29 *R.D.U.S.* 4, at p. 24. It is now well established that at the authorization stage, the role of the judge is to screen out *only* those applications which are "frivolous", "clearly unfounded" or "untenable": *Sibiga*, at paras. 34 ("the judge's function at the authorization stage is <u>only</u> one of filtering out <u>untenable claims</u>" (emphasis added)), 52 ("[a] motion judge should <u>only</u> weed out class actions that are <u>frivolous</u> or <u>have no prospect of success</u>" (emphasis added)) and 78 ("it was <u>enough</u> to show that the appellant's claim was <u>not a frivolous one</u> and that, at trial, she would have an arguable case to make on behalf of the class" (emphasis

---

[34]   2020 QCCS 1697; the decision of the Court of Appeal in pending.

added)); see also *Charles*, at para. 70; Lafond (2006), at pp. 112 ([translation] "the purpose of [art. 575(2) *C.C.P.*] is first, 'to immediately eliminate actions that are *prima facie* frivolous' and, second, to 'dispose in the same way of actions that, although not frivolous, are clearly unfounded'") and 116 ("the authorization stage exists solely to screen out applications that are frivolous or clearly unfounded in fact or in law, as the legislature originally intended"); see also *Fortier*, at para. 70; *Oubliés du viaduc de la Montée Monette v. Consultants SM inc.*, 2015 QCCS 3308, at para. 42 (CanLII). As this Court explained in *Infineon*, "the court's role is merely to filter out frivolous motions", which it does "to ensure that parties are not being subjected unnecessarily to litigation in which they must defend against untenable claims": para. 61 (emphasis added); see also paras. 125 ("a judge hearing a motion for authorization is responsible for weeding out frivolous cases") and 150 ("the purpose of the authorization stage is merely to screen out frivolous claims").[35]

### 3.2.1    Paragraph 575(1)

[75]    Here, there is really no debate. As Justice Chatelain held in *Catucci c. Valeant Pharmaceuticals International Inc.*: "the question of whether any Defendant committed a fault by violating a duty of diligence owed to any member of the class in respect of any alleged misrepresentation raises common issues of law and fact".[36]

### 3.2.2    Paragraph 575 (2)

[76]    Is Mr. Levy's proposed action frivolous?

[77]    It is not sufficient to simply allege a misrepresentation. As the Supreme Court said in J.J. there must be a minimum of proof to substantiate the factual allegations of the alleged fault:

> [59]            Furthermore, at the authorization stage, the facts alleged in the application are assumed to be true, so long as the allegations of fact are sufficiently precise: *Sibiga*,    at    para. 52; *Infineon*,    at    para. 67; *Harmegnies*,    at para. 44; *Regroupement des citoyens contre la pollution v. Alex Couture inc.*, 2007 QCCA 565, [2007] R.J.Q. 859, at para. 32; *Charles*, at para. 43; *Toure*, at para. 38; Fortier, at para. 69. Where allegations of fact are "vague", "general" or "imprecise", they are necessarily more akin to opinion or speculation, and it may therefore be difficult to assume them to be true, in which case they must absolutely "be accompanied by some evidence to form an arguable case": *Infineon*, at para. 134. It is in fact strongly suggested in *Infineon*, at para. 134 (if not explicitly, then at least implicitly), that "bare allegations", although "insufficient to meet the threshold    requirement    of    an    arguable    case"    (emphasis    added),    can be *supplemented* by "some evidence" that — "limited though it may be" — must accompany the application in order "to form an arguable case".

---

[35]    2019 SCC 35.
[36]    2017 QCCS 3870, par. 316.

[78]    In addition, a misrepresentation in a disclosure document filed, in accordance with the QSA, will not constitute a civil fault under article 1457, unless it contains a material misrepresentation within the meaning of the QSA. In the Court's view, Mr. Levy has not demonstrated an arguable case that the May 2018 document contained a material misrepresentation about the technology of Loop, for the reasons stated above.

[79]    In saying this the Court is well aware that it must base itself on the evidence provided by the applicant, or that was admitted by the Court. In an earlier judgment, the Court admitted the Kemitek report, because:

> [13]    Even considering the more limited scope for the production of evidence under article 574 C.C.P., the burden would be met as the documents constitute: "evidence that is essential and indispensable to the Court's analysis of the criteria of article 575 C.C.P." This is because a full analysis of whether a misrepresentation has been made, and hence whether the allegations are clearly false, can only be carried out properly by comparing the documents containing the alleged misrepresentations with others issued in the same timeframe. All the documents, perhaps with the exception of Exhibits D-12 and D-13, meet this criteria.[37]

[80]    The other document alleged by Mr. Levy is the investor presentation of May 2020, discussed above. In the Court's view it does not contain a material misrepresentation either. Indeed, it does tout the technology, but tempers this in the following way:

> Loop has an Innovation Center and pilot plant located in Terrebonne, Quebec. The pilot plant serves to optimize and demonstrate Loop's proprietary depolymerization technology and continuous operations in preparation for its ramp up to large scale commercialization.

[81]    The fact that the product is not commercialized is evident for all to see. In addition the qualifications of the scientific team are clearly set out.

[82]    Again, read in full, there is no reasonable argument that it contained a material misrepresentation.

[83]    As there is no material representation, it is not really necessary to consider the effect of the alleged public correction on the share price, as there was nothing to correct.

[84]    The Court will now briefly consider the issue of whether Mr. Levy must demonstrate that he relied on the alleged misrepresentations, as there is no allegation of any reliance.

[85]    Loop posits that in an action under article 1457 C.C.Q. for misrepresentations in the secondary market, the causal link requires a demonstration of two elements: (1) the Plaintiff must have relied on the misrepresentations, and (2) the variation in the value of

---

[37]  *Levy c. Loop Industries Inc.*, 2021 QCCS 2171.

700-06-000012-205                                                      PAGE : 22

the securities must have been caused by the misrepresentations and their subsequent correction, offering the following citation:

> Le lien de causalité entre la transmission d'informations fausses ou trompeuses et la réalisation du dommage comporte deux dimensions. Premièrement, il réfère à l'impact de ces informations sur le cours ou la valeur des titres. Dans cette dimension, la démonstration du lien de causalité consiste à établir que les informations fausses ou trompeuses constituent la cause effective de la perte subie. Deuxièmement, le lien de causalité concerne l'impact des informations fausses ou trompeuses sur la décision des investisseurs. Autrement dit, il s'agit d'établir que les investisseurs se sont appuyés sur les informations pour prendre leurs décisions.[38]

[86]    However, in the recent matter of *Dillon c. Wayland Group Corp.*, Justice Bisson offers the following:

> [46]    The Court notes that the Plaintiffs are not required to prove reliance under Québec law.
>
> [47]    This Court distinguishes causality and reliance. These are two different, though sometimes overlapping concepts. But Art. 1457 C.C.Q. only requires causality.[39]

[87]    In *Nseir c. Barrick Gold Corporation*, the undersigned presented a different position:

> [308] There is another important reason why Mr. Nseir's action does not meet the requirement of this article. He has failed to allege that he relied on any misrepresentations of Barrick when he decided to purchase Barrick shares. The need to demonstrate reliance to ground an action under article 1457 C.C.Q. has been discussed by the Court of Appeal in the matter of *Allaire c. Girard & Associés (Girard et Cie comptables agréés)*, where it stated:
>
> [53]    Le premier juge rappelle que la responsabilité professionnelle des comptables ne sera engagée que si la faute qu'on leur impute est bien à l'origine de l'investissement. Le dommage doit, en effet, être une suite directe et immédiate de cette faute: *Caisse populaire de Charlesbourg c. Michaud*, [1990] R.R.A. 531, pp. 537 et 538 (C.A.); *Verrier c. Malka*, AZ-98011480 (C.A.), [1998] R.R.A. 715; *Irwin Management Consultants Ltd. c. Thorne, Riddell*, AZ-95011575 (C.A.), [1995] R.R.A. 589; *Garnet Retallack & Sons Ltd. c. Hall Y Henshaw Ltd.*, AZ-90011437 (C.A.), [1990] R.R.A. 303.

---

[38]  Stéphane ROUSSEAU, « Régimes de responsabilité civile: divulgation sur les marchés primaire et secondaire », in JurisClasseur Québec, coll. « Droit civil », *Valeurs mobilières*, fasc. 13, Montréal, LexisNexis Canada, Electronic Loose-Leaf, 2010, par. 25.

[39]  2022 QCCS 1553.

> [309] In the *Theratechnologies* decision, Justice Abella also acknowledged the need to demonstrate reliance on the issuer's misrepresentation.[40]
>
> [310] In a different context, the Court of Appeal decided that for an action to lie under article 1457 C.C.Q., the plaintiffs were required to show that they relied on the misinformation in the financial statements.[41]
>
> [311] The Court acknowledges that the judgment of Justice Chatelain in *Chandler c. Volkswagen Aktiengestllchaft*, might well lead to the conclusion that reliance is not a required element to find fault under article 1457 C.C.Q. However, it is clear from her recital of the facts that there was reliance on the part of the investor in that case, and, further, this reliance was alluded to by Justice Schrager[42] in his reasons dismissing the application for leave to appeal.[43]
>
> [References omitted]

[88]     The words of Justice Abella are indeed interesting, as reading paragraphs [28] and [33] together one concludes that the creation of the statutory regime removed the burden that the investor had under article 1457 C.C.Q. to demonstrate that he had relied on the information:

> [28]     In Quebec, investors faced a similarly heavy burden under the Civil Code. To establish civil liability, claimants were required to prove a fault, such as the publication of misinformation or the failure to meet a statutory disclosure obligation; that they suffered prejudice; and that there was a causal link between the fault and the prejudice — that is, that they had relied on the misinformation in making the trade: arts. 1457 and 1607 of the Civil Code of Québec. Demonstrating the requisite causal link proved to be particularly onerous in the securities context: Quebec, National Assembly, Committee on Public Finance, "Étude détaillée du projet de loi n° 19 — Loi modifiant la Loi sur les valeurs mobilières et d'autres dispositions législatives", Journal des débats de la Commission permanente des finances publiques, vol. 40, No. 10, 1st Sess., 38th Leg., October 25, 2007 ("Étude detaillée"), at p. 2.
>
> [...]
>
> [33]                 Under this regime, when a security is acquired or transferred at the time of a false declaration or omission of information that should have been disclosed, the fluctuation in the value of the security is presumed to be attributable to that fault.   Investors were thereby released from the heavy burden of demonstrating that the variation in the market price of the security was linked to

---

[40]   *Theratechnologies Inc. v. 121851 Canada Inc. supra* note 12.
[41]   *Wightman c. Widdrington (Succession de)*, 2013 QCCA 1187, par. 200.
[42]   *Volkswagen c. Chandler*, 2018 QCCA 1347.
[43]   *Nseir c. Barrick Gold Corporation, supra* note 34.

700-06-000012-205                                                          PAGE : 24

the misinformation or omission, and from demonstrating that they personally relied on that information or omission in buying or transferring the security.[44]

[89]    This statement of Justice Abella reflects the legislator's decision, in article 225.12 of the QSA, to clearly indicate that reliance was not required for a secondary market claim.

[90]    All this to say, with deference to colleagues having a different view, that while the issue of reliance in securities matters may require clarification by the higher Courts, the Court maintains the view that it expressed in *Barrick Gold*.

[91]    In any event, the present matter does not turn on the reliance of Mr. Levy, as there is no arguable case that there was a material misrepresentation for him to rely upon, unlike the situation in *Chandler* or *Dillon,* where the omissions in the former and the misrepresentations in the latter were clear and supported by credible evidence.

[92]    There is one final element to consider, the fact that Mr. Levy continues to hold the shares. He claims damages in an amount to be determined.

[93]    Were the Court to authorize the secondary market claim under the QSA, section 225.28 provides a mechanism to determine the damages of the investor who has kept the shares. However, in the Court's view, the section is not applicable to a regular damage action under article 1457 C.C.Q., given a plaintiff's obligation to mitigate his or her damages according to article 1479 C.C.Q.:

> 1479. A person who is bound to make reparation for an injury is not liable for any aggravation of the injury that the victim could have avoided.

[94]    After a preliminary debate on the issue, both Plaintiff and Defendants withdrew their requests to each produce a document showing the evolution of the share price. However, by choosing to hold on to his shares, is Mr. Levy able to demonstrate a cause of action, all the more so in that he did not provide further information on the evolution of the share price?

[95]    In the Court's view he cannot, as for the purposes of a civil responsibility claim, Mr. Levy has failed to demonstrate that the fault of Loop has caused him an injury. At the moment that he filed the authorization application in October 2020 and when the amended application was filed on December 13, 2020 the injury was only a potential one and the damages suffered, if any, would only crystallize upon the sale of the shares. In fact, more than two years since the alleged misrepresentation, he still owns the shares and it seems next to impossible to relate the current share price to what happened then.

[96]    In addition, given the lack of information on the share price's evolution, the Court has no information on whether Mr. Levy could have mitigated the damages he alleges that the misrepresentation caused him.

---

[44]    *Theratechnologies Inc.* v. *121851 Canada Inc. supra* note 12.

700-06-000012-205                                                                                    PAGE : 25

[97]    While not based on an identical situation, as the action was instituted against a broker, the judgment in *Chapdelaine-Pelletier c. Services financiers Tandem inc.*, discusses the issue of mitigation:

> [45]          Le comportement fautif du représentant ou du cabinet de services financiers pourra donner ouverture à un recours en dommages au client lésé.  Le client pourra réclamer des dommages compensatoires équivalents aux pertes encourues et aux gains dont il a été privé.
>
> [46]          Par ailleurs, le client a l'obligation de minimiser sa perte et ses dommages.[45]
>
> [References omitted]

[98]    Justice Gascon's judgment, while in this Court, in *Services financiers banque nationale inc. c. Girard*, is also helpful to consider on the issue of mitigation:

> [112]    Or, dit Lloyd's, Dre Hachachena aurait dû procéder au rachat dès qu'elle s'est rendu compte de la faute en décembre 2000.  Selon l'assureur, il n'a pas à faire les frais du délai écoulé jusqu'en avril 2001 durant lequel la part a baissé de 4,00 $ additionnels.
>
> [113]    Sur ce point, le Tribunal considère que Lloyd's a raison.
>
> [...]
>
> [115]    Or, l'article 1479 C.c.Q. précise que la personne tenue à réparation ne répond pas de l'aggravation du préjudice que la victime pouvait éviter.  C'est le cas ici.
>
> [116]    En effet, dès décembre 2000 et janvier 2001, Dre Hachachena pouvait aisément apprécier l'étendue du préjudice causé par les représentations erronées et fausses de M. Girard.  Si l'on peut comprendre son choc de le réaliser en décembre 2000, il est difficile par contre d'expliquer qu'elle ait attendu de janvier à avril 2001 avant de procéder au rachat, dans un contexte de baisse constante de son placement depuis son origine en février 2000.
>
> [117]    Pour reprendre les propos de la Cour d'appel dans une affaire similaire, dès janvier 2001, Dre Hachachena connaissait de façon claire, précise et non équivoque le caractère spéculatif et risqué de son placement.  Elle était alors consciente du risque qu'elle prenait à le garder.  Elle doit en assumer les conséquences négatives à compter de cette date.[46]
>
> [References omitted]

---

[45]   2006 QCCS 5670.
[46]   2005 CanLII 54143; see also *Bazinet c. Wood Gundy Inc.*, 1997 CanLII 10442 (QCCA).

700-06-000012-205    PAGE : 26

[99]    To say it differently, Mr. Levy is asking the Court to recognize his personal cause of action, where his damages are purely speculative, and to authorize a class action, which the Court will not do. The criteria of article 575(2) C.C.P. are not present in this matter.

### 3.2.3    Paragraph 575(3)

[100]    The Defendants do not contest that the composition of the Class makes it difficult or impracticable to apply the rules for mandates to take part in judicial proceedings on behalf of others or for consolidation of proceedings, as contemplated in article 575(3) of the CCP. The Court agrees.

[101]    The Defendants do find the class to be too broadly described, and the Court agrees, as it will discuss below.

### 3.2.4    Article 575(4)

[102]    Mr. Levy is not an adequate representative because he fails to demonstrate that he has a personal cause of action against the Defendants.

[103]    In *Karras c. Société des loteries du Québec*, the Court of Appeal stated:

> [53]    En l'espèce, la compétence de l'appelante n'est pas en cause, pas plus que l'absence de conflit avec les membres du groupe. Par contre, même en adoptant une approche minimaliste, souple et libérale, il n'en demeure pas moins que l'appelante n'a pas l'intérêt suffisant pour agir étant donné que son recours personnel ne remplit pas le fardeau de démonstration, tel que discuté ci-avant sous les deux premiers moyens d'appel. Par ailleurs, selon son témoignage, elle n'a pas démontré un intérêt sur les questions soulevées dans le litige avant d'avoir accepté d'agir comme représentante du groupe.
>
> [54]    La Cour a reconnu que le représentant devait avoir un recours personnel. En conséquence, il va de soi que l'appelante ne peut être en mesure d'assurer une représentation adéquate des membres au sens de l'article 575(4) C.p.c.[47]

> [Reference omitted]

## 4.    THE PROPOSED ACTION AGAINST THE OFFICORS AND DIRECTORS

[104]    Given the conclusions in relation to the action against Loop, the Court will only consider this question summarily. A similar attempt to pursue directors or employees was undertaken by the plaintiff in *Lambert (Gestion Peggy) c. 2993821 Canada inc. (Écolait ltée)* Justice Pinsonnault dealt with it as follows:

---

[47]    2019 QCCA 813.

700-06-000012-205                                                                    PAGE : 27

[41]   Avec grand respect pour l'opinion contraire, aucun fait précis n'est allégué relativement à ces administrateurs, et encore moins une faute indépendante de celle apparemment commise par Écolait. Force est de constater qui si le Tribunal autorisait l'ajout des trois administrateurs à l'action collective, cette autorisation reposerait essentiellement sur la qualification juridique des contrats que propose la demanderesse Peggy Lambert qui invite le Tribunal à conclure que les trois administrateurs poursuivis auraient en quelque sorte « manipulé » le conseil d'administration d'Écolait pour l'amener à conclure ou cautionner des contrats qu'elle qualifie d'abusifs et ainsi privilégier leurs intérêts personnels au détriment de ceux de cette société.

[42]   En soit, il n'y a rien de répréhensible comme tel à tenter d'adjoindre à un recours existant des codéfendeurs qui permettront qu'un jugement favorable à la demanderesse et aux membres du Groupe qu'elle représente puisse être exécuté en cas d'insolvabilité d'Écolait. Encore faut-il que ce droit d'action envisagé puisse être exercé contre ces administrateurs avec une chance minimale de succès, ce qui, de l'avis du Tribunal, n'est pas le cas en l'espèce.[48]

[105]   In the present matter, there are some facts alleged against the directors and officers:

16.3   LOOP's directors, officers and employees violated the above policies, (as listed in Exhibit P-12)[49] in their dealings with and in conducting LOOP's business, in particular, by consistently falsely stating in core documents that it has a "proven" solution that LOOP is "leading the sustainable plastic revolution". As alleged above, the Hindenburg Report concluded that LOOP is "smoke and mirrors with no viable technology";

16.4   LOOP's directors, officers and employees further violated these policies by failing to disclose material information regarding the true nature of LOOP's "technology", as required by the Quebec Securities Act and other securities law;

16.5   LOOP and the individual Defendants knew, at the time that each of the documents referred to above were released, that they contained a misrepresentation or deliberately avoided acquiring such knowledge at or before that time;

[106]   The Court has several observations. Firstly, no core document was alleged to support the claim that the directors made material misrepresentations. Secondly, as the Court has said, there is no arguable case that any of the documents alleged contained material misrepresentations, so these allegations are without merit.

[107]   A final, not unimportant point, is that the vague nature of the allegations in the application and the lack of precision, as to when some of them were made, makes it

---

[48]   2018 QCCS 2431, confirmed on appeal to C.A.,*Lambert (Gestion Peggy) c. 2993821 Canada inc. (Écolait ltée)*, 2018 QCCA 2189.
[49]   Loop's Code of Ethics.

700-06-000012-205

PAGE : 28

difficult to determine which directors might have been privy to the misrepresentations, but given its conclusion, the Court need not consider this further

## 5.   **JURISDICTION**

[108]   Defendants raise an issue of jurisdiction in relation to Loop Industries Inc., as the company is domiciled in Nevada.

[109]   This argument is without merit, as the real question is whether the damage suffered by Mr. Levy was suffered here. This flows from the judgment of the Supreme Court of Canada in *Infineon Technologies AG* v. *Option consommateurs*:

> [46]                    Quebecor Printing, a case the appellants rely on, should not be read so broadly as to systematically exclude a purely economic loss as a type of damage to which art. 3148(3) applies. Rather, that case indicates that where financial damage is merely recorded in Quebec, that fact is not sufficient to ground jurisdiction under art. 3148(3). To satisfy the requirement of art. 3148(3), the damage must be suffered in Quebec. As Kasirer J.A. explained in the judgment of the Court of Appeal in the case at bar, there is a distinction between damage that is substantially suffered in Quebec and damage that is simply recorded in Quebec on the basis of the location of the plaintiff's patrimony:
>
> > [Préjudice] is to be distinguished from the "dommage/damage" that is the subjective consequence of the injury relevant to the measure of reparation needed to make good the loss. As a result, in specifying "damage was suffered in Québec/un préjudice y a été subi" as the relevant connecting factor, article 3148(3) seeks to identify the substantive situs of the "bodily, moral or material injury which is the immediate and direct consequence of the debtor's default" (article 1607 C.C.Q.) and not the situs of the patrimony in which the consequence of that injury is recorded. [para. 65][50]

[110]   Contrary to the situation in *Ranger v. Aphria*,[51] in this matter the Court cannot conclude that the transaction for the purchase of shares was concluded and settled outside of Quebec. It was transacted through TD direct investing, but there is no evidence that the account was outside of Quebec.

[111]   This does not end the question of competence, given the broad scope of the class that Mr. Levy is seeking to represent.

[112]   The Supreme Court of Canada allowed a national class in *Vivendi Canada Inc. v. Dell'Aniello*:

> [61]                    The group proposed by the respondent includes 250 retirees or surviving spouses of employees who worked in six provinces: Quebec

---

[50]   2013 SCC 59.
[51]   2021 QCCS 534.

(134 members), Ontario (82 members), Alberta (3 members), British Columbia (16 members), Saskatchewan (2 members) and Manitoba (13 members). Since no applicable law was designated in the contracts of employment of the various employees, the law of the province where each employee worked would have to apply to that employee's case (art. 3118 of the *Civil Code of Québec*, S.Q. 1991, c. 64 ("*C.C.Q.*")). According to the motion judge, the multitude of legal schemes applicable to the individual claims is an additional difficulty that demonstrates the proposed group's lack of homogeneity.

[62]             However, the fact that the employees worked in six different provinces is not in itself a bar to the authorization of the class action. In a class action, the court can accept proof of the law applicable in the common law provinces or take judicial notice of that law: art. 2809 *C.C.Q.* Only substantial differences between the applicable legal schemes would cause a class action to lose its collective nature: *Union des consommateurs* (2012), at paras. 120 and 123.

[63]             In the case at bar, the fact that members of the group live in different Canadian provinces should not prevent the court from authorizing the class action. There are common questions in the claims of the members of the proposed group with respect to the legality or the validity of the 2009 amendments.[52]

[113]   However, it is important to note that the Court did not discuss the criteria of article 3148 C.C.P., likely because the trial judge had held the following:

[44]     À la lumière des faits qui nous occupent, la Cour supérieure a compétence en vertu de l'article 3148 (3) C.c.Q. qui indique que les autorités québécoises sont compétentes lorsqu'une faute a été commise au Québec, qu'un préjudice y a été subi, qu'un fait dommageable s'y est produit ou que l'une des obligations découlant d'un contrat devait y être exécutée.

[45]     En effet, un recours collectif peut être exercé pour le compte de personnes non domiciliées au Québec pourvu que chacune d'elles démontre que la cause d'action quant à elle a pris naissance au Québec ou que son contrat y a été conclu.

[46]     En l'espèce, la Requête est fondée sur un contrat de travail liant tous les membres du groupe et un successeur de Seagram (Vivendi), dont le siège social à l'époque était situé à Montréal.[53]

[Reference omitted]

[114]   A national class was also found to be appropriate in *Benamor c. Air Canada*,[54] but Air Canada had agreed that one was appropriate and, considering article 3148 C.C.Q., its head office is in Quebec.

---

[52]   2014 SCC 1.

[53]   *Dell'Aniello c. Vivendi Canada inc.*, 2010 QCCS 3416.

[54]   2020 QCCA 1597.

700-06-000012-205                                                                                    PAGE : 30

[115]  The article reads as follows:

3148. In personal actions of a patrimonial nature, Québec authorities have jurisdiction in the following cases:

(1) the defendant has his domicile or his residence in Québec;

(2) the defendant is a legal person, is not domiciled in Québec but has an establishment in Québec, and the dispute relates to its activities in Québec;

(3) a fault was committed in Québec, injury was suffered in Québec, an injurious act or omission occurred in Québec or one of the obligations arising from a contract was to be performed in Québec;

(4) the parties have by agreement submitted to them the present or future disputes between themselves arising out of a specific legal relationship;

(5) the defendant has submitted to their jurisdiction.

However, Québec authorities have no jurisdiction where the parties have chosen by agreement to submit the present or future disputes between themselves relating to a specific legal relationship to a foreign authority or to an arbitrator, unless the defendant submits to the jurisdiction of the Québec authorities.

[116]  Loop is not domiciled here. Through Loop Canada, it might be argued that it does have an establishment here, but as for the dispute relating to activities in Quebec, that is only the case for the members of the proposed class, who reside in Quebec. The same reality relates to the injury being suffered in Quebec. This only links the dispute to Quebec residents and there is no factual allegation that would allow the Court to conclude that the fault was committed here. In short, there is nothing in the allegations that would allow the Court to take jurisdiction over the claims of the residents of other Canadian provinces or other jurisdictions.[55]

[117]  Were the Court to authorize the class action, it would limit the class to Quebec residents.

## FOR THESE REASONS, THE COURT:

[118]  **DISMISSES** Applicant's Amended Application for Authorization of a Class Action and for Authorization to Bring an Action Pursuant to Section 225.4 of the *Quebec Securities Act*;

[119]  **WITH JUDICIAL COSTS**.

THOMAS M. DAVIS, J.S.C.

---

[55]  *Holcam c. Retaurants Brands International Inc.*, 2022 QCCS 2168, par. 21-25.

700-06-000012-205                                                        PAGE : 31

Mtre Joey Zukran
LPC AVOCAT INC.
Mtre Jean El-Masri
EL MASRI AVOCAT INC.
Lawyers for Plaintiff

Mtre Eric Préfontaine
Mtre Frédéric Plamondon
OSLER, HOSKIN & HARCOURT, S.E.N.C.R.L./S.R.L.
Lawyers for Defendants

Hearing date:                           February 24, 2022.